IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NUMBER:

FLORIDA BAR NUMBER: 283886

MARLANDE LAZARD,
individually and as assignee
of SIGNET IMAGING, LLC,

      Plaintiff,

vs.

OCEANUS INSURANCE COMPANY, a risk
retention group, a foreign corporation,
CNA FINANCIAL CORPORATION,
a foreign corporation d/b/a
COLUMBIA CASUALTY COMPANY,
PARIS-KIRWAN ASSOCIATES, INC., a foreign corporation
MARSH USA, INC., a foreign corporation d/b/a
MARSH and McLENNAN COMPANIES,

      Defendants.

_____/

## C O M P L A I N T

Plaintiff sues the Defendants and state:

1. This is an action for damages in excess of the minimum jurisdictional requirements of the above-entitled Court.

2. Venue is proper in Miami-Dade County, Florida pursuant to §47.051, F.S., since each of the defendants has or usually keeps an office for transaction of its customary business and has agents or other representatives in Miami-Dade County, Florida.

3. At all times material hereto, OCEANUS INSURANCE COMPANY, hereinafter referred to as "OCEANUS," was a foreign corporation

authorized to do and doing business in the State of Florida and in Miami-Dade County, Florida.

4.   At all times material hereto, CNA FINANCIAL CORPORATION was doing business as COLUMBIA CASUALTY COMPANY, hereinafter referred to as "CNA," was a foreign corporation authorized to do and doing business in the State of Florida and in Miami-Dade County, Florida.

5.   At all times material hereto, PARIS-KIRWAN ASSOCIATES, INC., hereinafter referred to as "PARIS," was a foreign corporation authorized to do and doing business in the State of Florida and in Miami-Dade County, Florida.

6.   At all times material hereto, MARSH USA, INC.., hereinafter referred to as "MARSH," was a foreign corporation authorized to do and doing business in the State of Florida and/or was doing business as MARSH and McLENNAN INSURANCE COMPANIES and in Miami-Dade County, Florida.

7.   On September 21, 2013, MARLANDE LAZARD presented to a hospital emergency room with a complaint of a lump in her left breast for one (1) week.  Ultrasound of the left breast was performed and was interpreted as showing a small nodule at 2:00, question lymph node vs. other pathology which could not be excluded.

8.   On October 2, 2013, MARLANDE LAZARD presented to SIGNET DIAGNOSTIC IMAGING SERVICES, LLC, a Florida corporation,

2

hereinafter referred to as "SIGNET", for a repeat left breast ultrasound with a presenting history of left breast pain and swelling and antibiotic treatment for two (2) weeks.  Ultrasound of the left breast was performed and was interpreted by JAMES DOMESEK, M.D.  Dr. DOMESEK's findings of the left breast failed to discuss the mass/nodule at 2:00 o'clock, identified the axillary nodes as normal and identified skin/mantle thickening.  Dr. DOMESEK's impression was that the Plaintiff's left breast was benign.

9.  On October 10, 2013, Elite Imaging, LLC, et. al, hereinafter referred to as "ELITE", entered into a purchase agreement with SIGNET for the purchase of SIGNET's assets including, but not limited to, the subject facility and which was intended to be effective on September 30, 2013.  A copy of the asset purchase agreement is attached and is marked Plaintiff Exhibit #1.

10. Between October, 2013 and June, 2014, MARLANDE LAZARD was seen in follow-up by multiple physicians and surgeons in South Florida for follow-up regarding her left breast; however, no biopsies were ever scheduled or performed and no definitive diagnosis or treatment was rendered.

11. In July, 2014, breast biopsies were performed in Tennessee which were consistent and/or diagnostic for late stage breast cancer.

12. In October, 2013 and at all times material hereto, MARLANDE LAZARD had clinical findings and radiological findings which were

3

consistent and/or diagnostic of early stage breast cancer which was not described and/or diagnosed by JAMES M. DOMESEK, M.D.

13. In December, 2015, MARLANDE LAZARD, filed a medical negligence claim against SIGET, ELITE, Dr. DOMESEK, et. al

14. On December 14, 2016, MARLANDE LAZARD's medical negligence claim against ELITE was mediated and resulted in an eleven ($11,000,000.00) dollar settlement.  See mediation report and consent final judgment attached hereto and marked as Plaintiff Composite Exhibit #2.

15. As part of the aforesaid settlement, ELITE, assigned their legal rights to the plaintiff to pursue a legal claim against the Defendant-insurance companies and Defendant-insurance brokers.  A copy of the assignment is attached hereto and is marked as Plaintiff Exhibit #4.

16. On April 20, 2017, a jury rendered a verdict against SIGNET, U.S. RADIOLOGY and JAMES M. DOMESEK, M.D. in the total amount of $21,585,148.19.  See verdict attached hereto and marked as Plaintiff's Exhibit #3.

17. At all times material hereto, SIGNET and/or ELITE, were insured for the losses claimed herein, by virtue of a policy of insurance issued by OCEANUS bearing policy, #19-2012-405.  Plaintiff is not in possession of the policy, but alleges in good faith the existence of same; in the alternative, SIGNET and/or ELITE were not insured for the losses claimed herein.

4

18. At all times material hereto, ELITE, was insured for the losses claimed herein, by virtue of a policy of insurance issued by CNA bearing policy #HMA 4032149809-0. A copy of the insurance binder and policy with retroactive date of April 29, 2002 are attached hereto and is marked Plaintiff Composite Exhibit #5; in the alternative, ELITE was not insured for the losses claimed herein.

19. At all times material hereto, PARIS, was the insurance agent or insurance broker for SIGNET and/or ELITE and had a fiduciary non-delegable duty to ensure that SIGNET and/or ELITE were properly insured for the losses claimed herein.

20. At all times material hereto, MARSH, was the insurance agent or insurance broker for SIGNET and/or ELITE and had a fiduciary non-delegable duty to ensure that SIGNET and/or ELITE were properly insured for the losses claimed herein.

**COUNT I**

**DECLARATORY RELIEF AGAINST OCEANUS**

21. Plaintiff realleges, readopts and reaffirms each and every allegation contained in paragraphs 1-20 as if expressly set forth herein.

22. This is an action for declaratory relief pursuant to Chapter 86, F.S.

23. Plaintiff is in doubt as to her rights under the terms and providers under the subject policy of insurance pursuant to Florida Law.

24. The subject policy of insurance served to provide liability insurance coverage to SIGNET and/or ELITE, for the losses incurred by Plaintiff. Accordingly, Plaintiff requests that this Court:

    a. Take jurisdiction over this matter for purposes of rendering a declaratory decree;

    b. Order full disclosure of all documents and allow full and liberal discovery of all facts that may lead to admissible evidence relevant to the determinations herein including production of the complete policy of insurance and a complete copy of the written material in the possession of the defendant that would shed light on the issues involved herein;

    c. Declare that any ambiguities in the statutes or policy be construed and interpreted in favor of coverage and in favor of the Plaintiff and against Defendant(s);

    d. Determine the applicable law, including the provisions of Florida Statutes and case law that apply to this policy or to the parties;

    e. Declare that each policy provision not in conformity with Florida Law be amended to confirm with Florida Law;

    f. Declare that the subject policy of insurance is vague, ambiguous and should be construed against the drafter of the contract;

g. Declare that clauses in insurance policies should be strictly and narrowly construed against the drafter of the contract;

h. Declare that defendant is estopped from denying benefits;

i. Determine and declare any other material matters pertaining to the coverage or otherwise as to the respective rights and responsibilities of the parties under the policy is needed to do complete justice in this case.

j. Determine that there is liability coverage applicable to this claim;

k. Retain jurisdiction over the parties and the subject matter to assess reasonable attorneys' fees and costs pursuant to Section 627.428, F.S., and any and all penalties this Court deems just and proper;

l. Declare that the position relied on by Defendant who denied coverage or limited coverage is inapplicable under the totality of the facts and circumstances of the action sued upon;

m. Grant such other relief as this Court deems proper pursuant to Section 86.061, F.S.

WHEREFORE, Plaintiff demands declaratory relief, pursuant to Section 86.011, et seq., F.S., and further demands costs and attorneys' fees pursuant to Section 627.428, F.S., and any other Florida Statues, and other such further relief as this Honorable Court deems just and proper, and demands a trial by jury on all issues so triable as of right by a jury.

7

**COUNT II**
**DECLARATORY RELIEF AGAINST CNA**

25. Plaintiff realleges, readopts and reaffirms each and every allegation contained in paragraphs 1-20 as if expressly set forth herein.

26. This is an action for declaratory relief pursuant to Chapter 86, F.S.

27. Plaintiff is in doubt as to her rights under the terms and providers under the subject policy of insurance pursuant to Florida Law.

28. The subject policy of insurance served to provide liability insurance coverage to SIGNET and/or ELITE for the losses incurred by Plaintiff. Accordingly, Plaintiff requests that this Court:

    a. Take jurisdiction over this matter for purposes of rendering a declaratory decree;

    b. Order full disclosure of all documents and allow full and liberal discovery of all facts that may lead to admissible evidence relevant to the determinations herein including production of the complete policy of insurance and a complete copy of the written material in the possession of the defendant that would shed light on the issues involved herein;

    c. Declare that any ambiguities in the statutes or policy be construed and interpreted in favor of coverage and in favor of the Plaintiff and against Defendant(s);

d.  Determine the applicable law, including the provisions of Florida Statutes and case law that apply to this policy or to the parties;

e.  Declare that each policy provision not in conformity with Florida Law be amended to confirm with Florida Law;

f.  Declare that the subject policy of insurance is vague, ambiguous and should be construed against the drafter of the contract;

g.  Declare that clauses in insurance policies should be strictly and narrowly construed against the drafter of the contract;

h.  Declare that defendant is estopped from denying benefits;

i.  Determine and declare any other material matters pertaining to the coverage or otherwise as to the respective rights and responsibilities of the parties under the policy is needed to do complete justice in this case.

j.  Determine that there is liability coverage applicable to this claim;

k.  Retain jurisdiction over the parties and the subject matter to assess reasonable attorneys' fees and costs pursuant to Section 627.428, F.S., and any and all penalties this Court deems just and proper;

l.  Declare that the position relied on by Defendant who denied coverage or limited coverage is inapplicable under

the totality of the facts and circumstances of the action sued upon;

m. Grant such other relief as this Court deems proper pursuant to Section 86.061, F.S.

WHEREFORE, Plaintiff demands declaratory relief, pursuant to Section 86.011, et seq., F.S., and further demands costs and attorneys' fees pursuant to Section 627.428, F.S., and any other Florida Statues, and other such further relief as this Honorable Court deems just and proper, and demands a trial by jury on all issues so triable as of right by a jury.

## COUNT III
## NEGLIGENCE CLAIM AGAINST PARIS KIRWIN

29. Plaintiff realleges, readopts and reaffirms each and every allegation contained in paragraphs 1-20 as if expressly set forth herein.

30. At all times material hereto, PARIS KIRWIN, was an insurance broker who was acting on behalf of SIGNET and/or ELITE in obtaining and placing professional liability coverage for the imaging center(s) purchased from SIGNET including, but not limited to, the subject facility where the October 2, 2013 ultrasound of Plaintiff's left breast was performed.

31. At all times material hereto, PARIS KIRWIN, had a fiduciary non-delegable duty to properly protect the interest of SIGNET and/or ELITE, and to properly insure the subject facility for the losses

suffered by the Plaintiff as a result of the negligence which occurred at the subject facility on October 2, 2013.

32. PARIS KIRWIN breached its fiduciary non-delegable duty to SIGNET and/or ELITE, by allowing the prior professional liability coverage to lapse, by failing to insure that the subject facility was properly insured on October 2, 2013 and/or by failing to timely and properly advise SIGNET/ELITE that the subject facility was not properly insured for any losses that occurred at the subject facility after ELITE's purchase from SIGNET.

33. That as a direct, proximate and reasonably foreseeable result of the negligence aforesaid, SIGNET and/or ELITE were left without any insurance coverage for the losses suffered by the Plaintiff ultimately resulting the aforesaid negotiated mediation settlement in the amount of $11 million dollars and a jury verdict in the amount of $21,585,148.19.

WHEREFORE, Plaintiff demands judgment against the Defendant for the mediation settlement, consent judgment, the jury verdict, interest, costs and demands jury trial on all issues triable as a matter of right by a jury.

## COUNT IV
## NEGLIGENCE CLAIM AGAINST MARSH USA, INC. d/b/a
## MARSH and McLENNAN INSURANCE COMPANIES

34. Plaintiff realleges, readopts and reaffirms each and every allegation contained in paragraphs 1-20 as if expressly set forth herein.

11

35. At all times material hereto, MARSH was an insurance agent/broker who was acting on behalf of SIGNET and/or Elite Imaging, LLC in obtaining and placing professional liability coverage for imaging center(s) purchased from SIGNET including, but not limited to, the subject facility where the October 2, 2013 ultrasound of Plaintiff's left breast was performed.

36. At all times material hereto, MARSH, had a fiduciary non-delegable duty to properly protect the interest of SIGNET and/or ELITE, and to properly insure the subject facility for the losses suffered by the Plaintiff as a result of the negligence which occurred at the subject facility on October 2, 2013.

37. MARSH breached its fiduciary non-delegable duty to SIGNET and/or ELITE by allowing the prior professional liability coverage to lapse, by failing to insure that the subject facility and its employees were properly insured on October 2, 2013, by failing to timely and properly advise SIGNET and/or ELITE that the subject facility and its employees were not properly insured for any losses that occurred at the subject facility after ELITE's purchase from SIGNET and/or by failing to timely and properly advise SIGNET and/or ELITE that the subject facility and its employees were not insured for the negligence that occurred on October 2, 2013, thereby resulting in plaintiff's referenced losses.

38. As a direct, proximate and reasonably foreseeable result of the negligence aforesaid, SIGNET and/or ELITE were left without any

12

insurance coverage for the losses suffered by the Plaintiff ultimately resulting in a negotiated mediation settlement in the amount of $11 million dollars and a jury verdict in the amount of $21,585,148.19.

WHEREFORE, Plaintiff demands judgment against the Defendant for the mediation settlement, consent judgment, the jury verdict, interest, costs and demands jury trial on all issues triable as a matter of right by a jury.

FRIEDMAN & FRIEDMAN, P.A.
2600 Douglas Road
Suite 1011
Bank of America Building
Coral Gables, FL 33134
(305) 446-6485
f: (305) 448-7636
gary@friedmantriallawyers.com
susy@friedmantriallawyers.com
evelyn@friedmantriallawyers.com

By:/s/Gary Alan Friedman, Esq.
    GARY ALAN FRIEDMAN

# ASSET PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (the "Agreement") is made on this 10th day of October, 2013, intended to be effective on the 30th day of September, 2013, by and between ELITE IMAGING, LLC, a Florida limited liability company ("Elite"), ELITE IMAGING AVENTURA, LLC, a Florida limited liability company ("Aventura"), ELITE IMAGING HOLDING, LLC, a Florida limited liability company ("Holding"), ELITE IMAGING MIAMI BEACH, LLC, a Florida limited liability company ("Miami Beach"), ELITE IMAGING ORANGE PARK, LLC, a Florida limited liability company ("Orange Park"), ELITE IMAGING WESTON, LLC, a Florida limited liability company ("Weston")(Elite, Aventura, Holding, Miami Beach, Orange Park and Weston are collectively referred to as the "LLCs" or the "Sellers"), and MARK ZHUK, M.D., an adult individual and the principal of the LLC's ("the "Principal") and TRISTATE IMAGING GROUP, LP, a Delaware limited partnership ("TSIG"), Tri-State Imaging FL Holdings, LLC, a Florida limited liability company ("FL Holdings"), or another affiliate or subsidiary of TSIG organized for the purposes of taking title to certain of the Assets being conveyed hereunder  (collectively, the "Buyer").

WHEREAS, the Seller owns the assets and properties used at and manages the diagnostic imaging centers listed on Exhibit A attached hereto and made a part hereof (collectively the "Centers"); and

WHEREAS, the Buyer desires to purchase, and the Seller desires to sell, substantially all the assets, tangible and intangible, properties and business related to the Centers including, at Buyer's option, the Membership Interests (hereinafter defined) of Elite; and

WHEREAS, the sale and transfer of the Transferred Assets (as defined below) is a transaction that is intended to qualify as a tax-free transfer and contribution of property pursuant to Section 721 of the Internal Revenue Code of 1986, as amended; and

WHEREAS, as additional consideration, and as a material inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, the Seller desires to make certain representations, warranties, indemnities, covenants and agreements relating to the sale of the Centers; and

WHEREAS, as additional consideration, and as a material inducement to the Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer desires to make certain representations, warranties, indemnities, covenants and agreements relating to the sale of the Centers; and

WHERAS, concurrently with the purchase by Buyer of the Transferred Assets (hereinafter defined), Buyer has agreed to assume certain liabilities and obligations of Seller relating to the operation of the Centers, as delineated herein, upon the terms and conditions set forth herein.

{00399597 6}



NOW, THEREFORE, for and in consideration of the premises and the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, intending to be legally bound, the parties agree as follows:

## 1. CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the respective meanings set forth below:

1.01    "Accounts Payable" means financial obligations of the Seller to third parties which have arisen in the ordinary course of the ongoing operation of the Business and which are properly classified as accounts payable on the balance sheets of the Seller (the "Balance Sheets") in accordance with GAAP.

1.02    "Accounts Receivable" means financial obligations of unaffiliated third parties to the Seller which have arisen in the ordinary course of the ongoing operation of the Business and which are properly classified as accounts receivable on the Balance Sheets in accordance with GAAP.

1.03    "Affiliates" has the meaning set forth in Rule 501 of Regulation D under the Securities Act of 1933, as amended and includes the Owners.

1.04    "Assigned Contracts" means, collectively, the Real Property Leases, Equipment Loans, the Employee Plans (except such rights and interests as are reserved to Seller hereunder),  Seller's rights under certain insurance policies relating to the operation of the Business, as set forth in Schedule 7.17, except for those policies that are Excluded Assets and rights under certain policies that are being assigned to Buyer as part of the Transferred Assets which rights are expressly reserved to Seller and constitute Excluded Assets, as detailed in Section 7.05,  and other contracts and personal property leases of Seller to be assigned to and assumed by the Buyer at the Closing or which are deemed to be assumed by Buyer pursuant to this Section 1.04),  but excluding any security deposits, prepaid rent and prepaid expenses paid thereunder (all of which shall remain the sole property of Seller, subject to the provisions of Section 4.03; a list of security deposits is annexed to Exhibit B (Excluded Assets), and any prepaid rent and prepaid expenses shall be prorated as of the Closing Date pursuant to Section 4.02), plus such contracts and agreements which are not specifically required to be disclosed on <u>Schedule 1.04</u> pursuant to this Section 1.04, but nevertheless shall constitute an Assigned Contract for purposes of this Agreement.  Buyer acknowledges that Seller shall not be required to list on Schedule 1.04: (i) contracts that are cancelable on thirty (30) days notice without further obligation or which involve a total liability of Seller not exceeding $2,500 in any consecutive twelve (12) month period; (ii) purchase orders issued in the ordinary course of the Business for equipment, supplies, inventory, component and replacement parts and contracts or purchase orders for ongoing repair and/or maintenance services to the Centers or any of the Assets; and (iii) those contracts and agreements entered into in the ordinary course of the

Business by Seller between the date hereof and the Closing Date, but each such contract and commitment shall nevertheless constitute an Assigned Contract for purposes of this Agreement.

1.05     "Business" means, collectively, the business of owning the assets of and operating and/or managing the Centers.

1.06     "Disclosure Schedule" means the disclosure schedule attached hereto as Schedule 1.06.

1.07     "Employee Plans" shall mean all "employee benefit plans," as defined in § 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder (collectively, "ERISA"), all specified fringe benefit plans as defined in § 6039D of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder (collectively the "Code"), and all other bonus, incentive compensation, deferred compensation, profit sharing, stock option, severance, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit or welfare plan or employment, consulting, change in control, independent contractor, professional services, confidentiality or non-competition agreement or any other similar plan, agreement, policy or understanding (whether oral or written, qualified or non-qualified) and any trust, escrow or other funding arrangement related thereto, (i) which is currently maintained or contributed to by Seller, or (ii) with respect to which Seller has any liability or obligations to any current or former officer, employee, or service provider of Seller, all of which are listed on Schedule 1.07.

1.08     "Equipment Loans" means those loans and finance leases described on Schedule 1.08 for diagnostic imaging equipment, equipment and other assets.

1.09     "Law" or "Laws" means any and all currently effective federal, state, and local statutes, codes, licensing requirements, ordinances, laws, rules, regulations, decrees or orders of any foreign, federal, state or local government and any other governmental department or agency, and any judgment, decision, decree or order of any court or governmental agency, department or authority.

1.10     "Licenses" means licenses, permits, consents, approvals, authorizations, registrations, qualifications and certifications of any governmental or administrative agency or authority (whether federal, state or local).

1.11     "Liens" means any lien, claim, security interest, mortgage, pledge, restriction, covenant, charge or encumbrance of any kind or character, direct or indirect, whether accrued, absolute, contingent or otherwise.

1.12     "Consultant" means Select Medical Marketing, LLC, a Florida limited liability company and an Affiliate of Seller, which shall enter into the Consulting Agreement with the Buyer or Buyer's designee.

1.13    "Consulting Agreement" means the Consulting Agreement between the Marketer and Buyer or Buyer's designee, in substantially the form of Exhibit "G" attached hereto and made a part hereof

1.14    "Material Adverse Effect" means, with respect to any party, any event, circumstance, change or effect that individually or in the aggregate with all other events, circumstances, changes or effects, is reasonably expected to be materially adverse to the condition (financial or otherwise), properties, assets, liabilities, businesses, operations, or results of operations of such party or to such party's ability to perform its obligations as contemplated in this Agreement.

1.15    "Membership Interest" means all issued and outstanding limited liability company membership interests in Elite currently held by entities affiliated with or controlled by the Principal, namely, Select Medical Group, LLC, MAZ 18 Holdings, Inc. and Omega 44, Inc.

1.16    "Payment Programs" means Medicare, Medicaid, TRICARE, Worker's Compensation, Blue Cross/Blue Shield programs, and all other health maintenance organizations, preferred provider organizations, health benefit plans, health insurance plans, and other third party reimbursement and payment programs for the Business, including without limitation the Seller Payment Programs.

1.17    "Real Property Leases" means the real estate leases for the Centers, and all licenses or permits for the use and occupancy of the premises at which the Centers conduct the Business, all of which are set forth on Schedule 1.17 hereto.

1.18    "Reimbursement / Adjustment Payments" means amounts due or that may become due to Medicare, Medicaid or any other health care reimbursement or payment intermediary, or other third party payor on account of Medicare cost report adjustments or other payment adjustments attributable to any period prior to the Closing Date, or any other form of Medicare or other health care reimbursement recapture, adjustment or overpayment whatsoever, including fines and penalties, with respect to any period prior to the Closing Date, regardless of when such liability is asserted or determined.

1.19    "Taxes" means all taxes of any type or nature whatsoever, including without limitation, income, gross receipts, excise, franchise, property, value added, import duties, employment, payroll, sales and use taxes and any additions to tax and any interest or penalties thereon.

1.20    "Tax Returns" means any and all returns, declarations, reports, claims for refunds and information returns or statements relating to Taxes, required to be filed by the Seller for itself and for the employee benefit plans of the Seller, including all schedules or attachments thereto and including any amendment thereof.

1.21    "Transferred Assets" means all of the assets to be transferred and assigned to the Buyer at the Closing, including, without limitation, those listed on Schedule 1.21 hereto, the Assigned Contracts and the Membership Interests.

## 2.  PURCHASE AND SALE OF ASSETS

2.01    Purchase of Assets.

(a)    Assets.  Subject the terms and subject to the conditions set forth in this Agreement and, except as otherwise expressly set forth herein, at the Closing the Seller shall sell, transfer and assign to the Buyer, free and clear of all liens, pledges, security interests, charges, claims or encumbrances (collectively, "Liens"), all of the Seller's right, title and interest in and to all of the assets, tangible and intangible, properties, rights and business related to the ownership and operation of the Centers, whether tangible, intangible, real, personal or mixed, and wherever located, including the Membership Interests which are actually used in or necessary for the conduct of Seller's Business or otherwise owned by Seller, including, without limitation, the personal property identified on Schedule 1.21 hereto.

Without limitation of the foregoing, the Transferred Assets include all of the Seller's right, title and interest in, to and under:

(i)      all tangible property, medical equipment, computer equipment, inventories (except where prohibited, with respect to drugs, by applicable law or regulation), software and associated licenses (each to the extent transferable), office equipment, furniture, fixtures located at the Centers, and tenant improvements (regardless of whether they are accounted for as an asset on the books of Seller, or of any Affiliate of Seller) other than such tenant improvements as may revert to the landlord upon termination of the applicable lease;

(ii)     Accounts Receivable as of the date of Closing, as set forth on Schedule 4.03;

(iii)    the Assigned Contracts;

(iv)     manufacturers' warranties with respect to tangible assets, to the extent assignable;

(v)      the Seller's telephone and facsimile numbers;

(vi)     the Centers' ACR accreditations, if transferable;

(vii)    the Centers' active and inactive lists of customers, patients and referral sources;

(viii)   to the extent permitted by applicable law and professional ethics, including, without limitation, the Health Insurance Portability and Accountability Act of 1996, as may be amended from time to time

("HIPAA"), patient records and files, as described in Section 5.02(j) hereof.

(ix)    the Membership Interests, and all limited liability company books and records maintained in connection therewith;

(x)    all Licenses, permits, and certificates of need, each to the extent transferable to Buyer,  pursuant to the terms thereof or under applicable law;

(xi)    all intangible property rights, trade names, trademarks (registered or unregistered), copyrights owned by, licensed to or used by Seller in connection with the Centers, and all other properties (tangible and intangible), transferable assets and information necessary to or used in connection with the operation of the business of the Centers;

Notwithstanding the foregoing, the Seller shall not sell, transfer and assign any "Excluded Assets."  The Excluded Assets consist of:

(i)    the LLCs' cash (except to the extent required by Section 4.03);

(ii)    cash equivalents;

(iii)    bank, mutual fund and any other financial accounts of the LLC's;

(iv)    all of the LLC's legal claims, choses in action, causes of action and judgments related to the Business which have arisen and commenced prior to the Closing Date, other than those incident to or associated with the Accounts Receivable;

(v)    the Seller's (other than Elite's) books and records with respect to the Centers;

(vi)    documents and records or privilege (including, without limitation, the attorney-client privilege)

(vii)    security deposits, funds held in escrow for the exclusive or partial benefit of Seller (including the escrow described in Schedule 7.08),  prepaid rent, prepaid expenses, refunds, credits, carrybacks or carryforwards or rebates from taxing authorities for any period ending on or prior to the Closing Date (collectively, "Security Deposits"), subject to adjustment under Section 4.03;

(viii)    tenant improvements to any of the Centers that revert to the landlord pursuant to the terms of the applicable lease;

(ix)    right and funds in connection with any Employee Plan of Seller, or under the trust agreements related to such Plans;

(x)    Seller's entire right, title and interest in and to those insurance contracts and policies and claims that are not part of the Assigned Contracts, including, but not limited to, those certain insurance policies on the lives of Principal ($3,000,000 death benefit; Reliastar Life Insurance Company Policy Number AD20079802) and Dr. Paavo K. Soila ($1,000,000 death benefit; American General Insurance Policy Number YH00572280), and Seller's claims under each of Seller's insurance policies (whether or not such policies are part of the Assigned Contracts), and, subject to Section 7.05 below, all insurance proceeds resulting from a claim not involving or related to any of the Transferred Assets and all credits or refunds in respect of prepayments under Seller's insurance policies and any return of premium resulting from cancellation of any such policies; and

(xi)    any other assets set forth on <u>Exhibit B</u> attached hereto and made a part hereof or expressly designated as Excluded Assets in <u>Schedule 7.22</u> or any other exhibit or schedule to this Agreement.

(b)    <u>Further Transfer of Assets</u>.  Seller acknowledges and agrees that TSIG may further assign and convey the Transferred Assets to FL Holdings and/or another operating subsidiary of TSIG, organized for the purpose of holding and operating the Transferred Assets, and that Buyer may direct that Seller assign and convey certain of the Transferred Assets directly to such subsidiary; <u>provided</u>, <u>however</u>, that notwithstanding such assignment, TSIG shall remain directly and primarily liable for each of Buyers' obligations under this Agreement as if no such assignment had been made.

2.02   <u>Liabilities and Assignment of Assigned Contracts</u>.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing the Seller shall transfer and assign the Assigned Contracts to the Buyer and shall obtain consents to such assignments, and the Buyer shall:

(i)    accept such assignments; and

(ii)    assume, timely pay, discharge and perform when due or payable only those liabilities arising under the Assigned Contracts, from and after the Closing Date, all personal property Tax obligations with respect to the Transferred Assets solely with respect to the current tax period, the Reimbursement / Adjustment Payments, but any such Reimbursement / Adjustment Payments shall be reconciled in the Net Working Capital reconciliation provided for in Section 4.03, and those other liabilities which are listed on <u>Schedule 2.02(b)</u> hereto (collectively, the "Assumed Obligations"), and Buyer shall indemnify and hold harmless Seller from any and liabilities whatsoever accruing following the Closing as to such Assumed Obligations. Except for the Assumed Obligations and the Accounts Payable, to the extent assumed pursuant to Section 2.03 below, the Buyer shall not assume or be bound by any obligations or liabilities of the Seller of any kind or nature, known, unknown, contingent or otherwise, and the Seller shall discharge all such obligations when due.

2.03   Accounts Payable.  At Closing, Buyer shall assume the Accounts Payable of Seller aged less than thirty (30) days as of the Closing Date, a schedule of which shall be prepared by Seller no later than five (5) days prior to the Closing Date, which shall be reviewed and agreed to by Buyer at Closing.  Without limiting the foregoing, prior to Closing Seller shall pay and satisfy all Accounts Payable aged in excess of thirty (30) days as of the Closing Date.

2.04   Excluded Liabilities.   EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER DOES NOT ASSUME AND SHALL NOT BE LIABLE FOR ANY OF THE DEBTS, OBLIGATIONS OR LIABILITIES OF SELLER, SELLER'S BUSINESS, ANY STOCKHOLDER OR ANY AFFILIATE OF SELLER, WHENEVER ARISING AND OF WHATEVER TYPE OR NATURE.  In particular, but without limiting the foregoing, Buyer shall not assume, and shall not be deemed by anything contained in this Agreement (other than Section 2.02, Liabilities and Assignment of Assigned Contracts, or as otherwise expressly set forth in this Agreement) to have assumed and shall not be liable for any debts, obligations or liabilities of Seller, any Affiliate of Seller or Seller's Business (including, without limitation, the LLC's), whether known or unknown, contingent, absolute or otherwise and whether or not they would be included or disclosed in financial statements prepared in accordance with GAAP (the "Excluded Liabilities").   Without limitation of the foregoing, the Excluded Liabilities shall include debts, liabilities and obligations:

(a)   under any real estate lease or personal property lease or any contract or agreement to which Seller is a party or by which Seller or Seller's Business is bound that has not been listed as an Assigned Contract on Schedule 1.04 hereof or otherwise is deemed disclosed and assumed by Buyer pursuant to Section 1.04;

(b)   with respect to any Assigned Contract, accruing during the period prior to the Closing Date;

(c)   arising out of any collective bargaining agreement to which Seller is a party accruing during the period prior to the Closing Date;

(d)   for any employee pension plan or any retirement obligations accruing and/or payable during the period prior to the Closing Date;

(e)   for any obligation for Taxes accruing during the period prior to the Closing Date other than personal property Tax liability for the current tax period with respect to the Transferred Assets, which shall be prorated between Buyer and Seller as of the Closing Date;

(f)   for any liability for local or state sales, use or transfer tax and taxes that may be imposed upon the sale or assignment of the Transferred Assets pursuant to this Agreement and the Assignment and Assumption, Bill of Sale and the transfer of the Membership Interests, regardless of when such obligations may become known and due;

(g)   for any damages or injuries to persons or property or for any tort or strict liability arising from events, actions or inactions in Seller's Business or the operation of Seller's Business prior to the Closing Date;

(h)     arising out of any litigation arising with respect to the period prior to the Closing Date, whether or not threatened or pending on or before the Closing Date;

(i)     incurred by Seller or by Seller's Business for borrowed money;

(j)     for any accounts payable of Seller or any Affiliate of Seller greater than thirty (30) days old as of the Closing Date; and

(k)     for amounts due or that may become due to Medicare, Medicaid or any other health care reimbursement or payment intermediary, or other third party payor on account of Reimbursement / Adjustment Payments attributable to any period prior to the Closing Date, or any other form of Medicare or other health care reimbursement recapture, adjustment or overpayment whatsoever, including fines and penalties, with respect to any period prior to the Closing Date, regardless of when such liability is asserted or determined, which shall be determined and reconciled in the Net Working Capital reconciliation provided for in Section 4.03

The intent and objective of Buyer and Seller is that, except for liabilities explicitly assumed by Buyer hereunder, Buyer does not assume, and no transferee liability shall attach to Buyer pertaining to, any of the Excluded Liabilities. Notwithstanding anything herein to the contrary, for any of the types of liabilities listed in clauses (b) and (e) that are payable prior to Closing which includes a period of time prior to Closing and a period of time after Closing shall be apportioned between Buyer and Seller and reconciled within forty-five (45) days following Closing so that Buyer shall only be responsible for that portion of the bill that covers the period of time after Closing.

2.05    Payment of Sales Taxes; Cooperation with Respect to Taxes.

(a)     Buyer and Seller shall each pay one-half (1/2) of any and all sales, use or other transfer taxes payable by reason of the transfer and conveyance of the Transferred Assets hereunder.  The parties will prepare and deliver and if necessary file at or before Closing all transfer tax returns and other filings necessary to vest in Buyer full right, title and interest in the Transferred Assets.

(b)     The party which has the primary obligation to do so under applicable law shall file any Tax Return that is required to be filed with respect to Taxes, and shall pay the Taxes shown on such Tax Return and notify the other party in writing of such other party's share of the Taxes for which it is responsible pursuant to this Agreement, if any, and the method in which such Taxes and share of Taxes were calculated. The party receiving the notice shall reimburse the paying party for the share of Taxes so paid within ten (10) calendar days after receipt of such notice.

(c)     The parties to this Agreement shall cooperate, including, without limitation, during times of audit by taxing authorities and in preparation of Tax Returns, to avoid payment of duplicate or inappropriate Taxes, and each party shall furnish, at the reasonable request of the other, proof of payment of any such Taxes or any other documentation that is a prerequisite to avoiding payment of a duplicate or inappropriate

Tax. Such cooperation shall include, without limitation, furnishing information regarding prior years' Tax Returns and related work papers, rulings, and determinations by any tax authority.

(d)     The parties agree, to the extent applicable, to adopt the alternative procedure for preparing and filing Forms W-2 as set forth in Rev. Proc. 2004-53.

(e)     Buyer acknowledges that Elite intends to file IRS Form 930 effective as of the Closing Date, and Seller shall be entitled to retain copies of such records as may be necessary or appropriate, in the opinion of Elite and its tax accountants, in order to make such filing.

## 3.  OTHER PROVISIONS RELATING TO THE PURCHASE AND SALE OF THE TRANSFERRED ASSETS

3.01   Further Assurances.  At any time and from time to time after the Closing, at the request and at the sole expense of the Buyer, and without further consideration, the Seller shall execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation as may be reasonably requested by the Buyer in order to more effectively transfer, convey and assign to the Buyer, to confirm the Buyer's title to, and to put the Buyer in possession of, the Transferred Assets, free and clear of Liens.

## 4.  PURCHASE PRICE

4.01   Purchase Price.  In consideration for the Transferred Assets, the representations and warranties and the covenants and agreements set forth herein, including the assumption of the Assumed Obligations, the Buyer shall tender to Select Medical Group, LLC, as Seller's designee,  fully-paid, non assessable Class A limited partnership interests in TSIG (to be evidenced by a Unit Certificate, delivered to Seller on the Closing Date), equal to twelve and one-half percent (12.5%) of all issued and outstanding partnership interests (of all classes) in TSIG as of the Closing Date, subject to the terms and conditions of TSIG's Limited Partnership Certificate and the Limited Partnership Agreement (the "Purchase Price"), and subject to adjustment as provided hereinbelow.  Seller shall also be entitled to appoint the Principal (or in the case of his death or mental incapacity, Catarina Fara, or another representative reasonably satisfactory to a majority of the Board of Directors of the General Partner of Buyer) to the Board of Directors of the General Partner of TSIG on the Closing Date and such right of appointment shall continue thereafter so long as Seller, Principal or one or more of their Affiliates remains a limited partner of TSIG.

4.02   Pro-Rations.  Seller and Buyer shall prorate as of the Closing Date, any amounts which become due and payable on or after the Closing Date with respect to (i) the Assigned Contracts, (ii) all real estate taxes for the current term(s) or fiscal year(s) imposed by whatsoever jurisdictions shall be prorated between Buyer and Seller as of the Closing Date based upon the applicable term or fiscal year of such taxes; (iii) all utilities servicing any of the Centers, including without limitation, water, sewer, telephone, electricity and gas service; (iv) and (v) all other normal and customarily proratable items.  The parties shall prepare and initial a

{00399597 6}                          - 10 -

reconciliation statement setting forth such prorations within forty-five (45) days following the Closing, with payments to be made by Seller to Buyer, or by Buyer to Seller, as applicable, concurrently with the delivery and initialing of the reconciliation statement.

4.03    Net Working Capital Adjustment.    For purposes of this Agreement, the "Net Working Capital" shall mean the net difference between (a) collected Accounts Receivable for all periods prior to the Closing Date, adjusted for contractual allowances and bad debts, plus cash on hand at Closing, plus the Security Deposits, minus (b) the sum of all Accounts Payable, Accrued Expenses arising from Center operations, any Reimbursement / Adjustment Payments made for periods prior to Closing, accrued payroll and accrued payroll taxes and other accrued Employee Benefits (hereafter defined), and the expenses and liabilities described in Schedule 4.03, all as computed as of the Closing Date (collectively, "Qualified Payables"). For the avoidance of doubt, Qualified Payables shall not include Excluded Liabilities, and any payables due to Seller's professionals, including, without limitation, accountants and attorneys, arising from this Agreement and the transactions contemplated herein.  For purposes of the foregoing, it is agreed that such computations shall be made based on generally accepted accounting principles, consistently applied.

The determination of the Net Working Capital shall be made as of September 30, 2013, and shall be computed by Buyer on or before March 31, 2014.   Buyer's accountant shall prepare the calculation of Net Working Capital as of September 30, 2013, and both parties shall receive copies of same and supporting schedules (the "NWC Calculation").  If Seller does not object in writing to the NWC Calculation within thirty (30) days following receipt ("Notice of Disagreement"), the NWC Calculation shall be deemed to have been accepted by Seller and shall become final and binding upon the parties.

During the ten (10) days immediately following the delivery of a Notice of Disagreement, Seller and Buyer shall seek in good faith to resolve any differences that they may have with respect to any matter specified in the Notice of Disagreement.  If, at the end of such ten (10) day period, Seller and Buyer have been unable to resolve such differences, then Seller and Buyer shall submit to an independent accounting firm of recognized national or regional standing mutually selected by Seller and Buyer (such accounting firm, the "Independent Accounting Firm") for review and resolution of any and all matters that remain in dispute with respect to the Notice of Disagreement.  Buyer and Seller shall cause the Independent Accounting Firm to use commercially practicable efforts to make a final determination of the NWC Calculation within twenty (20) days from such submission, and such final determination shall be final and binding on the parties.  The cost of the Independent Accounting Firm's review and determination shall be split between and paid by Seller and Buyer a proportionate basis, based upon the relative amount by which the determination of the amount of the NWC Calculation of each of them differed from that determined by the Independent Accounting Firm.  During the twenty (20) day review by the Independent Accounting Firm, Buyer and Seller will each make available to the Independent Accounting Firm interviews with such individuals and such information, books and records as may be reasonably required by the Independent Accounting Firm to make its final determination.

At Closing, Buyer shall retain the Security Deposits as security for Seller's obligations under this Section 4.03 and shall not reimburse them to Seller.  If the Net Working Capital is less

than One Hundred Thousand Dollars ($100,000.00)(the "Shortfall"), as determined in the NWC Calculation, then Buyer shall be entitled to a credit against the Security Deposits equal to the Shortfall, and shall reimburse to Seller any remaining Security Deposits.  If the Shortfall is in excess of the retained amount of the Security Deposits, Seller shall pay to Buyer, in cash, within fifteen (15) days of the final determination of Net Working Capital, funds sufficient to cover such excess.  If Seller is unable to pay the entire Shortfall in cash within such fifteen (15) day period, Buyer shall be entitled to deduct any remaining balance of the Shortfall from fees payable to Select Medical Marketing, LLC under the terms of the Consulting Agreement, by deducting one-sixth (1/6) of the remaining balance of the Shortfall from each of the six (6) monthly installments next due under the Consulting Agreement.  If the Net Working Capital is greater than One Hundred Thousand Dollars ($100,000.00)("Excess NWC"), then Buyer shall, within fifteen (15) days of the final determination of Net Working Capital, reimburse to Seller the retained amount of the Security Deposits and pay to Seller, in cash, the amount of the Excess NWC.  The amount of such Excess NWC or Shortfall shall be treated as an adjustment in the Purchase Price.

Nothing herein shall be deemed to limit or prevent Buyer from asserting against Seller any appropriate claim for indemnification as provided in this Agreement with respect to any Account Payable, cost, expense, loss or other liability accrued by Seller or the Centers prior to Closing that is not expressly satisfied in connection with the NWC Computation.

4.04   Allocation of Purchase Price.  Buyer and Seller acknowledge and agree that the agreed monetary value of the Purchase Price is Five Million Dollars ($5,000,000), which shall be allocated to the Transferred Assets in accordance with Schedule 4.04 hereto.  The amount allocated herein to the covenant not to compete is not intended by the parties as a measure of damages that might be incurred by Buyer in the event of a breach of such covenant.  Buyer and Seller agree to report the transactions contemplated by this Agreement for federal and state income tax purposes in accordance with such allocation.  The parties shall execute all forms required to be filed for tax purposes with any taxing authority in a manner consistent with the allocation on Schedule 4.04 hereto.

4.05   Negotiated Value.  The parties agree that the monetary value of the Purchase Price and the Purchase Price allocation set forth on Schedule 4.04 reflect the fair value of the Seller's Business and the fair values of the Transferred Assets, respectively, agreed to by the parties hereto as a result of arms' length negotiations.  The parties agree that no consideration is or will be paid for the value of any patient referrals (direct or indirect) to or from Buyer, Seller or any of their Affiliates.

# 5. CLOSING; CLOSING DELIVERIES

5.01   Closing.  The closing of the sale of the Transferred Assets and the assumption of the Assumed Obligations pursuant to this Agreement (the "Closing") shall take place via electronic and overnight courier exchange of the documents and deliveries of Buyer and Seller provided for herein, not later than fourteen (14) days after the conditions to closing in Section 6 have been satisfied.  The anticipated Closing date is September 30, 2013, or, if the Closing does

not occur on such date, on such later date that is not later than fourteen (14) days after the conditions to closing in Section 6 have been satisfied, or on such other date or at such other place as may be mutually agreed upon by the parties (the "Closing Date"), but not later than October 14, 2013.

5.02    <u>Closing Deliveries of the Seller</u>.   At the Closing, as a condition of the Buyer's obligations to consummate the transactions contemplated by this Agreement, the Seller shall cause to be delivered to the Buyer (or Buyer's designee) the following (or receive the Buyer's written waiver with respect thereto):

(a)    <u>Bills of Sale and Assignments</u>.   One or more General Assignment and Bill of Sale in the form attached hereto as <u>Exhibit C</u>.

(b)    <u>Assignment and Assumption of Assigned Contracts</u>.   The Assignment and Assumption of Assigned Contracts in the form attached hereto as <u>Exhibit D</u> ("Assignment of Contracts"), duly executed by the Seller.

(c)    <u>Assignment and Assumption of Leases</u>.   Assignment and Assumption of Lease, duly executed by the Seller, along with Consents to Lease Assignment and Lease Estoppel Certificates duly executed by the respective landlords for the Real Property Leases for the Centers, in the form attached hereto as <u>Exhibit E</u> (collectively, "Assignment of Leases"), dated and effective as of the Closing Date.

(d)    <u>Transfer of Membership Interests</u>.   A duly executed assignment and transfer of the Membership Interest, in substantially the form of <u>Exhibit F</u> attached hereto.

(e)    <u>Resolutions</u>.   A copy of the resolutions of the Managers and Members of the Seller certified by a duly elected officer as being complete and correct as of such date, authorizing and approving the execution, delivery and performance of this Agreement and the transactions contemplated hereby and the acts of the officers and employees of the Seller in carrying out the terms and provisions hereof.

(f)    <u>Closing Certificate</u>.   A certificate of an officer of the Seller delivered pursuant to Sections 6.01(a) and (b).

(g)    <u>Keys.</u>   All keys and possession and unencumbered right of occupancy and use of the Premises occupied by Sellers, and all keys, passwords, and security codes to any equipment transferred to the Buyer pursuant to this Agreement.

(h)    <u>Good Standing Certificate</u>.   A good standing certificate for each of the LLC's from its state of organization, dated no more than thirty (30) days prior to the date of Closing.

(i)    <u>Third Party Consents</u>.   All Third Party Consents in form and substance reasonably satisfactory to the Buyer.

(j)     Government Approvals.  All Governmental Approvals and consents by necessary governmental authorities to the transfer or reissuance to the Buyer of all Licenses for the Centers in form and substance satisfactory to the Buyer;

(k)     Patient Records.  Ownership and custody of the patient records to the Buyer, and the Buyer shall cause the patient records to be maintained for a period that shall not be less than the minimum retention period required by Florida law or United States law, whichever is greater.  The Seller shall be entitled to make and retain a copy of such patient records prior to Closing.  If Seller reasonably determines that patient records or other information relating to the Transferred Assets (which information the Buyer shall retain in accordance with state and federal law) is needed on or after the Closing Date in connection with a governmental investigation, a legal proceeding, or other situation, but such information was transferred to the Buyer as part of the transaction described in this Agreement, then, upon reasonable request from the Seller, the Buyer agrees that it shall promptly, and in no event later than five (5) business days after such request, cooperate with the Seller to provide such information.  The Buyer shall, to the extent permitted by law, be entitled to impose a reasonable charge for the cost of copying such records (including, without limitation, imaging disks, films, reports and logbooks).

(l)     Consulting Agreement.  The Consulting Agreement executed and delivered by the Consultant.

(m)     Other Documents.  Such other documents and instruments, each in a form reasonably satisfactory to the Buyer and its counsel, as may be reasonably requested by the Buyer in order to carry out the transaction contemplated by this Agreement and to vest good and marketable title in the Transferred Assets in the Buyer, free and clear of all Liens.

5.03    Closing Deliveries of the Buyer.  At the Closing, as a condition of the Seller's obligation to consummate the transactions contemplated by this Agreement, the Buyer shall deliver or cause to be delivered to the Seller the following (or receive the Seller's written waiver with respect thereto):

(a)     Purchase Price.  The Buyer shall deliver the Purchase Price as provided in Section 4.01, including a fully executed copy of the Limited Partnership Agreement of TSIG and a Limited Partnership Unit Certificate evidencing ownership by Select Medical Group, LLC of a 12.5% Class A Limited Partnership Interest.

(b)     Resolutions.  A copy of the resolutions of the General Partner of the Buyer and or the Managers/Members of Buyer's designee, certified by a duly elected officer as being complete and correct as of such date, authorizing and approving the execution, delivery and performance of this Agreement and the transactions contemplated hereby and the acts of the officers and employees of the Buyer in carrying out the terms and provisions hereof.

(c)     Assignment and Assumption of Contracts.  The Assignment of Contracts, duly executed by the Buyer.

(d)     <u>Assignment and Assumption of Leases</u>.  The Assignment of Leases, duly executed by the Buyer.

(f)     <u>Consulting Agreement.</u>  The Consulting Agreement, duly executed by the Buyer or the Buyer's designee, <u>provided</u>, that TSIG shall remain directly and primarily liable for Buyer's or its designee's obligations under said Agreement.

(g)     <u>Other Documents</u>.  Such other documents and instruments, each in a form reasoanbly satisfactory to the Seller and its counsel, as may be reasonably requested by the Seller in order to carry out the transaction contemplated by this Agreement and to vest good and marketable title in the Transferred Assets in the Buyer, free and clear of all Liens, and to effectuate the assignment of the Assigned Contracts and the assumption by the Buyer of the Assumed Obligations.

# 6.  CONDITIONS

6.01   <u>Conditions to Buyer's Obligations</u>.  At the Closing, it shall be a condition of Buyer's obligation to consummate the transactions contemplated by this Agreement that the following shall be true:

(a)     <u>Representations and Warranties True</u>.  All representations and warranties of the Seller contained in this Agreement shall be true and accurate when made and, except:

(i)     as a result of the taking of any action contemplated hereby, or

(ii)     insofar as any representation or warranty relates to any specified earlier date, shall be true and accurate as of the Closing Date in all material respects, as though such representations and warranties were then made.  On such date, a duly elected and currently serving officer of the Seller shall have executed and delivered to the Buyer a certificate to such effect.

(b)     <u>Performance</u>.  The Seller shall have performed and complied, in all material respects, with all covenants and agreements contained herein required to be performed or complied with by them prior to or at the Closing Date.  A duly elected and currently serving officer of the Seller shall have executed and delivered to the Buyer a certificate to such effect.

(c)     <u>Closing Deliveries</u>.  The Seller shall have delivered all of the resolutions, certificates, documents and instruments required to be delivered by it by this Agreement, including, without limitation, those specified in Section 5.02 hereof.

(d)     <u>Orders, Decrees, Judgments</u>.  No order, decree or judgment of any court or governmental body shall have been issued and remain in effect at such date restraining, prohibiting, restricting or delaying the consummation of the transactions contemplated by

this Agreement, and no proceeding (including, without limitation, under bankruptcy laws) for the issuance of any such order, decree or judgment shall be pending.

(e)     Consents.   All Third Party Consents or approvals required for the consummation of the transactions contemplated by this Agreement by any third party shall have been obtained.

(f)     Governmental Approvals.   All approvals, consents, permits or licenses from any federal, state or local governmental agency or body required in connection with the consummation of the transactions contemplated hereby shall have been duly obtained to the extent that such approvals, consents, permits or licenses can be legally obtained prior to such date.

(g)     No Changes or Destruction of Property.   Between the date hereof and the Closing Date, there shall have been (a) no material adverse change in the business of the Centers or any of the Transferred Assets; and (b) no damage, destruction, loss or claim or condemnation or other taking materially adversely affecting the Centers or the Transferred Assets that has not been repaired or replaced in accordance with Section 9.04 hereof.

(h)     Review of Proceedings.   All actions, proceedings, instruments and documents required to carry out the transactions contemplated by this Agreement or any other agreement to be executed and delivered by any of the parties hereunder or in connection herewith shall be subject to the reasonable approval of the Buyer's counsel, and the Seller shall have furnished to such counsel such documents as such counsel may have reasonably requested for the purpose of enabling such counsel to pass upon legal matters incidental thereto.

(i)     Equipment Loan Financing.   Buyer shall have obtained the consent of the holders of the Equipment Loans to the transfer of the same from Seller to Buyer.

(j)     Due Diligence Review.   Buyer, directly and through its representatives, shall have been afforded an opportunity to conduct such financial, legal, operating and managerial due diligence review of the Centers as it deems appropriate, and the results of such due diligence review shall be satisfactory to Buyer. The personnel, auditors and counsel of Seller shall cooperate with this due diligence review.   Such review may include, without any limitation, a review of matters relating to title to assets (including, with respect to the Real Property, environmental, structural and other investigations), condition and operability of equipment in the Centers, compliance by Seller with environmental, employment, Medicare, Medicaid, or any other laws, rules or regulations, and accounting practices and procedures, solely related to the Seller's operation of the Centers.   Buyer shall have completed the foregoing due diligence review on or before September 30, 2013 and the condition to Closing described in this Paragraph 6.01(j) shall be deemed satisfied if Buyer has not terminated this Agreement by 12:01 a.m. October 1, 2013 by reason of the non-fulfillment of said condition.

(k)     Closing of Signet Acquisition.   Buyer's Affiliate shall have closed, contemporaneously with the Closing hereunder, on the acquisition of certain assets of Signet Diagnostic Imaging Services, LLC and its Affiliates, pursuant to the Asset Purchase Agreement dated as of September 30, 2013.

In the event that any of the foregoing conditions are not satisfied by the Closing Date, Buyer shall have the right to terminate this Agreement upon written notice to Seller, whereupon Agreement, except for the Confidentiality provisions of Section 12.02, shall thereafter be null and void, and neither party shall any further rights or obligations hereunder.   The parties acknowledge that the non-disclosure letter agreement dated September 14, 2012 by and between Seller, Principals and TSIG is and remains in full force and effect and shall not be superseded by this Agreement.

6.02    Conditions to the Seller's Obligations.   At the Closing, it shall be a condition to the Seller's obligation to consummate the transactions contemplated by this Agreement that the following shall be true:

(a)     Representations and Warranties True.   All representations and warranties of the Buyer contained in this Agreement shall be true and accurate when made and, except:

(i) as a result of the taking of any action contemplated hereby, or

(ii) insofar as any representation or warranty relates to any specified earlier date, shall be true and accurate as of the Closing Date in all material respects, as though such representations and warranties were then made by the Buyer.  On such date, a duly elected and currently serving officer of the Buyer shall have executed and delivered to the Seller a certificate to such effect.

(b)     Performance.   The Buyer shall have performed and complied in all material respects with all agreements and covenants contained herein required to be performed or complied with by the Buyer prior to or at the Closing Date.  A duly elected and currently serving officer of the Buyer shall have delivered a certificate to the Seller to such effect.

(c)     Closing Deliveries.   The Buyer shall have delivered the Purchase Price and all of the resolutions, certificates, documents and instruments required to be delivered by it by this Agreement.

(d)     Orders, Decrees, Judgments.   No order, decree or judgment of any court or governmental body shall have been issued and remain in effect at such date restraining, prohibiting, restricting or delaying the consummation of the transactions contemplated by this Agreement.

(e)     Governmental Approvals.  All approvals, consents, permits or licenses from any federal, state or local governmental agency or body required of the Buyer in connection with the consummation of the transactions contemplated hereby shall have been obtained, to the extent that such approvals, consents, permits or licenses can be legally obtained prior to such date.

(f)     Review of Proceedings.   All actions, proceedings, instruments and documents required to carry out the transactions contemplated by this Agreement or any other agreement to be executed and delivered by any of the parties hereunder or in connection herewith shall be subject to the reasonable approval of the Seller's counsel, and the Buyer shall have furnished to such counsel such documents as such counsel may have reasonably requested for the purpose of enabling such counsel to pass upon legal matters incidental thereto.

(g)     Consents.  All Third Party Consents or approvals required for the consummation of the transactions contemplated by this Agreement by any third party shall have been obtained.

# 7.  REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer as follows, except as disclosed in the Disclosure Schedule:

7.01    Organization and Authority.  Each of LLC's is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of its organization and the jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it in connection with the Business makes such qualification or licensing necessary.  The Principal is *sui juris*, and has the authority to execute this Agreement and the other instruments and documents to be executed pursuant to this Agreement.

7.02    Power and Authority.  The Seller has full power and authority to carry on its business as now being conducted and to own, operate and lease its properties in the places where such business is now conducted and where such properties are now owned, leased or operated. This Agreement and the transactions contemplated hereby have been duly approved by all necessary action on the part of the Seller.  The Seller has full power and authority to enter into this Agreement and to consummate the transactions contemplated hereby, and this Agreement and all other agreements to be executed and delivered by the Seller in connection herewith constitute the legal, valid and binding obligations of the Seller enforceable against them in accordance with their respective terms.

7.03    Compliance.  The execution and delivery of this Agreement, together with all documents and instruments contemplated herein (the "Transaction Documents") and the consummation of the transactions contemplated thereby by the Seller shall not:

(i)       violate any provision of the organizational documents of either of the LLCs,

(ii)       violate any provision of or result in the breach of or entitle any party to accelerate (whether after the giving of notice or lapse of time or both) any obligation under, any mortgage, Lien, lease, contract, license, instrument or any other agreement to which the Seller is a party or to which any property of the Seller is subject,

(iii)       result in the creation or imposition of any Lien, charge, pledge, security interest or other encumbrance upon the Transferred Assets or the Seller's Business, or

(iv)       violate or conflict with any court order, judgment or decree, or any law, ordinance or regulation to which the Seller, any of the Seller's properties, or the Transferred Assets is subject.

7.04    <u>Consents and Approvals.</u>

(a)       <u>Governmental Consents and Approvals.</u>  No registration or filing with, or consent or approval of, or other action by, any federal, state or other governmental agency or instrumentality is or will be necessary for the valid execution, delivery and performance of this Agreement by the Seller and the transfer of the Transferred Assets to the Buyer, that has not been obtained by Seller (each, a "Governmental Approval").

(b)       <u>Third Party Consents.</u>  Except for the consents to assignment of the Real Property Leases from the respective landlords for the Centers and for the consent to the transfer of the Assigned Contracts and Equipment Loans, no material consent, approval or authorization of any non-governmental third party is required in order to consummate the transactions contemplated hereby or to vest full right, title and interest in the Transferred Assets free and clear of any Lien upon the Buyer, all without any change in the Transferred Assets and all rights therein after Closing (each, a "Third Party Consent").

7.05    <u>Transferred Assets.</u>  The Seller is the sole and exclusive legal and equitable owner of all right, title and interest in, and has good, clear, indefeasible, insurable and marketable title, to all of the Transferred Assets free and clear of all Liens (except with respect to the equipment subject to the Equipment Financing).  **Buyer acknowledges and agrees that, except as otherwise expressly provided herein, the Transferred Assets constituting personal property are being sold, assigned, and transferred to buyer in their "As Is" "Where Is" condition with all faults and without any warranty, express or implied, including, without limitation, any warranty of merchantability or fitness for a particular purpose.**  Except as set forth in the next sentence, the Transferred Assets constituting medical imaging diagnostic equipment are, in the aggregate, in reasonable working condition, excepting only periodic termporary shutdowns for maintenance which, individually and in the aggregate, have not resulted in a material interruption in the operation of the Centers within the past one (1) year.

Buyer acknowledges its awareness that one diagnostic imaging unit located at the Miami Beach Center, specifically a Siemens CT Scanner, Sensation 64 Model leased by Miami Beach, is currently non-operational and has not been operating continuously during the past one (1) year. Seller has filed an insurance claim with respect to said imaging unit to compensate Seller for the cost of attempting to repair the unit and for lost revenues and, in addition, may institute legal proceedings against Florida Power & Light (FPL) and/or others responsible for the non-operational condition of said unit. Buyer agrees that, notwithstanding anything in Section 2.01 to the contrary, Seller shall be entitled to retain for its own account any and all proceeds with respect to such insurance claim up to the first One Hundred Thousand Dollars ($100,000), with Buyer being entitled to any proceeds in excess of One Hundred Thousand Dollars ($100,000), and, further, shall be entitled to all damages recovered from third parties other than the insurer with respect to the foregoing matter.

The Seller will transfer, convey and assign to the Buyer at Closing all of the Transferred Assets free and clear of any and all Liens (except for security interests securing the Equipment Financing).

7.06    Leases. As to each of the Leases identified on Schedule 1.16, as of the Closing Date:

(i)    such Lease is legal, valid, binding, enforceable and in full force and effect, and there is not under such Lease, nor has there been threatened or asserted, any existing material breach or material default or event of material default or event which with notice or lapse of time or both would constitute such a default;

(ii)    such Lease shall continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing, as applicable;

(iii)    there are no disputes, oral agreements or forbearance programs in effect as to any such Lease;

(iv)    the Seller which entered into such Lease has performed and satisfied in full all obligations to be performed under such Lease;

(v)    the Seller has not granted any subleases or entered into any sharing or similar arrangements with respect to the property covered by such Lease; and

(vi)    the Seller has furnished the Buyer with a true correct and complete copy of such Lease, together with all amendments thereto.

7.07    Contracts.

(a)    As of the Closing Date, the Seller is not in material default under the terms of any the Assigned Contracts, including the Equipment Loans. To Seller's knowledge, no event has occurred that would constitute a material default by the Seller under any

Assigned Contract, nor has the Seller received any notice of any default under any Assigned Contract. To the Seller's knowledge, the counterparties to the Assigned Contracts are not in default under the terms thereof, nor has any event occurred that would constitute a default by any such counterparty under any Assigned Contract, nor has the Seller received any notice of any such counterparty's default under any Assigned Contract.

(b)     The Assigned Contracts are valid and binding obligations and in full force and effect and have been entered into in the ordinary course of business, consistent with past practice. The Seller has not received any notice from any other party to a Assigned Contract of the termination or threatened termination thereof, nor any claim, dispute or controversy thereon, and has no knowledge of the occurrence of any event which would allow any other party to terminate any Assigned Contract, nor has the Seller received notice of any asserted claim of default, breach or violation of, any Assigned Contract and there is no basis therefor.

(c)     Consummation of the transactions contemplated by this Agreement will not constitute a default under any material Assigned Contract, nor will it trigger any other provision in a material Assigned Contract that would result in a change in such Assigned Contract, including without limitation the requirement for a transfer fee or new deposit, or termination thereof.

(d)     As of the Closing there shall be no leases, conditional or installment sale or other contracts affecting the Transferred Assets other than the Assigned Contracts. The Seller has made available to the Buyer complete and correct copies of each of the Assigned Contracts, together with all amendments thereto, and Buyer acknowledges receipt thereof. All of the Assigned Contracts are in full force and effect on the date hereof and all parties thereto have performed all obligations required to be performed by them through the date hereof and shall perform such obligations through the Closing Date.

7.08     Litigation. There are no current claims, actions, suits, litigation, proceedings or, to the best of Seller's knowledge, investigations (arbitration or otherwise) pending, or, to the best of the Seller's knowledge, information and belief, threatened against the Seller with respect to the Business or the Transferred Assets at law or in equity in any court or before or by any governmental authority, except as set forth in Schedule 7.08, which includes reference to an ongoing dispute with adjacent suite tenant at Miami Beach (the "Miami Beach Dispute"). The Seller has not received any written or oral claim, complaint, incident report, threat or notice of any such proceeding or claim. There are no outstanding orders, writs, judgments, injunctions or decrees of any court, governmental agency or arbitration tribunal against, involving or affecting the Seller or the Seller's right, title and interest in, or ability to convey, the Transferred Assets, and there are no facts or circumstances which may result in the institution of any such action, suit, claim or legal, administrative or arbitration proceeding or investigation against, involving or affecting the Transferred Assets or the transactions contemplated hereby. The Seller is not in default in respect of any judgment, order, writ, injunction or decree of any court or other governmental authority with respect to the Business or

the transactions contemplated by this Agreement.  No liability arising out of any of the matters identified on the <u>Disclosure Schedule</u> in connection with this Section 7.08 shall become, following the Closing, a liability of the Buyer, or otherwise impact or diminish the value of the Transferred Assets.

7.09   <u>Membership Interest</u>.  The Members own one hundred percent (100%) of the outstanding and issued membership interests of each of the LLC's.  The Members have provided to Buyer a true and correct copy of the Operating Agreement of each of the LLC's and any supplements or amendments thereto.  As of the Closing, neither the Members nor any of the LLC's will be a party to any agreement, written or oral, creating rights with respect to the Membership Interest in any third person or relating to the sale, transfer, assignment or voting of the Membership Interest, except for this Agreement.  The Members are the lawful owner of all of the Membership Interest, free and clear of all security interests, pledges, liens, encumbrances, equities and other charges.   There are no existing warrants, options, purchase agreements, redemption agreements, restrictions of any nature, calls or rights to subscribe of any character relating to the Membership Interest, nor are there any securities convertible into such Membership Interest.  None of the LLC's has any subsidiaries.

7.10   <u>Environmental Matters.</u>

(a)   <u>Definitions</u>.  For purposes of this Section 7.10, the following terms shall have the indicated meanings, unless the context or use indicates another or different meaning:

"Applicable Environmental Laws" shall mean all federal, state, foreign and local statutory laws, rules or regulations, agreements with governments, court orders, administrative orders and case law pertaining to the health or the environment, or petroleum products or hazardous substances and all amendments, modifications and additions thereto, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Resource Conservation and Recovery Act of 1976; the Superfund Amendments and Reauthorization Act of 1986; and the Toxic Substances Control Act; and regulations or rules promulgated under each of the foregoing.

"Hazardous Substances" shall mean pollutants, contaminants, dangerous substances, toxic substances, hazardous wastes, hazardous materials or hazardous substances as defined in or pursuant to any Applicable Environmental Law.  Included within the definition of Hazardous Substances, but without limiting same, are (i) any PCB electrical transformers, capacitors or other PCB equipment, (ii) any asbestos containing materials, (iii) any gasoline, fuel oil or other storage tanks - be they above ground or underground, (iv) any raw chemical or waste chemical storage facilities, or (v) any actual or potential contaminate that may be identified as "toxic substance(s)" by Applicable Environmental Laws.

To Seller's knowledge, there has been no:

      (a)      release or threatened release of any Hazardous Substance, resulting from any activity by or on behalf of the Seller or any predecessor in interest, including but not limited to, the generation, handling, storage, treatment, transportation or disposal of any hazardous waste at the premises on which the Centers is located (the "Premises");

      (b)      past or future action taken or to be taken by any federal, state or local entity or by any private party under any federal, state or local statute, rule, regulation or guideline concerning the release of any Hazardous Substance into the soil, air, surface or subsurface waters or the environment in general from the Premises; and

      (c)      claims or actions brought or which may be brought by any third party against the Seller for damages occurring at or outside of the Premises resulting from the alleged release or threatened release of any hazardous substance, pollutant or contaminant by the Seller or, to the best of its knowledge, any predecessor in interest, including but not limited to, claims for health effects to persons, property damage and/or damage to natural resources; nor does the Seller have any knowledge of any basis for any of the foregoing.  Further, the Seller hereby indemnifies, holds harmless and, if Buyer elects, agrees to defend it against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses as a result of the presence upon the property of any Hazardous Substance on the Closing Date.

      7.11    <u>Taxes</u>.  Each of the Sellers has filed, or has caused to be filed, on a timely basis and subject to all permitted extensions, all Tax Returns with the appropriate governmental agencies in all jurisdictions in which such Tax Returns are required to be filed, and all such Tax Returns were correct and complete, where the failure by Seller to do so could result in the imposition of a lien or charge of any kind against any or all of the Transferred Assets.  All Taxes that are shown as due on any such Tax Returns have been timely paid, or delinquencies cured with payment of any applicable penalties and interest.  There are no pending claims asserted for ad valorem, tangible, intangible or sales taxes or assessments upon the Transferred Assets nor are there any Liens for Taxes outstanding or threatened against any of the Transferred Assets.  The Seller has paid or caused to be paid to federal, state and local authorities all amounts required to be paid by federal, state and local law or regulations with respect to withholding from the wages of the Seller's employees.  The Seller has paid, discharged, or made adequate provisions for the payment of all Federal, state and local income, franchise, sales, use, occupation, excise or other taxes, assessments, interest, penalties, deficiencies, fees, rents and other governmental charges and impositions required to be paid and currently due and payable, or owing, as of the Closing Date in respect to the Transferred Assets or which relate to any personal property taxes due or owing by the Seller, and the Seller is not in default in payment of any such tax.  The Seller has collected and timely remitted all required sales taxes arising from its Business operations.  The Seller has not received and, to the best of its knowledge, will not receive any notice of tax deficiency outstanding, proposed or assessed against it, nor has it executed any waiver of any statute of limitations on the assessment or collection of any Tax.  The Seller shall have paid,

discharged, or made adequate provisions for payment of all Personal Property Taxes prior to or at the time of Closing. There are no tax liens upon, pending or threatened against any of the Transferred Assets except, if applicable, liens for taxes that are not yet due.

7.12    Brokers.  Neither the Seller nor anyone acting on its behalf has incurred any liability or obligation to any broker, finder or agent for any brokerage fees, finder's fees or commissions with respect to the transactions contemplated by this Agreement for which the Buyer shall be responsible in whole or in part.

7.13    Permits.  Set forth in Schedule 7.13 is a complete and accurate list of all material Licenses, certificates, permits, approvals, franchises, accreditations, notices and authorizations issued by governmental entities or other regulatory authorities, federal, state or local (collectively, the "Permits"), held by the Seller in connection with the Transferred Assets or the conduct of the Business. All such Permits are valid and in full force and effect, no such Permit is subject to any Lien, limitation, restriction, probation or other qualification and to Seller's knowledge there is no default under any Permit or any basis for the assertion of any default thereunder. Schedule 7.13 specifies the holder of each of Seller's Permits. There is no action or proceeding pending or, to the best knowledge of Seller, threatened, looking to or contemplating or that could result in the revocation or suspension of any such Permit or the imposition of any fine, penalty or other sanctions for violation of any legal or regulatory requirements relating to any Seller's Permit, or, to the best knowledge of the Seller, is there any basis therefor. Seller has no knowledge of any investigation that could result in the revocation or suspension of any such Permit or the imposition of any fine, penalty or other sanctions for violation of any legal or regulatory requirements relating to any Seller's Permit.

7.14    Payment Programs.

(a)    All Payment Programs in which Elite has participated at any time during the last one (1) year are listed on Schedule 7.14 (the "Seller Payment Programs"). Elite is a participating provider, in good standing, in each Seller Payment Program. To Elite's knowledge, there is no threatened investigation, and there is no concluded investigation, or civil, administrative or criminal proceeding relating to Elite's participation in any Payment Program. Elite has no knowledge of any pending investigation, or civil, administrative or criminal proceeding relating to Elite's participation in any Payment Program. Except for recoupments, requests for refunds or set-offs received from Payment Programs in the ordinary course of business from a Payment Program, no Payment Program has requested or threatened any recoupment, refund, or set-off from Elite. Elite has not been excluded from participation in the Medicare or Medicaid programs. Elite has not submitted to any Payment Program any intentionally false or fraudulent claim for payment, nor has Elite at any time knowingly violated any material condition for participation, or any rule, regulation, policy or standard of, any Payment Program.

(b)    Neither Elite nor any of Elite's managers or members, officers, employees or agents has, directly or indirectly:

(i) knowingly and willfully solicited or received any prohibited remuneration in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under any federal, state or private health care program; or

(ii) knowingly and willfully offered or paid any prohibited remuneration to a person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under any federal, state or private health care program.

For purposes of this Section and Section 7.15, a Federal health care program shall have the meaning ascribed to such term in 42 U.S.C. 1320a-7(b).

(iii) knowingly made or received or knowingly agreed to make or receive, or is aware that there has been made or received or that there has been any intention to make or receive, any payment to any person with the intention or understanding that any part of such payment would be used for any purpose other than that described in the documents supporting such payment.

All billing practices of Seller and all predecessors in interest thereof with respect to all Payment Programs have been, to Seller's knowledge, true and correct in all material respects and in material compliance with all applicable Laws, and all regulations and policies of all such Payment Programs, and Seller has not knowingly billed for or received any payment or reimbursement in excess of amounts permitted by law or the rules and regulations of Payment Programs or contracts therewith.

(iv) except for settlement of business disputes in the ordinary course of business, made a payment for services pursuant to a written agreement knowing that the services described in the agreement would never be furnished to Elite by the other party to the Agreement.

7.15    <u>Compliance with Laws.</u>

(a)    <u>Schedule 7.15</u> lists all correspondence or communications relating to Elite with state or federal governmental agencies (and such governmental agencies' intermediaries or carriers) within the past two (2) years that involves, relates to or alleges: any violation of any applicable Federal or state health care program law or regulation that would have a material adverse effect on Elite. Except as set forth on <u>Schedule 7.15</u>, there are no assertions against Elite of any violations of applicable Federal or state health care program laws or regulations by any government agency, intermediary or carrier. Elite is not currently subject to any outstanding audit by any such government agency, intermediary or carrier, and Elite has no actual knowledge of any fact that may support grounds to anticipate any such audit in the foreseeable future.

(b)    Except for Laws with respect to which the failure to comply would not have an adverse material effect on Elite, Elite is in compliance with all applicable Laws.

(c)     To Elite's knowledge, Elite has not intentionally submitted any claim to any Medicare program for services that are payable by Medicare arising out of any referrals that violated 42 U.S.C. § 1395nn (known as the "Stark Law") or intentionally submitted any claim to any other Payment Program arising out of any referrals that violate the Florida Patient Self-Referral Act of 1992, codified at Fla. Stat. 456.053.

(d)     To Elite's knowledge, Elite has complied with all disclosure requirements of all applicable self-referral Laws, including without limitation the Stark Law and any applicable state self-referral Law.

(e)     To Elite's knowledge, Elite has not: (i) knowingly and willfully offered or paid any prohibited remuneration in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; or (ii) knowingly and willfully solicited or received any prohibited remuneration in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility in a manner which violated the Florida Patient-Brokering Act, codified at Fla. Stat. 817.505.

(f)     To Elite's knowledge, Elite has not knowingly and willfully submitted any claim for payment to any Federal health care program in violation of any Laws relating to false claims or fraud.

(g)     To Elite's knowledge, Elite has materially complied with all applicable security and privacy standards regarding protected health information at the Centers under the Health Insurance Portability and Accountability Act of 1996 and all applicable state privacy Laws.

7.16   <u>Solvency</u>.   Seller is not insolvent under any bankruptcy, receivership or insolvency law. Following the Closing, Seller shall continue to be solvent. The Seller represents and warrants that the consideration for the Transferred Assets is fair and adequate, and that the value of the Purchase Price is equal to the negotiated value of the Transferred Assets, and that all claims of the creditors of the Seller shall be satisfied prior to the Closing. The Seller's sale of the Transferred Assets has not been undertaken with the intention to hinder, delay or defraud the Seller's current or future creditors.

7.17   <u>Insurance</u>.  The Seller has obtained and there exists in full force and effect, and will continue in full force and effect through the Closing Date, general liability and professional liability insurance covering all professional employees, the Transferred Assets and Premises against risks normally insured against by similar businesses under similar circumstances. <u>Schedule 7.17</u> correctly describes, by type, carrier, policy number, limits, premium and expiration date, the insurance coverage carried by the Seller, which insurance will remain in full force and effect in accordance with policy terms, with respect to all events occurring prior to the Closing Date.  <u>Schedule 7.17</u> also states whether each such policy is carried on a "claims made" or "occurrence" basis.  All such insurance policies are owned by and payable solely to the Seller or its Affiliates.  The Seller has not failed to give any notice or present any claim under any such policy or binder in due and timely fashion, has not received notice of cancellation or non-renewal of any such policy or binder and is not aware of any threatened or proposed cancellation or non-renewal of any such policy or binder.  There are no outstanding claims under any such policy which have gone unpaid for more than thirty (30) days, or as to which the insurer has disclaimed liability.

7.18   <u>Employment Matters</u>.

(a)   <u>List of Employees.</u>  Schedule 7.18 hereto contains a true and accurate list of Seller's employees, together with such person's position, date of hire, and current salary. The Seller has paid or made provision for the payment of all accrued benefits and wages for all of Seller's employees through the Closing Date.

(b)   <u>Compliance with Employment Laws</u>.  Seller has, with respect to the Business, complied, and is in compliance, with all laws relating to the employment of labor, including, without limitation, all laws and provisions thereof relating to wages, hours, equal opportunity, the payment of social security and other taxes, and occupational safety and health.

(c)   <u>Labor Agreements</u>.  The Seller is not a party to or otherwise bound by any labor union or collective bargaining agreement with respect to the Business, and there are no pending labor negotiations with or union organizing efforts by any employees of the Seller working in the Business or with any union representing or attempting to represent any such employees.  The Seller has no knowledge of any grievance under a collective bargaining agreement by an employee of the Seller that has not been resolved.  To the knowledge of the Seller, no key employee or agent or group of employees or agents of the Seller whose principal responsibilities are associated with the operation of the Business has or have any plans to terminate employment by or agency with the Seller or would not be available for employment by the Buyer.

(d)   <u>Non-Competition Agreements</u>.  No employee or contractor of the Seller is subject to any secrecy or non-competition agreement or any other agreement or restriction of any kind that would impede in any material way the ability of such employee to carry out fully all activities of such employee in furtherance of the Business.

7.19   <u>Real Properties</u>.  Schedule 7.19 sets forth a true and complete description of all

real property used in connection with the Centers (the "Premises").  In Seller's reasonable business judgment, the Seller has sufficient lease interest to those Premises and has the right to use the Premises to conduct the Seller's Business as currently conducted.  As of the Closing Date, the Sellers shall hold the leasehold interest in the Premises, and shall transfer the same to Buyer, free and clear of all claims or rights of any third parties and the possession of the Premises by the Seller has not been disturbed and no claim has been asserted against the Seller adverse to its rights in such Premises.  To Seller's knowledge, all improvements, fixtures and all structures on the Premises and the current uses of the Premises conform to all applicable federal, state and local laws, building, health and safety and other ordinances, laws, rules and regulations.  The Seller has all material certificates of occupancy and permits of any governmental body necessary or useful for the current use and operation of the Premises, and to Seller's knowledge, the Seller has complied with all material conditions of the permits applicable to it.  To Seller's knowledge, no default or violation, or event that with the lapse of time or giving of notice or both would become a default or violation, has occurred in the due observance of any permit.

7.20    <u>Financing Statements</u>.  Except with respect to the Equipment Loans and a line of credit with KeyBank National Association that will be satisfied at Closing and terminated, to the best of Seller's knowledge, there are no financing statements under the Uniform Commercial Code which affect the Transferred Assets, filed in any state.  Except for those no longer in effect, Seller has not filed any financing statement or signed any security agreement under which a secured party thereunder may file any such financing statement.

7.21    <u>No Referrals by Interested Parties</u>.  From and after commencement of ownership of the Business by the Seller at the Centers, and through the Closing Date, other than the Principal, who does not make referrals to the Centers, neither the Business nor the Sellers have been owned, directly or indirectly, by any physician.

7.22    <u>Related Party Transactions</u>.   The Disclosure Schedule identifies each entity, related through "common ownership or control" to the Seller or, to the knowledge of the Seller, a Centers under the definitions of such quoted term set forth under regulations promulgated by the federal Medicare program or by the Medicaid program of any state, that has transacted business with the Seller or, to the knowledge of the Seller, with the Centers.  For each such entity, the <u>Disclosure Schedule</u> also states the nature of the transaction and the nature of the relationship, including, but not limited to, the percentage of common ownership or relationship that creates control.  A copy of each contract and written agreement between such entity and the Seller or Centers have been or will be delivered to the Buyer prior to or at the Closing.  Except as set forth on the Disclosure Schedule, no Owner, director, officer or employee of the Seller or member of the family of any such person, or any corporation, partnership, trust or other entity in which any such person, or any member of the family of any such person, has a substantial interest or is an officer, director, trustee, partner or holder of any equity interest, is a party to any transaction with the Seller, including any contract, agreement or other arrangement providing for the employment of, furnishing of goods or services by, rental of real or personal property from or to or otherwise requiring payments or involving other obligations to any such person or firm.

7.23   Periodic Assessments on Health Care Entities.   Except as disclosed in the Disclosure Schedule, the Seller has timely filed all material reports required of it by federal or state agencies having jurisdiction over any aspect of the operation of the Centers and has timely paid all periodic assessments imposed by law or regulation with respect to the revenues derived from such operation, including, but not limited to PMATF assessments (if applicable), and shall be solely responsible for the payment of any such assessment that becomes payable after the Closing Date as a result of the operation of any of the Centers on or before the Closing Date.

7.24   Limited Representations and Warranties.   Except for those matters expressly set forth in this Agreement or any Exhibit to this Agreement, Seller does not make, and expressly disclaims, any representations or warranty as to the accuracy or completeness of any understanding, communication, disclosure, documentation, information, reports or other materials furnished to Buyer whether prior to or following the date of this Agreement.

7.25   Knowledge Defined.   As used throughout this Agreement, statements "to Seller's knowledge," or to Elite's knowledge, or statements of similar effect shall mean the actual knowledge of Mark Zhuk, M.D., Catarina Fara and Alex Dolgnos, after reasonable inquiry of Seller's or Elite's key managerial employees.

## 8. REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

8.01   Organization.   TSIG is a limited partnership duly organized and validly existing under the laws of the State of Delaware.  FL Holdings is a limited liability company duly organized and validly existing under the laws of the State of Florida.

8.02   Power and Authority.   The Buyer has full power and authority to carry on its business as now being conducted and to own, operate and lease its properties in the places where such business is now conducted and such properties are now owned, leased or operated.  This Agreement and all other agreements to be executed and delivered by the Buyer in connection herewith constitute the legal, valid and binding obligations of the Buyer enforceable against it in accordance with their respective terms.

8.03   Compliance.   The execution and delivery of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby by the Buyer shall not:

(i)   violate any provision of the organizational documents of the Buyer,

(ii)   violate any provision of or result in the breach of or entitle any party to accelerate (whether after the giving of notice or lapse of time or both) any obligation under, any mortgage, Lien, lease, contract, license, instrument or any other agreement to which the Buyer is a party or to which any property of the Buyer is subject,

(iii)   result in the creation or imposition of any Lien, charge, pledge, security interest or other encumbrance upon the Transferred Assets or the Buyer's Business, except

in connection with any financing obtained by Buyer for the acquisition or operation of the Transferred Assets, or

(iv)     violate or conflict with any court order, judgment or decree, or any law, ordinance or regulation to which the Buyer, any of the Buyer's properties, or the Transferred Assets is subject.

8.04     Litigation.   There are no material claims, actions, suits or proceedings (arbitration or otherwise) pending or, to the best of the Buyer's knowledge, threatened against the Buyer at law or in equity in any court or before or by any governmental authority which would have a Material Adverse Effect on the business or operations of the Buyer.   The Buyer is not in default in respect of any judgment, order, writ, injunction or decree of any court or other governmental authority with respect to the transactions contemplated by this Agreement.

8.05     Approvals.   No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other person is required in connection with the execution and delivery of this Agreement by the Buyer or the consummation by the Buyer of the transactions contemplated thereby.

8.06     Brokers.   Neither the Buyer nor anyone acting on its behalf has incurred any liability or obligation to any broker, finder or agent for any brokerage fees, finder's fees or commissions with respect to the transactions contemplated by this Agreement for which the Seller shall be responsible in whole or in part.

8.07     Capitalization.   TSIG owns beneficially and of record all of the issued and outstanding capital stock of FL Holdings.   The equity capitalization of TSIG is as set forth in the exhibits and Schedules to the TSIG Limited Partnership Agreement.   Other than in connection with the Signet Acquisition and as specifically set forth in the TSIG Limited Partnership Agreement, there are no outstanding subscriptions, options or warrants to purchase any equity interests in TSIG by any other person, nor are there outstanding any securities that are convertible into or exchangeable for any equity interests in TSIG, and TSIG has no obligation of any kind to issue any additional equity interests in TSIG. The Class A Limited Partnership Interest in TSIG to be issued to Select Medical Group, LLC in payment of the Purchase Price at Closing represents a 12.5% equity interest in all of the issued and outstanding partnership interests (of all classes) in TSIG.

8.08     Ownership of Buyer.    As of the Closing Date, the sole ultimate owner of the Buyer that will operate the Centers shall be a physician licensed to practice medicine in the State of Florida.

8.09     TSIG Financial Statements.    Buyer heretofore has delivered to Seller TSIG audited Financial Statements for fiscal years 2012 and 2011, and Seller acknowledges receipt thereof.   The TSIG Financial Statements are correct and complete in all material respects, fairly present the financial position of TSIG or its predecessor entity as of the dates thereof and results of its operations and cash flow for the periods then ended and have been prepared in accordance with GAAP (except for the absence of footnotes or year-end adjustments for any interim

financial statements).

    8.11   <u>Material Adverse Change.</u>  Since September 1, 2012, there has not been any material adverse change in Buyer's business, operations, assets, properties, patient referral base, or condition (financial or otherwise) or any occurrence, circumstance or combination thereof that reasonably could be expected to result in any such material adverse change.

## 9. COVENANTS OF THE PARTIES

    9.01   <u>Cooperation</u>.  The Seller shall perform and fulfill all conditions and obligations to be fulfilled or performed by Seller hereunder, to the end that the transactions contemplated hereby shall be fully and timely consummated.

    9.02   <u>Access</u>.  Until the Closing, the Seller shall give the Buyer, its attorneys, accountants, lenders and other authorized representatives access, upon reasonable notice and at reasonable times, to the Seller's offices, suppliers, employees, business and financial records, contracts, business plans, budgets and projections, agreements and commitments and other documents and information concerning the Seller and the Business (the "Information") and persons employed by or doing business with the Seller, except such documents covered by the attorney-client privilege.  In order that the Buyer may have full opportunity to make such examination and investigation as it may desire of the Business, the Seller shall furnish the Buyer and its representatives during such period with all such Information as such representatives may reasonably request and cause the respective officers, employees, consultants, agents, accountants and attorneys of the Seller to cooperate fully with the representatives of the Buyer in connection with such review and examination; provided, however, that the Buyer shall hold the documents and information concerning the Seller and the Business confidential in accordance with Section 12.02 hereof.  No investigation by or on behalf of the Buyer shall affect the representations and warranties of the Seller hereunder.

    9.03   <u>Actions Prior to Closing</u>.  The Seller shall conduct the Business and preserve the Transferred Assets pending the Closing only in the ordinary and usual course consistent with past practice.  Seller shall maintain sufficient working capital in the Business to allow the Business to meet its obligations as they become due.  The Seller promptly shall notify the Buyer of any action, suit, proceeding or investigation that may be threatened or commenced of which it becomes aware that would been listed in the <u>Disclosure Schedule</u> if such action, suit, proceeding or investigation had arisen or were in existence on or prior to the date hereof.

    9.04   <u>Maintenance</u>.  The Seller shall act reasonably and in accordance with its prior practice with respect to the Business to preserve, maintain in good and usable condition and insure and repair the Transferred Assets and the Centers, and in connection therewith, the Seller shall maintain in effect all Equipment Maintenance Agreements and appropriate insurance consistent with its representations regarding same.

    9.05   <u>Consents and Approvals</u>. The Buyer shall act diligently and reasonably to secure:

(i)     the consents and approvals of any governmental agencies and authorities and any other persons, including required to be obtained by them in order to assume from Seller any Assigned Contracts or Permits included within the Transferred Assets;

(ii) such other documents as may be necessary to satisfy the conditions set forth in Section 6 hereof; provided that the Seller shall not make any agreement or understanding affecting the Transferred Assets, the Centers or the Business as a condition for obtaining any such consent except with the prior written consent of the Buyer.

9.06    Amendment/Renewal of Assigned Contracts.   The Seller shall keep the Buyer fully informed of all developments with respect to any proposed amendment or the renewal of any Assigned Contracts, and the Seller shall act upon the Buyer's instructions with respect to the proposed amendment or renewal of any such Contracts.

9.07    Retained Liabilities.   After the Closing, the Seller shall pay all of its obligations, other than the Assumed Obligations, in a timely fashion.

9.08    Accounts Payable.   Prior to Closing the Seller shall pay all Accounts Payable before or when due in the ordinary course of business.

9.09    Taxes and Fees.   The Seller and Buyer shall each pay one-half (1/2) of all sales, use, transfer, recordation and documentary taxes and fees, if any, arising out of the transfer of the Transferred Assets pursuant to this Agreement.

9.10    Employees.   Buyer intends to hire all of Seller's employees (both full-time and part-time) currently working at the Centers, including, for these purposes,  any employees who are currently on medical or other approved leave of absence.  As of the Closing Date, all such employees shall be employees of Elite.  With respect to any employees of the Seller who become employees of Buyer on or after the Closing Date, the Buyer (through its acquisition of the Elite Membership Interest) shall assume the obligations of Seller under the Employee Plans, including, without limitation, all pre-Closing obligations due and owing to such employees, including accrued vacation pay and all obligations to such employees under any Employee Plans, but solely to the extent such obligations are disclosed to Buyer in the Disclosure Schedule, the Balance Sheet as of September 30, 2013 (to be delivered by Seller to Buyer within thirty (30) days of Closing)  or are otherwise disclosed in writing prior to the date of execution of this Agreement.

(a)     Compliance with Employment Laws.   Except as stated in the Disclosure Schedule, the Seller, during the past two (2) years, with respect to the Business, has complied, and is in compliance, with all laws relating to the employment of labor, including, without limitation, all laws and provisions thereof relating to wages, hours, equal opportunity, the payment of social security and other taxes, and occupational safety and health;

(b)     Labor Agreements.  The Seller is not a party to or otherwise bound by any labor union or collective bargaining agreement with respect to the Business, and there are no pending labor negotiations with or union organizing efforts by any employees of the Seller working in the Business or with any union representing or attempting to represent any such employees.  To the best knowledge of the Seller or the Owners, no key employee or agent or group of employees or agents of the Seller whose principal responsibilities are associated with the operation of the Business has or have any plans to terminate employment by or agency with the Seller or would not be available for employment by the Buyer.

9.11    Transition.  After the Closing Date, the Seller shall work collaboratively with the Buyer to make the transition as seamless as possible.  As part of this transition, the Seller agrees deliver a letter, to be jointly prepared by Buyer and Seller, and to be sent:

(i)  to any and all physicians who have referred patients to the Centers during the past one (1) year, at the sole cost and expense of the Buyer; and

(ii) to any and all insurance companies who have made payments to the Seller during the past one (1) years for patients served at the Centers, at the sole cost and expense of the Buyer, communicating, among other things, the sale of the Centers to the Buyer.

9.12    Third Party Consents.

(a)     Unless otherwise agreed to in writing by Buyer, Seller shall obtain prior to the Closing Date all material Third Party Consents.  If a material Third Party Consent is not obtained and delivered at Closing and Buyer waives in writing such requirement, (i) neither this Agreement nor any action taken hereunder shall be deemed to constitute an assignment of any Transferred Asset or any Contract if such assignment or attempted assignment would constitute a breach of any Contract or result in the loss or diminution of any rights thereunder or acceleration of any obligations thereunder, and (ii) Seller shall cooperate with Buyer, at Buyer's sole cost, in any reasonable arrangement proposed by Buyer designed to provide Buyer with the benefits of the Transferred Asset and Contract as to which such Third Party Consent relates, including enforcement by Seller, for the account and benefit of Buyer, of any and all rights of Seller against any other person arising out of the breach or cancellation of any such Contract by such other person or otherwise.

(b)     The parties acknowledge that as of the date of execution of this Agreement, Seller, despite its diligent efforts,  has not obtained Third Party Consents from the landlords listed on Schedule 9.12 for the Centers for the assignment and assumption of the Real Property Leases with respect to such Centers.  In addition, as of the date of execution of this Agreement, Seller, despite its diligent efforts, has not obtained Third Party Consents from the equipment lessors listed on Schedule 9.12 with respect to the Equipment Loans. The Third Party Consents described in this Paragraph 9.12(b) are hereinafter referred to as the "Material Consents".  The parties desire to consummate the purchase of the Transferred Assets and the transactions contemplated by

this Agreement notwithstanding the fact that the Material Consents identified in this Paragraph have not been obtained as of the Closing Date. Buyer agrees that so long as Seller shall continue to exercise its commercially reasonable and diligent good faith efforts to procure such Material Consents (at no additional cost to Seller) as soon as practicable following the Closing Date, Seller shall not be deemed in breach of its representations and warranties under Section 7.04(b) with respect to such Material Consents that have not been obtained, the condition to closing described in Section 6.01(e) shall be deemed waived solely with respect to such unobtained Material Consents, and Buyer shall not be entitled to assert a claim agianst Seller for indemnification under Section 13.02 solely by reason of such Material Consents not having been obtained as of the Closing. Seller covenants and agrees to keep Buyer regularly apprised of its efforts in obtaining the Material Consents described in this Section 9.12.

9.13    Cooperation. Seller shall continue to aid Buyer's efforts, after the Closing Date and at Buyer's expense, to pursue the Third Party Consents and Governmental Approvals to the extent not previously obtained in connection with the consummation of the transactions contemplated hereunder. Each of the parties hereto shall, from time to time after the Closing Date, upon the request of any other party hereto and at the expense of such requesting party, duly execute, acknowledge and deliver all such further instruments and documents reasonably required to further effectuate the interests and purposes of this Agreement.

9.14    Payments; Collections. Seller shall pay to Buyer all cash received from any source relating to services provided at or with respect to the Seller's Business on and subsequent to the Closing Date. Such payments shall be made within fifteen (15) days after receipt of such payments by Seller, and a copy of the remittance advice shall accompany such payments.

9.16    Names and Logos. From and after the Closing, the Seller shall not challenge Buyer's use of all names and logos of the Seller, including all signage at the Centers (the "Logos"). From and after the Closing Date, the Seller shall grant to Buyer a world-wide, royalty free, license to utilize the Logos.

9.17    Directors' and Officers' Liability Insurance. Buyer promptly shall apply for and shall purchase, for the benefit of the members of the Board of Directors of the General Partner of TSIG and the officers and employees of said General Partner, TSIG and TSIG's subsidiaries, directors' and officers' liability insurance in an amount not less than $2,000,000 per claim or occurrence and $5,000,000 in the aggregate (or such other coverage limits as may be agreed to between Principal and Buyer). Buyer shall provide Principal with a certificate of insurance evidencing such insurance, issued by a carrier selected by TSIG and reasonably satisfactory to Principal, no later than December 31, 2013, provided, that if Buyer diligently has endeavored to procure such coverage by such date and has been unable to do so, Buyer, upon written notice to Principal, shall have an additional ninety (90) days, i.e., until March 31, 2014, to obtain such coverage. Failure by Buyer to satisfy its obligations under this Agreement shall be deemed a material breach by Buyer under this Agreement and the Consulting Agreement.

## 10.  RESTRICTIVE COVENANT

10.01   Covenant.  As a material inducement to the Buyer to enter into this Agreement, in consideration of the Purchase Price, and for other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, as well as in recognition of the fact that the value of the Seller's Business, including the goodwill, would be diminished substantially if the Seller or any of the Principals were to engage in any business or activities in competition with the Buyer, commencing on the Closing Date and for a period of three (3) years thereafter (the "Restrictive Period"), the Seller, the Principal and its and his respective successors and assigns, covenant, consent and agree that they shall not, directly or indirectly:

(a)      own, manage, operate, advise (whether or not for compensation), control, invest or acquire an interest in any business, or otherwise engage or participate in, whether as a proprietor, partner, stockholder, director, officer, joint venturer, lender, advisor, consultant, investor or other participant, any business which offers diagnostic imaging services (a "Competitive Business") (except for an interest owned solely as an investment and comprising less than ten percent (10%) of the ownership of such business) anywhere within a twenty-five (25) mile radius from the Centers (the "Restricted Area"); provided. however, that a medical (other than radiology) practice which offers certain diagnostic imaging services as an ancillary part, and not as the primary activity, of its practice, and the performance of diagnostic imaging services at a hospital, urgent care center or similar health care institution, whether public or private,  shall not be deemed to constitute a Competitive Business for the purposes of this Agreement;

(b)      employ or contract with any individual employed by the Buyer at the Centers during the Restrictive Period or induce or attempt to influence any employee of the Buyer at the Centers to terminate such employment;

(c)      induce or attempt to influence any third party payor, health care purchasing organization, or other similar organization or entity that (i) had a contractual relationship with the Seller at the Centers prior to the Closing Date, or (ii) has a contractual relationship with the Buyer at the Centers at any time during the Restrictive Period, to terminate such relationship;

(d)      induce or attempt to influence any physician, other health care professional or health care facility or provider that (i) had a referring relationship with Seller at the Centers prior to the Closing Date, or (ii) has a referring relationship with the Buyer at the Centers at any time during the Restrictive Period, to terminate such relationship for any reason;

(e)      solicit, induce or influence any customer, supplier, or any other person or entity which has a business relationship with the Buyer to discontinue or reduce the extent of such relationship with the Buyer; or

(f)      employ or seek to employ, or cause any Competitive Business or permit any Competitive Business to employ or seek to employ any person who is employed by

the Buyer at the Centers.

10.02 <u>Enforcement</u>.   The Seller and Principals acknowledge that the restrictions contained in Section 10.01 above are reasonable and necessary to protect the legitimate interests of the Buyer and that any violation of such restrictions would result in irreparable injury to the Buyer.  If the period of time or other restrictions specified in Section 10.01 should be adjudged unreasonable in any proceeding, then the period of time or such other restrictions shall be reduced by the elimination or reduction of such portion thereof so that such restrictions may be enforced in a manner adjudged to be reasonable.  The Buyer, the Seller and the Principal acknowledge that, in the event of a violation of any such restrictions, which is not remedied within thirty (30) days after notice thereof, the Buyer shall be entitled to preliminary and permanent injunctive relief without having to prove actual damages or immediate or irreparable harm or to post a bond; the Buyer shall also be entitled to an equitable accounting of all earnings, profits and other benefits arising from such violation, which rights shall be cumulative and in addition to any other rights or remedies to which the Buyer may be entitled in law or equity.  In the event of a violation, the period referred to in Section 10.01 herein shall be extended by a period of time equal to that period beginning with the commencement of any such violation and ending when such violation shall have been finally terminated in good faith.  THE SELLER, THE PRINCIPAL AND THE BUYER ACKNOWLEDGE THAT THE TERMS OF THIS SECTION 10 HAVE BEEN NEGOTIATED AT ARM'S LENGTH.   SELLER AND PRINCIPAL REPRESENT THAT THEY UNDERSTAND THE FULL EXTENT AND IMPLICATION OF THE TERMS OF THIS SECTION 10, AND KNOWINGLY AND VOLUNTARILY AGREE TO BE BOUND HEREBY.

10.03 <u>Effect of Breach by Buyer Under Consulting Agreement</u>.   Notwithstanding anything to the contrary contained in this Article 10, in the event Buyer wrongfully terminates the Consulting Agreement or defaults under any of its payment obligations under the Consulting Agreement which remains uncured for a period of sixty (60) days following receipt of written notice from Seller, Seller and Principal automatically shall be relieved of their respective covenants and obligations under this Article 10.

## 11.  COVENANTS OF THE BUYER

11.01 <u>Cooperation</u>.  The Buyer covenants and agrees that it shall perform and fulfill all conditions and obligations to be fulfilled or performed by it hereunder, to end that the transactions contemplated hereby shall be fully and timely consummated.

## 12.  MUTUAL COVENANTS

12.01 <u>General Covenants</u>.  The Buyer and the Seller agree that following the execution of this Agreement and until the Closing:

(a)   If any event should occur which would prevent fulfillment of the conditions to the obligations of any party hereto to consummate the transactions

contemplated by this Agreement, the affected party shall immediately notify the other party, in writing of such event, and shall cure the same within thirty (30) days and the other party shall reasonably cooperate therewith. If the affected party is unable to cure within such thirty (30) day period, the other party has the right to terminate this Agreement on ten (10) days written notice;

(b)     They shall deliver such other instruments of title, certificates, consents, endorsements, assignments, assumptions and other documents or instruments, in form reasonably acceptable to the party requesting the same and its counsel, as may be reasonably necessary to carry out and/or to comply with the terms of this Agreement and the transactions contemplated herein; and

(c)     They shall confer on a regular basis with the other, report on material operational matters and promptly advise the other orally and in writing of any change or event having, or which, insofar as can reasonably be foreseen could have, a Material Adverse Effect on such party or which would cause or constitute a material breach of any of the representations, warranties or covenants of such party contained herein.

12.02   Confidentiality.

(a)     The parties agree that (i) all information not disclosed to the public by the Seller regarding the Seller's Business and the medical information of any patient currently receiving services or having previously received services at the Centers, whether oral or written, which is compiled by, obtained by, or furnished to the Buyer or any of its agents or employees in the course of its due diligence review of the Seller's Business is acknowledged to be confidential information, trade secrets and the exclusive property of the Sellers through the Closing Date, and of the Buyer thereafter, and (ii) all information not disclosed to the public by the Buyer regarding the Buyer's business or operations is acknowledged to be confidential information, trade secrets and the exclusive property of the Buyer (collectively, "Confidential Information")

(b)     The term "Confidential Information" shall include the terms of this Agreement and the transactions contemplated hereby. Each of the parties hereto agrees not to divulge, directly or indirectly, any Confidential Information of the other party in any manner contrary to the interests of such party, use or cause or suffer to be used any Confidential Information in competition with such party, or use Confidential Information in violation of the patients' confidentiality rights under the Federal Health Insurance Portability and Accountability Act of 1996 or any applicable state Law. Each of the parties acknowledges that the breach or threatened breach of the provisions of this Section would cause irreparable injury to the other party that could not be adequately compensated by money damages. Accordingly, a party may obtain a restraining order and/or injunction prohibiting a breach or threatened breach of the provisions of this Section, in addition to any other legal or equitable remedies that may be available. If requested by legal process to disclose any Confidential Information of another party, the party in receipt of such request shall promptly give notice thereof to the other party so that such party may, at its own cost and expense, seek an appropriate protective order or,

in the alternative, waive compliance to the extent necessary to comply with such request if a protective order is not obtained.  If a protective order or waiver is granted, the party subject to such legal process may disclose the Confidential Information to the extent required by such court order or as may be permitted by such waiver.

(c)     Each party shall be responsible for any breach of this provision by its directors, officers, employees, agents or representatives of such party (collectively, the "Representatives").   In the event that the Closing does not occur, each party shall promptly return to the other all copies of such other party's Confidential Information.

(d)     The term "Confidential Information" does not include information or data which (i) the party can demonstrate it independently developed, (ii) became available to the public other than as a result of such party's violation of this Agreement, (iii) became available to such party from a source other than the other party if that source was not bound by a confidentiality agreement with such other party and such source lawfully obtained such information or data, or (iv) is required to be disclosed by applicable law, provided that promptly after being compelled to disclose any such information or data, the party being so compelled shall provide prompt notice thereof to the other party so that such other party may seek a protective order or other appropriate remedy.

## 13.  SURVIVAL AND INDEMNIFICATION

13.01  Survival.  All representations and warranties made in this Agreement, or in any instrument or document furnished in connection with this Agreement or the transactions contemplated hereby, shall expire eighteen (18) months after the Closing Date.  Notwithstanding any term in this Section 13.01, the applicable statute of limitations shall be the survival period for any matter relating to fraud or willful, intentional or reckless misrepresentation or willful omission of a material fact in order to make any representation or warranty contained herein not misleading, (b) any liability relating to personal injury, or (c) any actual violation of the representations and warranties made in Section 7.10 of this Agreement. The representations and warranties contained in Section 7.15 hereof shall expire thirty (30) months after the Closing Date. Those representations and warranties contained in Sections 7.02, 7.03 and 7.04 hereof shall not expire.

13.02  Indemnity by the Seller and Principal.   The Seller and Principal, jointly and severally, agree, subject to the limitations set forth in Section 13.05,  to unconditionally indemnify and hold harmless the Buyer and its successors and assigns and its and their respective officers, directors, controlling persons, employees, attorneys, agents, affiliates, partners and stockholders, on demand, in each case past, present, or as they may exist at any time after the date of this Agreement (the "Buyer Indemnitees") against and in respect of any and all claims, suits, actions, proceedings (formal and informal), investigations, judgments, deficiencies, damages, settlements, liabilities, losses, costs and legal and other expenses arising out of or based upon:

(a)      any breach of any representation, warranty, covenant or agreement of the Seller contained in this Agreement or in any other Transaction Documents executed and delivered by the Seller; and

(b)      losses, liabilities, deficiencies, penalties, interest, claims, damages, actions, suits, proceedings, settlements, judgments, costs and expenses (including reasonable attorneys' fees) arising out of, in connection with or incident to:

(i)      any breach by the Seller of any covenant, promise, agreement, representation and/or warranty contained in this Agreement;

(ii)     any false, incorrect or misleading representation or warranty or breach thereof made by or on behalf of the Seller in this Agreement (including the Exhibits and Schedules hereto) or in any of the Transaction Documents;

(iii)    any liability relating to personal injury and/or medical malpractice relating to an event occurring prior to the Closing Date;

(iv)     any and all debts, liabilities, obligations and duties of the Seller of any nature whatsoever, including any liabilities which arise from or relate to any property, business, occupation, withholding or similar taxes, and any interest or penalty thereof, prior to the Closing Date, whether known or unknown (other than such debts, liabilities, obligations and duties that are expressly assumed by the Buyer pursuant to this Agreement or deemed to be assumed pursuant to Section 1.04), and any and all actions and conduct by or on behalf of the Seller or its employees, contractors or agents which occurred on or prior to the Closing Date;

(v)      any attempt (whether or not successful) by any third party to cause or require the Buyer to pay any liability of, or claim against, the Seller of any kind in respect to the operation of the Centers prior to the Closing Date that have not been assumed by Buyer including, without limitation, any of the Excluded Liabilities.

(vi)     the provision, delivery or sale by the Seller at any time prior to the Closing Date of any services.

13.03   Indemnity by the Buyer.  The Buyer agrees to unconditionally indemnify and hold harmless the Seller and its successors and assigns and their respective officers and directors, controlling persons (if any), employees, attorneys, agents, affiliates, partners and stockholders on demand (the "Seller Indemnitees") against and in respect of any and all:

(a)    claims, suits, actions, proceedings (formal and informal), investigations, judgments, deficiencies, damages, settlements, liabilities, losses, costs and legal and other expenses arising out of or based upon (i) any breach of any representation, warranty, covenant or agreement of the Buyer contained in this Agreement, or in any other Transaction Documents executed and delivered by the Buyer, and (ii) the Assumed Obligations; and

(b)    claims, suits, actions and proceedings (formal and informal) of persons not a party to this Agreement and related investigations, judgments, deficiencies, damages, settlements, liabilities, losses, costs and legal and other expenses arising from events occurring after the Closing Date relating to the Transferred Assets or the operation or conduct of the Business after the Closing Date;

(c)    any liability relating to personal injury and/or medical malpractice relating to an event occurring on or after the Closing Date; and

(d)    any and all debts, liabilities, obligations and duties of the Buyer or any Affiliate of Buyer of any nature whatsoever, including any liabilities which arise from or relate to any property, Business, occupation, withholding or similar taxes, and any interest or penalty thereof, on or after the Closing Date.

13.04   <u>Defense of Claims</u>.   Any Buyer Indemnitee or Seller Indemnitee (the "<u>Indemnified Party</u>") seeking indemnification under this Agreement shall give to the party obligated to provide indemnification to such Indemnified Party (the "Indemnitor") a written notice (a "<u>Claim Notice</u>") describing in reasonable detail the facts giving rise to any claim for indemnification hereunder promptly upon learning of the existence of such claim.

(a)    <u>Third Party Claims</u>.   The obligations and liabilities of an Indemnifying Party under this Section 13 with respect to claims of any third party which are subject to the indemnification provided for in this Section 13 ("Third Party Claims") shall be governed by and contingent upon the following additional terms and conditions:

(i)    Upon receipt by the Indemnitor of a Claim Notice from an Indemnified Party with respect to any claim of a third party, such Indemnitor may assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party and, in such event, shall agree to pay and otherwise discharge with the Indemnitor's own assets all judgments, deficiencies, damages, settlements, liabilities, losses, costs and legal and other expenses related thereto; and the Indemnified Party shall cooperate in the defense or prosecution thereof and shall, at the Indemnitor's expense, furnish such records, information and testimony and attend all such conferences, discovery proceedings, hearings, trials and appeals as reasonably may be requested in connection therewith.   If the Indemnitor does not assume the defense thereof, the Indemnitor shall similarly cooperate with the Indemnified Party in such defense or prosecution.   If it would be detrimental to the defense of the Indemnified Party for the same counsel to represent both the Indemnified Party and the Indemnitor, then the Indemnified

Party shall be entitled to retain its own counsel, in each jurisdiction for which the Indemnified Party determines counsel is required, at the expense of the Indemnifying Party

(ii)     If the Indemnitor shall have failed to assume the defense of any claim in accordance with the provisions of this Section, then the Indemnified Party shall have the absolute right to control the defense of such claim and, if and when it is finally determined that the Indemnified Party is entitled to indemnification from the Indemnitor hereunder, the fees and expenses of the Indemnified Party's counsel shall be borne by the Indemnitor and paid by the Indemnitor to the Indemnified Party within five (5) business days of written demand therefor, but the Indemnitor shall be entitled, at its own expense, to participate in (but not control) such defense

(iii)     So long as the Indemnitor has assumed and is conducting the defense of the Third Party Claim in accordance with Section 13.04(a) above, (i) the Indemnitor will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably provided that the Indemnified Party is completely released from all claims) unless the judgment or proposed settlement involves only the payment of money damages by the Indemnitor and does not impose an injunction or other equitable relief upon the Indemnified Party and (ii) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnitor (not to be withheld unreasonably).

(b)     Claims between Parties/Non-Third Party Claims.  With respect to any claim for indemnification hereunder which does not involve a Third Party Claim, the Indemnified Party will give the Indemnitor written notice of such claim. The Indemnitor may acknowledge and agree by notice to the Indemnified Party in writing to satisfy such claim within twenty (20) days of receipt of notice of such claim from the Indemnified Party.  If the Indemnitor shall dispute such claim, the Indemnitor shall provide written notice of such dispute to the Indemnified Party within such twenty (20) day period, setting forth in reasonable detail the basis of such dispute.  Upon receipt of notice of any such dispute, the Indemnified Party and the Indemnitor shall use reasonable efforts to resolve such dispute within thirty (30) days of the date such notice of dispute is received. Once (A) the Indemnitor has acknowledged and agreed to pay any claim pursuant to this Section 13.04(b), (B) any dispute under this Section 13.04(b) has been resolved in favor of indemnification by mutual agreement of the Indemnitor and the Indemnified Party, or (C) any dispute under this Section 13.04(b) has been finally resolved in favor of indemnification by order of a court of competent jurisdiction or other tribunal (including an arbitrator contemplated by this agreement) having jurisdiction over such dispute, then the Indemnitor shall pay the amount of such claim to the Indemnified Party within thirty (30) days of the date of acknowledgement by the Indemnitor or final resolution in favor of indemnification, as the case may be, to such account and in such manner as is

designated in writing by the Indemnified Party.

13.05   <u>Limitations of Indemnity Obligations</u>.

(a)      Except as otherwise explicitly provided in this Agreement or by statute to the extent that statutory remedies cannot legally be waived by the person entitled thereto, and except for fraud, deceit or intentional misrepresentation by the Buyer or the Seller and except as expressly provided in Section 10, after consummation of the transactions contemplated by this Agreement, the sole and exclusive remedies of the Buyer or the Seller under this Agreement are as set forth in this Section 13.  Each party acknowledges and agrees that the other parties would not have entered into this Agreement but for the inclusion herein of this Section 13.05.

(b)      Notwithstanding any provision contained herein to the contrary, no Indemnified Party shall be entitled to indemnification hereunder with respect to any false, incorrect or misleading representation or warranty in this Agreement (including the Exhibits and Schedules hereto) or in any of the Transaction Documents or breach thereof made by an Indemnifying Party that such Indemnified Party had actual knowledge of on the Closing Date, where such actual knowledge was acquired because of the events, circumstances and consequences thereof were clear on its face from materials actually provided to or obtained by the Indemnified Party prior to Closing.

(c)      Except as provided below, an Indemnified Party shall be entitled to indemnification for Damages (i) such given Damages exceed One Thousand Dollars ($1,000) individually and not in the aggregate; and (ii) the amount by which all Damages greater than One Thousand Dollars ($1,000), in the aggregate, exceeds Fifty Thousand Dollars ($50,000) (the "Basket Amount"), which indemnification shall be limited to the amount which such Damages exceed the Basket Amount.     In no event shall the aggregate indemnification liability of Seller and Principal under this Agreement exceed Seven Hundred Fifty Thousand Dollars ($750,000).   The amount due to Seller as indemnification from Buyer, or due to Buyer as indemnification from Seller, shall be reduced by the amount of any insurance proceeds, Tax benefits, credits, or deductions, or other payments benefiting the indemnified party in respect to the subject matter of such Damages.  As used herein, "Damages" means damages, liabilities, losses, judgments, settlements, and expenses, including, without limitation, all reasonable attorneys' fees and costs; provided that, in no event shall "Damages" mean consequential, special or punitive damages (except where an underlying cause of action giving rise to any such Damages is fraud or intentional misrepresentations).  Notwithstanding the foregoing, any claims for Damages arising from breaches of the representations and warranties contained in Sections 7.02, 7.03, 7.04, 7.05, 7.10, 7.11, 7.12, 7.14, and 7.15 hereof shall not be subject to the limit set forth in the first two sentences of this subsection (c), and Buyer shall be entitled to recover the full amount of Damages from any breaches of such representations and warranties.

(d)      Notwithstanding anything contained in this Article 13 to the contrary, if a full and unconditional settlement offer solely for money damages is made by the

applicable third party involved in a third party claim, which offer the Indemnifying Party notifies the Indemnitee in writing of the Indemnifying Party's willingness to accept, and the Indemnified Party declines to accept such settlement offer, the Indemnified Party may continue to contest such claim, free of any participation by the Indemnifying Party, at the Indemnitee's sole expense, and the amount of any ultimate liability with respect to which the Indemnifying Party has any obligation to pay hereunder shall be equal to the lesser of (i) the amount of the settlement offer which the Indemnitee declined to accept; or (ii) the ultimate losses incurred by the Indemnitee, but subject to the limitations on liability set forth in Section 5.3.

## 14. TERMINATION

14.01  <u>Termination</u>.   This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)     By Buyer at any time prior to Closing, in the event of the failure of any of the conditions precedent to Closing contained in this Agreement;

(b)     By the Buyer or the Seller if:

(i)    mutually consented to by the other party;

(ii)   by the Seller or the Buyer if the Closing shall not have occurred on or before October 14, 2013, unless the failure of the Closing to have occurred by such date is due to the failure of the party seeking to terminate this Agreement to perform or observe the covenants and agreements of such party set forth herein;

(iii)  any court or governmental body of competent jurisdiction shall have issued an order, decree or ruling, or taken any other action, permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, provided that no termination shall be permitted under this paragraph unless the party seeking such termination shall have used its reasonable best efforts to oppose such issuance or taking; or

(iv)  after written notice if the other party commits any breach of its representations, warranties or covenants set forth herein; provided, however, that if any such breach is curable, termination shall occur only if such breach has not been cured within thirty (30) days after notice is given to terminate this Agreement as a result of such breach.

Upon the occurrence of any of the events specified in this Section 14.01, written notice of such event forthwith shall be given to the other party to this Agreement, whereupon this Agreement shall terminate.

14.02  <u>Effect of Termination</u>.  In the event of the termination and abandonment of this Agreement pursuant to Section 14.01, this Agreement, other than the confidentiality provisions

of Section 12.02, shall become void and be of no effect, without any liability on the part of any party or its affiliates, directors, officers or members; provided that nothing in this Section 14.02 shall relieve any party to this Agreement of liability for breach of this Agreement.

## 15.  MISCELLANEOUS

15.01  <u>Notices</u>.  Every notice required or permitted under this Agreement shall, unless otherwise specifically provided herein, be given in writing and shall be sent by either United States Postal Service Certified Mail, return receipt requested, or Federal Express or similar overnight courier, provided that such courier obtains and makes available to its customers evidence of delivery and shall be addressed by the party giving, making or sending the same to the address set firth below or to such other address as either party may designate from time to time by a notice given to the other party. Notice shall be deemed to be given upon receipt, provided, however, that in the event a party shall refuse to accept delivery of notice, the notice shall nevertheless be deemed to be given upon the date of refusal to accept delivery and further provided that if the postal service is unable to deliver said Certified Mail the notice shall nevertheless be deemed to be given as of the date of the Postal Service's second notice of attempted delivery. Notwithstanding the above, a notice of change of address shall not be effective until received.

If to the Seller:

Elite Imaging, LLC
2925 NE Aventura Boulevard
Aventura, FL  33180
Attention: Mark Zhuk, M.D.

If to the Buyer:

c/o Tri-State Imaging Consultants, LLC
101 Greenwood Avenue, Suite 150
Jenkintown, PA  19046
Attention: Michael A. Carr, President

15.02  <u>Entire Agreement</u>.  This Agreement, together with its Schedules and Exhibits, contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements, either oral or written.  The Agreement may not be amended, or any term or condition waived, unless signed by both parties.  Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by other party(ies), or by anyone acting on behalf of any party, that are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding.

15.03  <u>Waiver</u>.  No waiver of any breach of any provision of this Agreement shall constitute a waiver of any other breach of that or any other provision hereof.  No failure by any party to take any action against any breach of this Agreement or default by another party shall

constitute a waiver of the former party's right to enforce any provision of this Agreement or to take action against such breach or default or any subsequent breach or default by the other party. To be effective any waiver must be in writing and signed by the waiving party.

15.04   Governing Law.   This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the internal laws of the State of Delaware, without giving effect to the conflict of law principles thereof.

15.05   Severability.   In the event that any court of competent jurisdiction shall finally determine that any provision, or any portion thereof, contained in this Agreement shall be void or unenforceable in any respect, then such provision shall be deemed limited to the extent that such court determines it enforceable, and as so limited shall remain in full force and effect.   In the event that such court shall determine any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement nevertheless shall remain in full force and effect.

15.06   Construction.   The parties have participated jointly in the negotiations and drafting of this Agreement and in the event of any ambiguity or question of intent or interpretation, no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

15.07   Descriptive Headings.   The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

15.08   Publicity.   None of the parties hereto shall issue any press release or otherwise make any public statement with respect to the execution of, or the transactions contemplated by, this Agreement prior to the Closing Date without the prior written consent of the others, except as may be required by applicable state or federal securities or other laws.

15.09   Counterparts.   This Agreement may be executed in one or more counterparts, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.10   Expenses.   Each of the parties hereto shall pay its own fees, costs and expenses incurred in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

15.11   Parties in Interest; Assignment.   This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their permitted succesors and assigns (if any), and nothing in this Agreement, expressed or implied, is intended to confer upon any other person any rights or remedies of any nature whatsoever under or by reason of this Agreement.  Neither party may assign this Agreement or any of its rights or obligations hereunder except with the prior written consent of the other parties, which may be withheld in the sole and absolute discretion of such other parties.  Notwithstanding the foregoing, Seller agrees that pursuant to a Collateral Assignment of Agreements by and between Buyer and Siemens Financial Services, Inc.

("Siemens"), a copy of which has been presented to Seller for purposes of acknowledgment and consent, Buyer may assign its rights under this Agreement including, but not limited to, the right of enforcement as collateral security for Buyer's loan obligations, to Siemens, as collateral agent and as Administrative Agent for the Lenders, as such term is defined in the Credit Agreement by and among Borrower, the Lenders from time to time parties thereto, and Siemens, as Administrative Agent.

15.12  <u>Schedules and Exhibits</u>.  The Schedules and Exhibits attached hereto are an integral part of this Agreement.  All exhibits and schedules attached to this Agreement are incorporated herein by this reference and all references herein to this "Agreement" shall mean this Agreement together with all such exhibits and schedules, and all ancillary agreements and exhibits and schedules thereto to be delivered at Closing.

[Signatures begin on next page]

IN WITNESS WHEREOF, the Buyer and the Seller have executed this Agreement as of the day and year first above written.

Witness/Attest:

SELLER:

ELITE IMAGING, LLC, a Florida limited liability company

By:  Select Medical Management, LLC, its Manager

By: _____

Name: Cathy Fate

Title:

By: _____

Name:   Mark Zhuk, M.D

Title:    Managing Member

*[Signatures Continued on Next Page]*

ELITE IMAGING AVENTURA, LLC, a Florida
limited liability company

By:   Select Medical Management, LLC, its
Manager

By: _____
Name: Mark Zhuk, M.D.
Title:   Managing Member

By: _____
Name: Cathy Fara
Title:


ELITE IMAGING HOLDING, LLC, a Florida
limited liability company

By:  Select Medical Management, LLC, its
    Manager

By: _____
Name: Mark Zhuk, M.D.
Title:  Managing Member

By: _____
Name: Cathy Fara
Title:


ELITE IMAGING MIAMI BEACH, LLC, a Florida
limited liability company

By:   Select Medical Management, LLC,
its Manager

By: _____
Name: Mark Zhuk, M.D.
Title:  Managing Member

By: _____
Name: Cathy Fara
Title:


ELITE IMAGING ORANGE PARK, LLC, a
Florida limited liability company

By:   Select Medical Management, LLC, its
Manager

By: _____
Name: Mark Zhuk, M.D.
Title:  Managing Member

By: _____
Name: Cathy Fara
Title:

- 48 -

ELITE IMAGING WESTON, LLC, a Florida
limited liability company

By:    Select  Medical  Management,  LLC,  its
       Manager

By: _____

By: _____
Name: _____
Name:  Mark Zhuk, M.D.
Title: _____
Title:  Managing Member

*[Signatures Continued on Next Page]*

**PRINCIPAL:**

_____        _____
                                        MARK ZHUK, M.D.


**OTHER MEMBERS OF SELLER (solely for purposes of Article 10 hereof):**

                                        SELECT MEDICAL GROUP, LLC

_____        By: _____
                                            Mark Zhuk, M.D., Managing Member

                                        MAZ 18 HOLDINGS, INC.
                                        By: _____
_____            Mark Zhuk, M.D., President


_____        OMEGA 44, INC.

                                        By: _____
                                            Mark Zhuk, M.D., President

                                        **BUYER:**

                                        TRISTATE IMAGING GROUP, LP, a
                                        Delaware limited partnership
                                        By: Tristate General Partner, Inc.,
                                        Its General Partner


By: _____     By: _____
Name: _____    Name: _Michael Cox_
Title: _____    Title: _President_


                                        TRI-STATE IMAGING FL HOLDINGS, LLC


By: _____     By: _____
Name: _____    Name: _Michael Cox_
Title: _____    Title: _President_

# EXHIBIT "A"

## _CENTER LOCATIONS_

1.     Concorde Centre II, 2999 NE 191st Street, Suite 103, Aventura, FL 33180

2.     Elite Imaging Aventura, 2925 Aventura Blvd., Suite 100, Aventura, FL 33180

3.     The Sheridan Center, 400 Arthur Godfrey Road, Suite 103, Miami Beach, FL 33140

4.     Elite Imaging Weston, 2229 North Commerce Pkwy., Weston, FL 33326

5.     Elite Imaging Orange Park, 2128 Park Ave., Orange Park, FL 32073

## Schedule 4.03

## Other Expenses and Liabilities Included in "Qualified Payables"

*[Subject to further modification]*

1.      All loss, costs and expenses, including attorneys fees and costs, incurred in connection with the dispute with the adjacent suite tenant at Miami Beach, in excess of the $12,000 currently held in escrow in connection with the dispute.

2.      Any costs or expenses incurred in connection with the dispute between Elite Orange Park and a radiology group, Diagnostic Imaging, P.A., headed by Shahid Nasir, M.D, pertaining to compensation arrangements.   A draft services agreement was prepared by never executed, and Orange Park pays the radiology group a flat monthly fee for service. Dr. Nasir has accepted these payments under reservation of rights and has asserted that his group's compensation should be calculated on a "per click" (image) basis.

Filing # 50837399 E-Filed 01/0   )17 05:49:38 PM

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 15-028411 CA 05

Marlande Lazard, et ux.,

     Plaintiff(s),

vs.

Lifemark Hospitals, Inc.

     Defendant(s).

_____/

### MEDIATOR'S REPORT ON PARTIAL SETTLEMENT

**PLEASE TAKE NOTICE** that a partial settlement was reached by and on the following:

MEDIATOR:    STANFORD BLAKE

LOCATION:    FALK, WAAS, HERNANDEZ, CORTINA, SOLOMON & BONNER
                135 SAN LORENZO AVE., SUITE 500
                CORAL GABLES, FL 33146

DATE:        WEDNESDAY, DECEMBER 14, 2016

TIME:         10:00 a.m.

The Mediator, Stanford Blake, files this report of a partial settlement on the above matter as to the Plaintiff and Elite Imaging reports:

1.   There is a negotiated settlement between the Plaintiff and Elite Imaging for ELEVEN million dollars ($11,000,000).
2.   All other terms are agreed to as set forth in a letter and correspondence between counsel for the parties.
3.   A formal settlement agreement will be filed at a later date.



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished on this 5th day of January 2017 via Email to:

| | |
|---|---|
| Michael P. Bonner, Esq.<br>135 San Lorenzo Avenue, Suite 500<br>Coral Gables, FL 33134<br>Mbonner@falkwaas.com<br>MVera@falkwaas.com<br>YDelCastillo@falkwaas.com<br>**Counsel for Palmetto** | Jay Chimpoulis, Esq.<br>150 South Pine Island Road<br>Suite 510<br>Plantation, FL 33324<br>Jay@chl-law.com<br>EVelazquez@CHL-Law.com<br>echimpoulis@chl-law.com<br>**Counsel for Dennis Burton, M.D., David Mizrachi, M.D. & Florida United Radiology** |
| Darren W. Friedman, Esq.<br>Cathy MacIvor, Esq.<br>One Biscayne Tower, Suite 2300<br>2 South Biscayne Blvd.<br>Miami, FL 33131<br>dfriedman@fflegal.com<br>sargy@fflegal.com<br>CMacIvor@fflegal.com<br>bmcgill@fflegal.com<br>rkeith@fflegal.com<br>esullivan@fflegal.com<br>**Counsel for Elite** | Ilisa W. Hoffman, Esq.<br>4601 Ponce De Leon Boulevard<br>Suite 350<br>Coral Gables, Florida 33146<br>ihoffman@ihoffmanlaw.com<br>tdreisch@ihoffmanlaw.com<br>cfabano@ihoffmanlaw.com<br>**Counsel for James Domesek, M.D. & US Radiology** |
| Julie W. Allison, Esq.<br>225 S. 21 Avenue<br>Hollywood, FL 33020<br>julie@allisonlaw.net<br>para@allisonlaw.net<br>**Counsel for Adelheid Reinoso, M.D.** | |

Respectfully submitted,

_[signature]_

_____
STANFORD BLAKE, MEDIATOR
2 GROVE ISLE DRIVE #203
MIAMI, FL 33133
Tel: (305) 890-6331
Email: stan@stanfordblakemediation.com

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NUMBER:  15-028411 CA 05

MARLANDE LAZARD,

     Plaintiff,

vs.

ELITE IMAGING, LLC.

     Defendant.

_____/

## CONSENT FINAL JUDGMENT

THIS CAUSE having come on before this Court on the Joint Stipulation for

Entry of Consent Judgment, and the Court being fully advised in the premises, it is

hereby:

ORDERED and ADJUDGED that said Stipulation be and the same is hereby

approved.  In consideration of the execution by the Defendant, Elite Imaging, LLC,

of the amount negotiated between the parties at mediation, attached as Exhibit A

and the Settlement Agreement between the parties attached as Exhibit B, and this

Court having accepted and approved as filed said Settlement Agreement, and this

Court being otherwise fully advised in the premises,

CONSENT JUDGMENT is hereby entered in favor of Marlande Lazard and

against Defendant, Elite Imaging, LLC, in the amount of $11 million dollars that

shall bear interest at the legal judgment rate, for which let execution issue.

Each side shall bear their own attorney's fees and costs.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on

05/11/17.

_____

JOHN SCHLESINGER
CIRCUIT COURT JUDGE

FINAL ORDERS AS TO ALL PARTIES
SRS DISPOSITION NUMBER  12
THE COURT DISMISSES THIS CASE AGAINST
ANY PARTY NOT LISTED IN THIS FINAL ORDER
OR PREVIOUS ORDER(S). THIS CASE IS CLOSED
AS TO ALL PARTIES.

Judge's Initials    JS

The parties served with this Order are indicated in the accompanying 11th Circuit email
confirmation which includes all emails provided by the submitter.   The movant shall
IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or
hand-delivery, to all parties/counsel of record for whom service is not indicated by the
accompanying 11th Circuit confirmation, and file proof of service with the Clerk of
Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Copies furnished to:
Gary Friedman, Esquire
Darren Friedman, Esquire

Page 2 of 2

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI
DADE COUNTY, FLORIDA

MARLANDE LAZARD,

CASE NO.: 2015-028411-CA-01

    Plaintiff,

vs.

SIGNET DIAGNOSTIC IMAGING
SERVICES, LLC., a Florida limited
liability company, U.S. RADIOLOGY
ASSOCIATES, P.C., a foreign
corporation, and JAMES M.
DOMESEK, M.D.

    Defendants.

_____/

### VERDICT FORM #1

We, the jury, return the following verdict:

1.    Was there negligence on the part of **James M. Domesek, M.D.** which was a legal
cause of loss, injury, or damage to **Marlande Lazard?**

        YES   ✓   NO  _____

If your answer to question #1 is NO, proceed to answer question #2 on Verdict Form #2.

If your answer to question #1 is YES, complete Verdict Form #2.

Please sign and date this Verdict Form.

**SO SAY WE ALL this** _20ᵗʰ_ **day of April, 2017.**

           _Saresta Rolland_
           **FOREPERSON**
           _Saresta Rolland_

EXHIBIT

#3

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI DADE COUNTY,
FLORIDA

MARLANDE LAZARD,

      Plaintiff,

vs.                                                CASE NO.: 2015-028411-CA-01

SIGNET DIAGNOSTIC IMAGING
SERVICES, LLC., a Florida limited
liability company, U.S. RADIOLOGY
ASSOCIATES, P.C., a foreign
corporation, and JAMES M.
DOMESEK, M.D.

      Defendants.

_____/

## VERDICT FORM #2

We, the jury, return the following verdict:

1.    State the percentage of negligence which was a legal cause of injury to
**Marlande Lazard** that you charge to:

    a.    Signet Diagnostic Imaging Services, LLC       85 %

    b.    James M. Domesek, M.D.       15 %

               **Total Must be 100%**       100 %

By answering the following questions you will determine the damages that
Marlande Lazard sustained as a result of the incident in question. In determining
the amount of damages, do not make any reduction because of the negligence, of
Signet Diagnostic Imaging Services, LLC. and/or James M. Domesek, M.D.

2.    What is the amount of any damages sustained by Marlande Lazard in the
past,

    a.    for medical expenses?       $ 2,009,476.19

    b.    for lost earnings or earning ability?       $ 156,000

Please answer question number 3.

3.  What is the present money value of any damages to be sustained by Marlande Lazard in the future,

    a.    for lost earning ability?                    $ 1,419,672

Please answer question number 4.

4.  What is the amount of any damages sustained by Marlande Lazard for pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a disease or physical defect or loss of capacity for the enjoyment of life,

    a.    in the past?                                  $ 7,000,000

    b.    in the future?                                $ 11,000,000

**Total Damages of Marlande Lazard**               $ 21,585,148.19
**[Add lines 2(a), 2(b), 3(a), 4(a), 4(b)]**

**SO SAY WE ALL this** ___20th___ **day of April, 2017.**

_Saresta Rolland_
**FOREPERSON**
_Saresta Rolland_

## ASSIGNMENT

Defendant Elite Imaging, Llc., ("Elite") through its manager and authorized agent, for $25,000.00 and other good and valuable consideration, does hereby assign to Plaintiffs Marlande Lazard and Emmanuel Thibaud, her husband, all rights, title, interest, claims and causes of action against Columbia Casualty Co., CNA, any other insurers with professional liability policies in effect or for plaintiff's injuries on October 2, 2013, and any insurance agents or brokers retained to secure coverage by Elite arising out of, or account of, or in connection with the October 2, 2013 ultrasound study of Marlande Lazard in Miami-Dade County, Florida. This Assignment includes but is not limited to, any and all claims in tort or contract for coverage as an insured under Columbia Casualty Co., policy number HMA4032149809-0 for breach of contract, declaratory relief, statutory bad faith, common law bad faith, bodily injury liability, excess liability, indemnification or exoneration, which this Defendant had, has now, or may acquire in the future.

EXHIBIT

4

Done at Miami-Dade County, Florida this _____ day of _____, 2016.

ELITE IMAGING, LLC.

By:_____     Dated:
    Manager & Authorized Agent

STATE OF FLORIDA      )
                 ) ss:
COUNTY OF MIAMI-DADE  )

      BEFORE ME, the undersigned authority, appeared _Rohit Navani_, personally known to me, or who produced _____ As identification, and being duly sworn, deposes and says that he/she signed the foregoing as his/her voluntary act and deed at the time and date stated thereon.

      SWORN TO AND SUBSCRIBED before me this _3rd_ day of _Feburary_, 2016.

                   Notary Public, State of Florida
                   My commission expires:

LISA R HOYT
MY COMMISSION # FF970069
EXPIRES March 10, 2020
(407) 398-0153   FloridaNotaryService.com



Eric Paynter
Underwriting Director
3957 Westerre Parkway
Richmond, VA 23233
Phone:804-934-2617
Fax:312-260-4593
Eric.Paynter@CNA.com

01/09/2014

*Revised*
## Binder of Insurance

**VIA Email**
Silvia  Leveron
AB Risk Specialist, Inc. (GA)
931 Tullis Road
Lawrenceville, GA 30043
678-359-6365
sleveron@abrisk.com

Re:   Elite Imaging, LLC
      HMA 4032149809-0

Dear Silvia:
We are pleased to bind the captioned account. Terms and conditions are as follows:

First Named Insured:        Elite Imaging, LLC
                            101 Greenwood Ave
                            Jenkintown, PA 19046

Additional Named Insured's:

| Name | Retroactive Date | Professional/General Liability |
|---|---|---|
| Elite Imaging, LLC | | |
| Elite Imaging Aventura, LLC | 4/29/2002 | PL Only |
| Elite Imaging Miami Beach, LLC | 7/1/2006 | PL Only |
| Elite Imaging Orange Park | 9/14/2009 | PL Only |
| Elite Imaging Weston | 4/29/2012 | PL Only |
| TriState Imaging Holdings of Florida, LLC | 4/6/2012 | PL Only |
| | 12/31/2013 | PL Only |

### PRIMARY

Coverage Provided:       HealthCare Facilities Professional Liability- Claims-Made

Policy Period:           12/31/2013 - 12/31/2014

Retroactive Date:        PL:12/31/13

Limit(s) of Liability:   Professional Liability:  $1,000,000 Each Claim
                                                  $3,000,000 Aggregate Limit



Page 1 of 6



## Healthcare Facilities Primary

**Insured Name**

Elite Imaging, LLC
101 Greenwood Ave
Jenkintown, PA 19046

**Policy Effective Date**

12/31/2013

**Producer Name**

AB Risk Specialist, Inc.

931 Tullis Road Lawrenceville ● GA, 30043   ● 678-359-6365

**Claim Services**

To file a claim, call 800-262-4454, fax 866-446-8632, or email HPReports@cna.com

**Risk Control Services**

To learn more about our award winning Risk Control Services and how to improve your bottom line, call 866-262-0540 or email us at riskcontrolwebinfo@cna.com.

® Copyright CNA All Rights Reserved.





## TABLE OF CONTENTS

| Form Name: | Page Number: |
|---|---|
| POLICY DECLARATIONS | 1 |
| SCHEDULE OF FORMS AND ENDORSEMENTS | 3 |
| COMMON TERMS AND CONDITIONS | 4 |
| GLOSSARY OF DEFINED TERMS | 12 |
| PROFESSIONAL LIABILITY COVERAGE PART DECLARATION | 27 |
| PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE | 28 |
| HIPAA PROCEEDINGS SUPPLEMENTARY PAYMENTS ENDORSEMENT | 32 |
| MEDIA EXPENSES SUPPLEMENTARY PAYMENTS ENDORSEMENT | 34 |
| DISCIPLINARY PROCEEDINGS SUPPLEMENTARY PAYMENTS ENDORSEMENT | 36 |
| CANCELLATION AND NONRENEWAL AMENDATORY ENDORSEMENT WITH MINIMUM EARNED PREMIUM PROVISIONS | 38 |
| EMERGENCY EVACUATION EXPENSES ENDORSEMENT | 39 |
| SERVICE OF SUIT ENDORSEMENT | 40 |
| DEDUCTIBLE ENDORSEMENT (APPLICABLE TO DAMAGES ONLY) | 41 |

© Copyright CNA All Rights Reserved.



**Healthcare Facilities Primary**
Policy Declarations



## POLICY DECLARATIONS

NOTICE: THIS IS A CLAIMS MADE POLICY. THE COVERAGE AFFORDED BY THIS POLICY IS LIMITED TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY IN ACCORDANCE WITH THE COMMON CONDITIONS, THE SECTION ENTITLED DUTIES IF THERE IS A CLAIM. DEFENSE COSTS COVERED BY THIS POLICY ARE INCLUDED WITHIN THE LIMIT OF LIABILITY. THE INSURED SHOULD READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND WHAT IS NOT COVERED.

### Named Insured and Mailing Address

| | |
|---|---|
| **Named Insured:**<br>Elite Imaging, LLC | **Mailing Address:**<br>101 Greenwood Ave<br>Jenkintown, PA 19046 |

### Policy Information / Producer Information

| Policy Information | | Producer Information | |
|---|---|---|---|
| **Policy Number:** | HMA 4032149809-0 | **Producer:** | AB Risk Specialist, Inc. |
| **Renewal of:** | | | 931 Tullis Road |
| **Policy Issued by:** | Columbia Casualty Company<br>333 S. Wabash Ave.<br>Chicago, IL 60604 | | Lawrenceville GA 30043 |
| | | **Producer code:** | 061439 |

### Policy Period / Forms and Endorsements Attached to this Policy

| Policy Period | Forms and Endorsements Attached to this Policy |
|---|---|
| 12/31/2013 to 12/31/2014 at 12:01 a.m. Standard Time at your mailing address shown above | See SCHEDULE OF FORMS AND ENDORSEMENTS |

### Limits of Insurance

| | |
|---|---|
| **Policy Aggregate Limit of Insurance** | N/A |
| **Professional Liability** | See Professional Liability Coverage Part Declarations |
| **General Liability** | See General Liability Coverage Part Declarations, if any |
| **Employee Benefits Liability** | See Employee Benefits Liability Coverage Part Declarations, if any |

© Copyright CNA All Rights Reserved.

**CNA**

Healthcare Facilities Primary
Policy Declarations

## Premium

| | |
|---|---|
| Professional Liability Premium | Included in Total Premium |
| General Liability Premium | N/A |
| Employee Benefits Liability Premium | |
| Terrorism Premium | |
| Total Premium | $80,000 |
| Minimum Earned Premium | 25% |

## Number of Days Notice of Cancellation / Non Renewal

| | Number of Days |
|---|---|
| Cancellation for nonpayment | 10 |
| Cancellation for any other reason | 30 |
| Nonrenewal | 30 |

## Notification Information

| | |
|---|---|
| Notice of **Claims and Potential Claims** | Phone #:  800-262-4454 |
| | Fax #:  866-446-8632 |
| | Email Address:  HPReports@cna.com |

Form No: CNA71817XX (03-2013)
Policy Declarations Page: 2 of 2
Underwriting Company:  Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 2 of 42

© Copyright CNA All Rights Reserved.

CNA

Healthcare Facilities Primary
Policy Schedule

## SCHEDULE OF FORMS AND ENDORSEMENTS

| Endorsement Number | Form Name | Form Number | Form Edition Date |
|---|---|---|---|
| | COMMON TERMS AND CONDITIONS | CNA71819XX | 03-2013 |
| | GLOSSARY OF DEFINED TERMS | CNA71818XX | 03-2013 |
| | PROFESSIONAL LIABILITY COVERAGE PARTCLAIMS MADE | CNA71820XX | 03-2013 |
| 1 | HIPAA PROCEEDINGS SUPPLEMENTARY PAYMENTS ENDORSEMENT | CNA71884XX | 03-2013 |
| 2 | MEDIA EXPENSES SUPPLEMENTARY PAYMENTS ENDORSEMENT | CNA71887XX | 03-2013 |
| 3 | DISCIPLINARY PROCEEDINGS SUPPLEMENTARY PAYMENTS ENDORSEMENT | CNA71890XX | 03-2013 |
| 4 | CANCELLATION AND NONRENEWAL AMENDATORY ENDORSEMENT WITH MINIMUM EARNED PREMIUM PROVISIONS | CNA71876XX | 03-2013 |
| 5 | EMERGENCY EVACUATION EXPENSES ENDORSEMENT | CNA71880XX | 03-2013 |
| 6 | SERVICE OF SUIT ENDORSEMENT | CNA71921XX | 03-2013 |
| 7 | DEDUCTIBLE ENDORSEMENT (APPLICABLE TO DAMAGES ONLY) | CNA71952XX | 03-2013 |

© Copyright CNA All Rights Reserved.





Healthcare Facilities Primary
Policy Conditions

## COMMON TERMS AND CONDITIONS

The Insurer designated in the Policy Declarations, a stock insurance corporation, hereafter called the "Insurer" and the **First Named Insured** in consideration of the payment of the premium agree as follows.

Terms in bold face type have special meaning as set forth in the **GLOSSARY OF DEFINED TERMS** or the applicable **coverage parts**, and associated forms and endorsements, of this policy. All headings are also in bold face type, whether or not they contain defined terms. See the section entitled **HEADINGS** below.

### ASSISTANCE AND COOPERATION

If there is a **claim** the **Insured** must:

A. forward to the Insurer or its designee, copies of the papers and documents, if any, which inform the **Insured** of a **claim**, including all notices, summonses or other processes regarding legal proceedings;

B. fully cooperate with the Insurer or its designee in all investigations, the making of settlements, the conduct of suits or other proceedings, enforcing any right of contribution or indemnity against another who may be liable to the **Insured** because of the **claim**. The **Insured** shall attend hearings and trials, assist in securing and giving evidence, and obtaining the attendance of witnesses; and

C. refuse, except at the **Insured's** own cost to voluntarily make any payment, assume any obligation or incur any expense other than reasonable medical expenses incurred at the time of the event and payable pursuant to the section entitled **COVERAGES**, paragraph **C.**, **Medical Payments** of the **General Liability Coverage Part.**

### BANKRUPTCY

Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate will not relieve the Insurer of its obligations under this policy.

### CANCELLATION AND NON-RENEWAL

The Cancellation/Nonrenewal provisions are as set forth in the Cancellation/Nonrenewal Endorsement attached to this policy.

### CHANGES TO THE POLICY

Notice to any of the Insurer's agents or knowledge possessed by any such agent or any other person shall not act as a waiver or change in any part of this Policy. Nor will such notice prevent the Insurer from asserting any rights under the provisions of this Policy. None of the provisions of this Policy will be waived, changed or modified except by written endorsement issued to form a part of this Policy.

### CHANGES TO THE BUSINESS, ACQUISITIONS AND MERGERS

A. The **Named Insured** must provide prior notice to the Insurer of the following events:

1. material or significant changes to the type or volume of the **professional services** reported to the Insurer in the **Named Insured's** application, unless such change is due to the acquisition or formation of a new subsidiary, in which case, **Section** entitled **NEW AND EXISTING SUBSIDIARIES/CESSATION OF SUBSIDIARY STATUS**, paragraph **A.** will control.

2. the **Named Insured's** merger with another entity; or

3. the acquisition of all or substantially all of the **Named Insured's** assets by another entity;

---

Form No: CNA71819XX (03-2013)
Policy Conditions Page: 1 of 8
Underwriting Company:  Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 4 of 42

© Copyright CNA All Rights Reserved.

B.  Upon receipt of such notice, the Insurer may:

1.  adjust the premium to reflect the added exposure; or

2.  solely with respect to items set forth in paragraphs **A.2.** and **A.3.** above, deem this policy to have ceased with respect to **claims** made against the **Insured** based on any act, error or omission in the rendering of **professional services**, or any **occurrence** or offense committed or allegedly committed on or subsequent to the time and date of said event. In such case, the **policy period** shall remain unaltered and coverage will continue but only with respect to any act, error or omission in the rendering of **professional services**, or any **occurrence** or offense committed or allegedly committed prior to the time and date of any such event in accordance with all other terms and conditions of this policy.

## CONCEALMENT, MISREPRESENTATION AND FRAUD

No concealment, misrepresentation or fraud shall avoid or defeat recovery under this policy unless such concealment, misrepresentation or fraud was material. Concealment, misrepresentation or fraud in the procurement of this policy which if known by the Insurer would have led to refusal by the Insurer to make this contract or provide coverage, or to make this contract or provide coverage on different terms or conditions, will be deemed material.

## DUTIES AS THE FIRST NAMED INSURED ON THE DECLARATIONS

The **First Named Insured**, on behalf of all others, will be:

A.  authorized to make changes in the terms of this policy with the consent of the Insurer;

B.  the payee of any premiums the Insurer refunds;

C.  responsible for:

1.  the payment of all premiums due;

2.  keeping records of the information the Insurer requires for premium computation, and sending copies of such records at such times as requested by the Insurer;

3.  notifying the Insurer that the **First Named Insured** on behalf of all others wants to cancel this policy.

## ECONOMIC AND TRADE SANCTIONS

This policy does not provide coverage for **Insureds**, transactions or that part of **damages** or **defense costs** that is uninsurable under the laws or regulations of the United States concerning trade or economic sanctions.

## ENTIRE CONTRACT

By acceptance of this policy, the **Insureds** agree that this policy, consisting of these **COMMON TERMS AND CONDITIONS** the **coverage parts**, the **GLOSSARY OF DEFINED TERMS**, and all endorsements to this policy, constitute the entire contract existing between the parties relating to this insurance.

## ESTATES, LEGAL REPRESENTATIVES, SPOUSES AND DOMESTIC PARTNERS

The estates, heirs, legal representatives, assigns, spouses and any **domestic partner** of a natural person **Named Insured** shall also be insured under this policy; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, spouses or **domestic partners** only for **claims** arising solely out of their status as such and, in the case of a spouse or **domestic partner**, where such **claim** seeks **damages** from marital community property, jointly held property or property transferred from the **Named Insured** to such spouse or **domestic partner**. No coverage is provided for any act, error or omission of an estate, heir, legal representative, assign, spouse or **domestic partner**.

Form No: CNA71819XX (03-2013)
Policy Conditions Page: 2 of 8
Underwriting Company:  Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 5 of 42

© Copyright CNA All Rights Reserved.



**Healthcare Facilities Primary**
Policy Conditions

## EXAMINATION OF THE NAMED INSURED'S BOOKS AND RECORDS

The Insurer may examine and audit the **Named Insured's** books and records as they relate to this Policy at any time during the **policy period** and up to 3 years afterward.

## EXTENDED REPORTING PERIOD

### A. Automatic Extended Reporting Period

With respect to any **coverage part** written on a claims made basis, the Insurer will provide the **First Named Insured** with an automatic, noncancelable **extended reporting period** starting at the termination of the **policy period** if the **Insured** has not obtained replacement coverage, whether a policy or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles or other alternative arrangements, within sixty (60) days of the termination of this policy. This automatic **extended reporting period** will terminate after sixty (60) days.

### B. Optional Extended Reporting Period

With respect to any **coverage part** written on a claims made basis, if the **First Named Insured** has not obtained replacement coverage and writes to the Insurer within 60 days of the termination date telling the Insurer that it wants a further extension, and pays any amounts owed to the Insurer promptly when due together with any earned but unpaid premium which may be due under the terminated policy, the period of time allowed by the Policy for the reporting of **claims** to the insurer will be further extended in accordance with the rules, rates and rating plans in effect for the Insurer at the inception of the reporting period. Once paid, the premium for this option is non-refundable and considered fully earned.

### C. It is understood and agreed that no **extended reporting period** shall be construed to be a new Policy and any **claim** submitted during an **extended reporting period** shall otherwise be governed by this Policy. The Insurer's liability for all **claims** reported during the automatic and optional **extended reporting periods** shall be part of and not in addition to the limits of liability for the **policy period** as set forth in the Declarations.

### D. The optional **extended reporting period**, if any, will run concurrently with the automatic **extended reporting period**. If purchased, **extended reporting period** coverage may not be cancelled.

Such extended reporting periods as set forth in paragraphs A. or B. above shall not apply to **claims** that are covered under any subsequent insurance the **Insured** purchases, or that would be covered but for exhaustion of the limit of insurance applicable to such **claims**.

## GOVERNMENT ACCESS TO RECORDS

In accordance with the requirements of Section 952 of the Omnibus Reconciliation Act of 1980, and upon written request, the Insurer will allow the Secretary of Health and Human Services and the Comptroller General access to the policy and necessary books, documents and records to verify the cost of the policy, to the extent required by law. Access will also be allowed to subcontracts between the Insurer and any of its related organizations and to such organization's books, documents and records. Such access will be provided up to four (4) years after the services furnished under this Policy end.

## HEADINGS

The description in the headings and subheadings of this Policy is solely for convenience, and forms no part of the terms and conditions of coverage.

## INSPECTIONS AND SURVEYS

The Insurer has the right but is not obligated to:

A. make inspections and surveys at any time;

---

Form No: CNA71819XX (03-2013)
Policy Conditions Page: 3 of 8
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 6 of 42

© Copyright CNA All Rights Reserved.



B.  give the **Named Insured** reports on the conditions it finds;

C.  recommend changes; or

D.  conduct loss control and prevention activity.

Any inspections, surveys, reports, or recommendations relate only to insurability and the premiums to be charged.

The Insurer does not:

1.  make safety inspections;

2.  undertake to perform the duty of any entity to provide for the health or safety of workers or the public; nor

3.  warrant that conditions:

    a.  are safe or healthful; or

    b.  comply with laws, regulations, codes or standards.

This provision applies not only to the Insurer, but also to any rating, advisory, rate service, or similar organization which makes insurance inspections, surveys, recommendations, reports, or gives loss control or prevention advice, on its behalf.

## INSURANCE UNDER MORE THAN ONE COVERAGE

If more than one of this Policy's **coverage part** apply to the same **claim**, the Insurer will not pay more than the limit of insurance of the **coverage part** most applicable to the type of **claim** which shall be determined at the Insurer's sole discretion.

## LEGAL ACTION LIMITATION

No **Insured** may bring any legal action against the Insurer concerning this policy until:

A.  the **Insured** has fully complied with all the provisions of this policy; and

B.  the amount of the **Insured's** obligation to pay has been decided.  Such amount can be set by judgment against the **Insured** after actual trial or **arbitration proceeding** or by written agreement between the **Insured**, the claimant and the Insurer.

Any claimant, or its legal representative, is entitled to recover under this Policy after it has secured a judgment or written agreement. Recovery is limited to the extent of the insurance afforded by this Policy. No claimant has any right under this Policy to include the Insurer in any action against the **Insured** to determine the **Insured's** liability, nor will the **Insured** or the **Insured's** representative bring the Insurer into such an action. If the **Insured** or the **Insured's** estate becomes bankrupt or insolvent, it does not change any of the Insurer's obligations under this policy.

## LIMITS OF INSURANCE/POLICY AGGREGATE

The Limits of Insurance are subject to the rules set forth under each **coverage part** under the section entitled **LIMITS OF INSURANCE.**

The Limits of Insurance for each **coverage part**, as applicable, are subject to the Policy Aggregate Limit of Insurance, if any, as specified in the Policy Declarations. As such, any aggregate Limit of Insurance in any **Coverage Part Declarations** are sublimits which are part of and not in addition to the Policy Aggregate Limit of Insurance.

Form No: CNA71819XX (03-2013)
Policy Conditions Page: 4 of 8
Underwriting Company:  Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 7 of 42

© Copyright CNA All Rights Reserved.



Healthcare Facilities Primary
Policy Conditions

## NEW AND EXISTING SUBSIDIARIES/CESSATION OF SUBSIDIARY STATUS

**A. Newly Acquired and Newly Formed Subsidiaries**

If, after the effective date of this policy any **Insured Entity** first has **management control** of any newly acquired or newly formed entity, such entity (and any subsidiaries, directors, officers, trustees or employees of such entity who otherwise would thereby become an **Insured**), shall be covered under this policy in conformance with all terms and conditions of this policy and with respect to such newly acquired or newly formed entity, subject to the following:

1. where coverage is provided on a Claims–Made basis, both the **occurrence**, act error or omission or offense giving rise to the **claim** and the **claim** itself is made on or after the effective date of **management control** and within 90 days of such effective date, or on the termination of this policy, whichever is earlier; and

2. where coverage is written on an occurrence basis, the **bodily injury** or **property damage**, or offense giving rise to **personal and advertising injury**, occurred on or after the effective date of **management control** and within 90 days of such effective date, or on the termination of this policy, whichever is earlier.

Notwithstanding the above, if the Insurer agrees to provide coverage to such newly acquired or newly formed entity, such entity will be listed in a **Subsidiary** Endorsement and coverage for such **subsidiary** will then apply in conformance with the provisions of such **Subsidiary** Endorsement.

**B. Underwritten Subsidiaries**

Except with respect to coverage provided to newly acquired or newly formed subsidiaries under paragraph **A.** above, coverage for any **subsidiary** or any natural person **executive** or **employee** of any such **subsidiary** applies in conformance with all terms and conditions of this policy and, that with respect to any such **subsidiaries** and its **executives** or **employees** coverage is also subject to the following:

1. where coverage is written on a Claims-Made basis,

   a. the **claim** is both first made during the **policy period** and on or after the effective date of **management control**, and

   b. the **claim** is based on or arises out of any **occurrence**, act, error or omission or offense that occurred:

      i. on or after the date an **Insured Entity** first had **management control** of any such **subsidiary**; or

      ii. on or after the date such **subsidiary** became continuously insured without interruption under any applicable claims made policy which date is indicated on a Schedule of **Subsidiary** Retroactive Dates submitted annually or as requested by the Insurer,

      whichever is earlier, unless such **subsidiary** is listed in the **Subsidiary** Endorsement and a Retroactive Date is specified for such **subsidiary** in such endorsement.

2. where coverage is written on an occurrence basis, the **bodily injury** or **property damage** or offense giving rise to **personal and advertising injury** occurred on or after the effective date of **management control**

**C. Cessation of Subsidiary**

On the date when **management control** ceases (the "termination date"), subject to all other terms and conditions of this Policy, coverage applies only to:

---

Form No: CNA71819XX (03-2013)
Policy Conditions Page: 5 of 8
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 8 of 42

© Copyright CNA All Rights Reserved.



1. with respect to **claims** made coverage, acts, error or omissions, or **occurrences**, or offenses causing **personal and advertising injury** that happened on or after the Retroactive Date, if any, or if none, on or after the effective date of this policy, and prior to the termination date;

2. with respect to occurrence coverage, acts, errors or omission, or **bodily injury, property damage,** or an offense causing **personal and advertising injury** that happened within the **policy period** and prior to the termination date.

## NOTICE OF CLAIMS AND POTENTIAL CLAIMS

A.  With respect to any **coverage part** written on a Claims-Made basis,

1. **Notice of Claims**

   The **Insured**, as a condition precedent to the obligations of the Insurer under this Policy, must give the Insurer written notice of any **claim** as soon as possible and during the **coverage relationship**. The Insurer agrees that the **Insured** may have up to, but not to exceed, 30 days after the termination of the **coverage relationship** to report a **claim** made against the **Insured** during the **policy period** if the reporting of such **claim** is done as soon as possible.

2. **Notice of Potential Claims**

   If during the **coverage relationship** any **authorized insured** becomes aware of:

   a. with respect to the **Professional Liability Coverage Part**, any act, error or omission in the rendering of **professional services**; or

   b. with respect to the **General Liability Coverage Part**, bodily injury or property damage arising out of an **occurrence**, or an offense causing **personal and advertising liability**; or

   c. with respect to the **Employee Benefits Liability Coverage Part**, any act, error or omission committed in the **administration** of the **Insured Entity's employee benefit program**:

   that may reasonably be expected to be the basis of a **claim** against the **Insured** and gives written notice during the **coverage relationship** to the Insurer of such act, error or omission or such injury, **occurrence** or offense, and the reasons for anticipating a **claim**, with full particulars, including but not limited to:

   i.   the specific act, error or omission, or the specific injury, **occurrence** or offense; and

   ii.  the dates and persons involved; and

   iii. the identity of anticipated or possible claimants; and

   iv.  the consequences which have resulted or may result from such act, error or omission, or such injury, **occurrence** or offense; and

   v.   the nature of the potential monetary amounts or non-monetary relief which may be sought in consequence of such specific act, error or omission, or such specific injury, **occurrence** or offense;

   then any **claim**, whenever made, that arises out of such reported act, error or omission or such injury, **occurrence** or offense shall be deemed to have been made at the time such written notice of the **potential claim** was first given to the Insurer. If notice of a **potential claim** is given to the Insurer in accordance with this paragraph, then until such date that a **claim** is made, the Insurer may pay for all costs or expenses it incurs at its sole discretion as a result of its investigation or settlement of such **potential claim**.

3. **When A Claim is Made**

   Except as set forth in paragraph 2., **Notice of Potential Claims**, a **claim** will be deemed first made at the earliest of the following times:

Form No: CNA71819XX (03-2013)
Policy Conditions Page: 6 of 8
Underwriting Company:  Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 9 of 42

© Copyright CNA All Rights Reserved.



    a. when any **authorized insured** first receives a written or oral demand or,

    b. when any **authorized Insured** is first served with a suit.

B. With respect to any **coverage part** written on an occurrence basis:

  1. The **Insured** must see to it that the Insurer is notified as soon as possible of an **occurrence** or an offense which may result in a **claim**. To the extent possible, notice should include:

    a. how, when and where the **occurrence** or offense took place;

    b. the names and addresses of any injured persons and witnesses; and

    c. the nature and location of any injury or damage arising out of the **occurrence** or offense.

  2. If a **claim** is made against any **Insured**, the **Insured** must:

    a. immediately record the specifics of the **claim** and the date received; and

    b. notify the Insurer in writing as soon as possible.

  3. The **Insured** must:

    a. immediately send the Insurer copies of any demands, notices, summonses or legal papers received in connection with the **claim**;

    b. authorize the Insurer to obtain records and other information.

### OTHER INSURANCE OR RISK TRANSFER ARRANGEMENTS

Any **claim** insured under any other insurance policy or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles or other alternative arrangements, which applies to this **claim** shall be paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to loss that is more than the total limit of all deductibles, retentions, limits of insurance, self-insured amounts or other valid and collectible insurance or risk transfer arrangements, whether primary, contributory, excess, contingent, or otherwise. In no event will the Insurer pay more than its limit of insurance. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific excess insurance over the Limits of Insurance of the Policy.

### PREMIUM

All premium charges under this policy will be computed according to the Insurer's rules and rating plans that apply at the inception of the current **policy period**. Premium charges may be paid to the Insurer or its authorized representative.

The Insurer computes the premium that the **Named Insured** pays for this Policy using information available prior to the effective date of the Policy. On some policies, the Insurer charges a fixed amount with no adjustment later. On auditable policies, all or part of the **Named Insured's** premium may be based on estimates. The deposit premium for auditable policies is shown on an audit endorsement and is due on the inception date of the Policy.

On auditable policies, the Insurer computes the **Named Insured's** actual premium when complete information is available after the end of the **policy period**. If it is more than the **Named Insured** has already paid, the **Named Insured** owes the Insurer the difference. If it is less, the Insurer shall pay the **Named Insured** back the difference. However, the **Named Insured** will not pay less than any minimum annual premium agreed upon.

The **Named Insured** must keep accurate records of the information the Insurer requires to compute the **Named Insured's** premium. The **Named Insured** agrees to send the Insurer these records at the end of each **policy period**, or any other time requested by the Insurer.

Form No: CNA71819XX (03-2013)
Policy Conditions Page: 7 of 8
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 10 of 42

© Copyright CNA All Rights Reserved.



Healthcare Facilities Primary
Policy Conditions

## SEVERABILITY OF INTERESTS

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the **First Named Insured**, this insurance applies:

A. as if each **Named Insured** were the only **Named Insured**; and

B. separately to each **Insured** against whom a **claim** is made.

## TERMS AND CONDITIONS

The terms and conditions of each **coverage part** apply only to that **coverage part** and shall not apply to any other **coverage part**. If any provision in these **COMMON TERMS AND CONDITIONS** is inconsistent with or in conflict with the terms and conditions of any **coverage part**, the terms and conditions of such **coverage part** shall control for purposes of that **coverage part**.

## TERRITORY

This policy applies to acts, errors or omissions, **occurrences** and offenses (including offenses that take place through the Internet or similar electronic means of communication) occurring any where in the world, provided that the **claim** is made and any legal proceedings are pursued within the United States of America, its territories, possessions, or commonwealths, Puerto Rico or Canada.

## TRANSFER OF INTEREST

Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

## TRANSFER OF RIGHTS OF RECOVERY

If any Insured for whom payment is made by the Insurer under this policy has rights to recover amounts from another, those rights are transferred to the Insurer to the extent of its payment. The **Insured** must do everything necessary to secure the Insurer's rights and must do nothing to prejudice such rights.

IN WITNESS WHEREOF, the Insurer has caused this policy to be signed by the Insurer's Chairman and Secretary, but this policy shall not be binding upon the Insurer unless completed by the attachment of the Declarations and signed by the Insurer's duly authorized representative.

Chairman of the Board                                    Secretary

Form No: CNA71819XX (03-2013)
Policy Conditions Page: 8 of 8
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 11 of 42

© Copyright CNA All Rights Reserved.





**GLOSSARY OF DEFINED TERMS**

This **GLOSSARY OF DEFINED TERMS** applies to the **Professional Liability Coverage Part**, the **General Liability Coverage Part** and the **Employee Benefits Liability Coverage Part**. For purposes of this policy, words in bold face type, whether expressed in the singular or the plural, have the meaning set forth below.

## ADMINISTRATION

**Administration** means:

A. providing information to **employees**, including their dependents and beneficiaries, with respect to eligibility for or scope of **employee benefit programs**;

B. handling records in connection with the **employee benefit program**; or

C. effecting, continuing or terminating any **employee's** participation in any benefit included in the **employee benefit program**.

However, **administration** does not include handling payroll deductions.

## ADMINISTRATIVE SERVICES

**Administrative services** means planning, organizing, directing and controlling, on the **Insured Entity's** behalf, the medical operations of the **Insured Entity** by or on behalf of an **administrator**. **Administrative services** include services as a member of a **formal review board**. **Administrative services** do not include:

A. employment benefit plan, program or policy consultation, administration or implementation;

B. billing services;

C. recording of accounts or monetary transactions, financial reporting and budgeting;

D. administration of insurance plans; including **claims**, **administration**, billing and collection services;

E. case management and utilization management or review for others;

F. quality assurance and risk management activities for others;

G. marketing and advertising activities;

H. designing, developing, programming, distributing, installing, licensing, servicing, and maintaining computer hardware and software, including web-based applications, web sites and online services.

## ADMINISTRATOR

**Administrator** means any natural person who is now, was or will be a superintendent, medical director, any department head (including the head of the medical staff), any **formal review board** member or any staff member but solely to the extent that he or she performs **administrative services** on the **Insured Entity's** behalf.

## ADVERTISEMENT

**Advertisement** means a notice that is broadcast or published to the general public or specific market segments about the **Insured Entity's** goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

A. notices that are published include material placed on the Internet or on similar electronic means of communication; and

B. regarding web-sites, only that part of a web-site that is about the **Insured Entity's** goods, products or services for the purposes of attracting customers or supporters is considered an **advertisement**.

---

Form No: CNA71818XX (03-2013)
Glossary Page: 1 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 12 of 42

© Copyright CNA All Rights Reserved.



## ARBITRATION PROCEEDING

Arbitration proceeding means a formal alternative dispute resolution proceeding or administrative hearing to which an Insured is required to submit by statute or court rule or to which an Insured has submitted with the Insurer's consent.

## ASBESTOS

Asbestos means the mineral in any form whether or not the asbestos was at any time airborne as a fiber, particle or dust, contained in or formed a part of a product, structure or other real or personal property, carried on clothing, inhaled or ingested, or transmitted by any other means.

## AUTHORIZED INSURED

Authorized insured means any executive officer, member of the Named Insured's human resources, risk management or in-house general counsel's office, or any employee authorized by the Named Insured to give or receive notice of a claim.

## AUTO

Auto means:

A.  a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment;

B.  any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However auto does not include mobile equipment.

## BODILY INJURY

Bodily injury means bodily injury, sickness or disease sustained by a person including death. Bodily injury also includes mental injury or mental anguish sustained by a person at any time if such mental injury or mental anguish results as a consequence of such bodily injury, sickness or disease.

## CAFETERIA PLANS

Cafeteria plans means plans authorized by applicable law to allow employees as defined with respect to the Employee Benefits Liability Coverage Part, to elect to pay for certain benefits with pre-tax dollars.

## CLAIM

Claim means:

A.  a civil proceeding in which damages because of injury to which this insurance applies are alleged, including:

   1.  an arbitration proceeding alleging such damages; or

   2.  any other alternative dispute resolution proceeding in which such damages are claimed and to which the Insured submits with the Insurer's consent; or

B.  a written or oral demand for damages alleging injury to which this insurance applies.

## COVERAGE PART

Coverage part  means only those coverage parts designated as included in the Declarations.

## COVERAGE RELATIONSHIP

Coverage relationship means that period of time that begins on the effective date of the first policy issued by the Insurer to the First Named Insured of which this policy is a renewal in a consecutive series of renewals and the cancellation date or nonrenewal date of the last such consecutive renewal policy issued by the Insurer to the First Named Insured, where there has been no gap in coverage

---

Form No: CNA71818XX (03-2013)
Glossary Page: 2 of 15
Underwriting Company:  Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 13 of 42

© Copyright CNA All Rights Reserved.



**Healthcare Facilities Primary**
Glossary

## DAMAGES

**Damages** means the amount an **Insured** is legally obligated to pay, either through:

A. final adjudication of a **claim**; or

B. through compromise or settlement of a **claim** with the Insurer's written consent or direction;

because of:

1. with respect to the **Professional Liability Coverage Part**, acts, errors or omissions in the rendering of **professional services**; or

2. with respect to the **General Liability Coverage Part**, **occurrences** causing **bodily injury** or **property damage** or offenses causing **personal and advertising injury** covered by this policy;

3. with respect to the **Employee Benefits Liability Coverage Part**, acts, errors or omissions negligently committed in the **administration** of the **Insured Entity's** employee benefit program.

In addition, **damages** includes the above mentioned sums only after deducting all other recoveries and salvages.

However, **damages** does not include:

a. with respect to any **claim**;

   i. restitution, return or disgorgement of fees, costs and expenses paid or incurred or charged by an **Insured**, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, set-off or otherwise, and injuries that are a consequence of any of the foregoing;

   ii. civil or criminal fines, sanctions, penalties, forfeitures, or taxes whether pursuant to statute, regulation or court rule, including those imposed under the Internal Revenue Code;

   iii. the multiplied portion of multiplied awards imposed pursuant to any statute or regulation requiring such awards;

   iv. injunctive or declaratory relief;

   v. any amount that is not insurable under any applicable law; or

   vi. plaintiff's attorney fees associated with any of the above;

b. in addition to paragraph a. i. through vii. above, with respect to the **Employee Benefits Liability Coverage Part**, **damages** also does not include:

   i. any amounts for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the **Insured**, from the applicable funds accrued or other collectible insurance; or

   ii. any amounts that exceed the limits and restrictions that apply to the payment of benefits in any plan included in the **employee benefit program**.

## DEFENSE COSTS

**Defense costs** mean:

A. reasonable and necessary fees, costs, and expenses incurred by the **Insurer** or consented to by the **Insurer** and incurred by the **Insured Entity** in the defense or appeal of any covered **claim**, and includes premium for appeal bonds, attachment bonds or similar bonds arising out of a covered judgment, but only such premium up to the applicable limit of insurance. In addition, the **Insurer** will pay up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which **bodily injury** coverage applies. The **Insurer** has no obligation to provide such bonds;

B. prejudgment interest awarded against an **Insured** on that part of a judgment covered by this policy. If the **Insurer** makes an offer to pay the applicable limit of insurance, the **Insurer** will not pay any prejudgment

---

Form No: CNA71818XX (03-2013)
Glossary Page: 3 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 14 of 42

© Copyright CNA All Rights Reserved.



interest based on that period of time after the offer;

C.  post judgment interest which accrues after entry of judgment, but before the Insurer has paid or offered to pay, or deposited in court that part of the judgment which is within the limit of insurance of this policy. The amount of interest the Insurer pays will be in direct proportion to the amount of **damages** the Insurer pays in relation to the total amount of the judgment;

D.  all reasonable expenses incurred by an **Insured** at the Insurer's request to assist the **Insurer** in the investigation or defense of the **claim**. This includes the **Insured's** actual loss of earnings up to $750 per day, because of time off from work;

E.  Solely with respect to the **General Liability Coverage Part**:

if the Insurer defends an **Insured** against a **claim** and an indemnitee of the **Insured** is also named as a party to the **claim**, the Insurer will defend that indemnitee if all of the following conditions are met:

1.  the **claim** against the indemnitee seeks damages for which the **Insured** has assumed the liability of the indemnitee in a contract or agreement that is an **insured contract**;

2.  this insurance applies to such liability assumed by the **Insured**;

3.  the obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the **Insured** in the same **insured contract**;

4.  the allegations in the **claim** and the information the Insurer knows about the **occurrence** are such that no conflict appears to exist between the interests of the **Insured** and the interests of the indemnitee;

5.  the indemnitee and the **Insured** ask the Insurer to conduct and control the defense of that indemnitee against such **claim** and agree that the Insurer can assign the same counsel to defend the **Insured** and the indemnitee; and

6.  the indemnitee:

    a.  agrees in writing to:

        i.    cooperate with the Insurer in the investigation, settlement or defense of the **claim**;

        ii.   immediately send the Insurer copies of any demands, notices, summonses or legal papers received in connection with the **claim**;

        iii.  notify any other insurer whose coverage is available to the indemnitee; and

        iv.   cooperate with the Insurer with respect to coordinating other applicable insurance available to the indemnitee; and

    b.  provides the Insurer with written authorization to:

        i.    obtain records and other information related to the **claim**; and

        ii.   conduct and control the defense of the indemnitee in such **claim**.

So long as the above conditions are met, attorneys' fees incurred by the Insurer in the defense of that indemnitee, necessary litigation expenses incurred by the Insurer and necessary litigation expenses incurred by the indemnitee at the Insurer's request will be paid as **defense costs** and, as such, such payments will not be deemed to be **damages** for **bodily injury** and **property damage** and will not reduce the limits of insurance.

The Insurer's obligation to defend an **Insured's** indemnitee and to pay for attorneys' fees and necessary litigation expenses ends when the Insurer has used up the applicable limit of insurance in the payment of judgments or settlements; or the conditions set forth above, or the terms of the agreement described in paragraph **6.** above, are no longer met.

However **defense costs** do not include:

Form No: CNA71818XX (03-2013)
Glossary Page: 4 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 15 of 42

© Copyright CNA All Rights Reserved.



**Healthcare Facilities Primary**
Glossary

   i.  salaries, wages, fees, overhead or benefit expenses associated with an **Insured Entity's executive officers** or **employees**;

   ii.  fees and expenses of independent adjusters engaged by the Insurer or salaries of the Insurer's officials or employees, other than fees and expenses charged by the Insurer's employed attorneys who may be designated to represent an **Insured** with such **Insured's** consent.

## DOMESTIC PARTNER

**Domestic partner** means any person qualifying as such under any federal, state or local laws or under the **Insured Entity's** employee benefit plans or **employee benefits program.**

## ELECTRONIC DATA

**Electronic data** means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

## EMPLOYEE

**Employee** means:

A.  with respect to the **Employee Benefits Liability Coverage Part**, a person actively employed, formerly employed, on leave of absence or disabled, or retired. **Employee** includes a **leased worker**. **Employee** does not include a **temporary worker;**

B.  with respect to the **Professional Liability Coverage Part** and the **General Liability Coverage Part**, a person whose work is or was engaged and directed by the **Insured Entity**, including students and volunteers. An **employee** includes seasonal and temporary **employees** and **employees** leased or loaned to the **Insured Entity**. An independent contractor is not an **employee**. Solely with respect to the **Professional Liability Coverage Part**, an **employee** does not include interns, residents, physicians, surgeons, dentists, nurse anesthetists, nurse midwives, podiatrists or chiropractors acting in their capacity as such except and solely to the extent they are rendering **Good Samaritan services, proctoring services** or **administrative services.**

## EMPLOYEE BENEFIT PROGRAM

**Employee benefit program** means a program providing some or all of the following benefits to **employees**, as defined with respect to the **Employee Benefits Liability Coverage Part**, whether provided through a **cafeteria plan** or otherwise:

A.  group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexible spending accounts, provided that no one other than an **employee** may subscribe to such benefits and such benefits are made generally available to those **employees** who satisfy the plan's eligibility requirements;

B.  profit sharing plans, **employee** savings plans, **employee** stock ownership plans, pension plans and stock subscription plans, provided that no one other than an **employee** may subscribe to such benefits and such benefits are made generally available to all **employees** who are eligible under the plan for such benefits;

C.  unemployment insurance, social security benefits, workers' compensation and disability benefits; or

D.  vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies.

## EXECUTIVE OFFICER

**Executive officer** means any natural person director, officer, trustee or governor of a corporation, management committee member of a joint venture, partner of any partnership or manager or member of the Board of Managers of a limited liability company. Solely with respect to the **Professional Liability Coverage Part**, an **executive officer** does not include interns, residents, physicians, surgeons, dentists, nurse anesthetists, podiatrists or chiropractors  except and solely to the extent they are rendering **Good Samaritan services,**

Form No: CNA71818XX (03-2013)
Glossary Page: 5 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 16 of 42

© Copyright CNA All Rights Reserved.



proctoring services or administrative services.

## EXTENDED REPORTING PERIOD

Extended reporting period means:

A. with respect to the **Professional Liability Coverage Part**, the period of time after the end of the **policy period** for reporting **claims** to the Insurer that are made against an **Insured** during the applicable **extended reporting period** arising out of acts errors or omissions that took place on or after any applicable Retroactive Date and prior to the end of the **policy period;**

B. with respect to the **General Liability Claims Made Coverage Part**, the period of time after the end of the **policy period** for the reporting of **claims** to the Insurer that are made against the **Insured** during the applicable **extended reporting period** arising out of an **occurrence** causing **bodily injury** or **property damage,** which **occurrence** took place on or after any applicable Retroactive Date and prior to the end of the **policy period,** or arising out of an offense causing **personal and advertising injury,** which offense took place on or after any applicable Retroactive Date and prior to the end of the **policy period;** or

C. with respect to the **Employee Benefits Liability Coverage Part**, the period of time after the end of the **policy period** for reporting **claims** to the Insurer that are made against an **Insured** during the applicable **extended reporting period** arising out of acts errors or omissions negligently committed in the **administration** of the **Insured Entity's employee benefit program** that took place on or after any applicable Retroactive Date and prior to the end of the **policy period;**

## FIRST NAMED INSURED

First Named Insured means the entity first listed as a **Named Insured** in the Declarations.

## FORMAL REVIEW BOARD

Formal review board means the **Insured Entity's** official boards or committees formed for the purpose of:

A. evaluating the qualifications or performance of the **Insured Entity's** professional staff; or

B. evaluating, maintaining and ensuring the quality of **professional services** being provided at the **Insured Entity's** healthcare facility.

## FUNGI

Fungi means any form of fungus, including but not limited to, yeast, mold, mildew, rust, smut or mushroom, and including any spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of fungi. However, **fungi** does not include any fungi intended by the **Insured** for consumption.

## GOOD SAMARITAN SERVICES

Good Samaritan services means services provided by a natural person **Insured:**

A. in a sudden and unforeseen emergency situation; or

B. at the direction of an **Insured Entity;**

for which no remuneration is expected, demanded or received.

## HAZARDOUS PROPERTIES

Hazardous properties means radioactive, toxic or explosive properties.

## HEALTHCARE SERVICES

Healthcare services means services performed on behalf of the **Insured Entity** by an **Insured,** or by someone for whom an **Insured** is liable, to care for or assist the **Insured Entity's** patient. **Healthcare services** include the furnishing of food, beverages, medications or appliances in connection with such services, and the postmortem

Form No: CNA71818XX (03-2013)
Glossary Page: 6 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 17 of 42

© Copyright CNA All Rights Reserved.



handling of human bodies.

## HOSTILE FIRE

**Hostile fire** means one which becomes uncontrollable or breaks out from where it was intended to be.

## IMPAIRED PROPERTY

**Impaired property** means tangible property, other than **insured product** or **insured work** that cannot be used or is less useful because:

A.  it incorporates **insured product** or **insured work** that is known or thought to be defective, deficient, inadequate or dangerous; or

B.  the **Insured Entity** has failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of **insured product** or **insured work**; or the **Insured Entity's** fulfilling the terms of the contract or agreement.

## INSURED

**Insured** means any **Insured Entity** and,

A.  with respect to coverage under the **Professional Liability Coverage Part**:

    1.  any person who is or becomes the **Insured Entity's executive officer, employee** or **administrator** during the **policy period** shown in the Declarations; or

    2.  any person or organization to whom or to which the **Insured Entity** is obligated by virtue of a written contract or agreement:

        a.  to add to this policy as an additional insured for its liability; or

        b.  to hold harmless or indemnify such person or organization;

    but such person or organization is an insured exclusively for the vicarious liability imposed upon such person or organization because of acts, errors or omissions in the rendering of covered **professional services** by the **Insured Entity**, and only to the extent of the limits of insurance required by such contract or agreement, not to exceed the limits of insurance of this Policy;  However, this provision does not apply:

        i.  unless the written contract or agreement has been executed prior to the act, error or omission in the rendering of **professional services** upon which the **claim** is based. The contract or agreement will be considered executed when the **Insured's** performance begins, or when it is signed, whichever happens first; or

        ii.  to any person or organization for its liability arising out if its own acts, errors or omissions.

    Further, where required by such written contract or agreement, coverage for such person or organization shall be primary and non-contributory as respects any other insurance policy issued to such additional insured. Otherwise the section entitled OTHER INSURANCE OR RISK TRANSFER ARRANGEMENTS in the COMMON TERMS AND CONDITIONS applies.

B.  with respect to coverage under the **General Liability Coverage Part**, any individual who was, is or becomes:

    1.  an **executive officer** but only with respect to the conduct of the **Insured Entity's** business; or

    2.  the **Insured Entity's** stockholders, but only with respect to their liability as stockholders;

    3.  the **Insured Entity's employee**, but only for acts within the scope of their employment by the **Insured Entity** or while performing duties related to the conduct of the **Insured Entity's** business.

    However, none of these **employees** is an Insured for:

Form No: CNA71818XX (03-2013)
Glossary Page: 7 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 18 of 42

© Copyright CNA All Rights Reserved.



   a.  **bodily injury** or **personal and advertising injury:**

     i.  to the **Insured Entity**, to an **Insured Entity's executive officers**, or to a **co-employee** while such injured person is either in the course of his or her employment or performing duties related to the conduct of the **Insured Entity's** business;

     ii.  to the spouse, **domestic partner**, child, parent, brother or sister of such injured person as a consequence of paragraph **i.** above; or

     iii.  for which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **i.** or **ii.** above.

   b.  **property damage** to property:

     i.  owned, occupied or used by;

     ii.  rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

     the **Insured Entity**, any of its **employees** or **executive officers**.

4.  any person (other than the **Insured Entity's employee**), or any organization while acting as the **Insured Entity's** real estate manager;

5.  any person or organization having proper temporary custody of a natural person **Named Insured's** property if he or she dies, but only:

   a.  with respect to liability arising out of the maintenance or use of that property; and

   b.  until such **Named Insured's** legal representative has been appointed.

6.  any person or organization to whom or to which the **Insured Entity** is obligated by virtue of a written contract, agreement or permit:

   a.  to add to this policy as an additional Insured for its liability; or

   b.  to hold harmless or indemnify such person or organization;

   but such person or organization is an Insured exclusively for **bodily injury** or **property damage** arising out of an **occurrence**, or **personal and advertising injury** arising out of an offense, for which such person or organization is vicariously liable because of acts or omissions committed by the **Insured Entity**. However, this provision does not apply:

     i.  unless the written contract or agreement has been executed, or the permit has been issued, prior to the **bodily injury**, **property damage** or offense. The contract or agreement will be considered executed when the **Insured's** performance begins, or when it is signed, whichever happens first; or

     ii.  to any person or organization:

       (a)  for **bodily injury**, **property damage**, or **personal and advertising injury** arising out of its own acts or omissions; or

       (b)  included as an Insured by an endorsement issued by the Insurer and made a part of this policy.

   Further, where required by such written contract or agreement, coverage for such person or organization shall be primary and non-contributory as respects any other insurance policy issued to such additional insured. Otherwise the section entitled **OTHER INSURANCE OR RISK TRANSFER ARRANGEMENTS** in the **COMMON TERMS AND CONDITIONS** applies.

C.  with respect to coverage under the **Employee Benefits Liability Coverage Part**, any individual who is, was or becomes:

   1.  the **Insured Entity's executive officer**, but only for the **administration** of the **Insured Entity's employee**

---

Form No: CNA71818XX (03-2013)
Glossary Page: 8 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 19 of 42

© Copyright CNA All Rights Reserved.



benefit program; or

2.  the **Insured Entity's** employee authorized to administer its **employee benefit program**; or

3.  any person, organization or **employee** having proper temporary authorization to administer the **Insured Entity's employee benefit program**, but only until an authorized legal representative is appointed on behalf of the **Insured Entity**.

## INSURED CONTRACT

**Insured contract** means:

A.  a contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to the **Insured Entity** or temporarily occupied by the **Insured Entity** with permission of the owner is not an **insured contract;**

B.  a sidetrack agreement;

C.  any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

D.  an obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

E.  an elevator maintenance agreement;

F.  that part of any other contract or agreement pertaining to the **Insured Entity's** business (including an indemnification of a municipality in connection with work performed for a municipality) under which the **Insured Entity** assumes the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

However, **insured contract** does not include that part of any contract or agreement:

1.  that indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

2.  that indemnifies an architect, engineer or surveyor for **bodily injury** or **property damage** arising out of:

    a.  preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    b.  giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.

3.  under which the **Insured**, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the **Insured's** rendering or failure to render professional services, including those listed in paragraph 2. above and supervisory, inspection, architectural or engineering activities.

## INSURED ENTITY

**Insured Entity** means the natural person or entity **Named Insured** and any **subsidiary**.

## INSURED PRODUCT

**Insured product** means:

A.  any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    1.  the **Insured Entity;**

    2.  others trading under the **Insured Entity's** name; or

---

Form No: CNA71818XX (03-2013)
Glossary Page: 9 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 20 of 42

© Copyright CNA All Rights Reserved.



3. a person or organization whose business or assets the **Insured Entity** has acquired; and

B. containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products;

C. warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **insured product**, and the providing of or failure to provide warnings or instructions.

**Insured product** does not include vending machines or other property rented to or located for the use of others but not sold.

## INSURED WORK

**Insured work** means:

A. work or operations performed by the **Insured Entity** or on the **Insured Entity's** behalf; and

B. materials, parts or equipment furnished in connection with such work or operations;

**Insured Work** includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of insured work and the providing of or failure to provide warnings or instructions.

## LEASED WORKER

**Leased worker** means a person leased to the **Insured Entity** by a labor leasing firm under an agreement between **Insured Entity** and the labor leasing firm, to perform duties related to the conduct of the **Insured Entity's** business. **Leased worker** does not include a **temporary worker**.

## LOADING OR UNLOADING

**Loading or unloading** means the handling of property:

A. after it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or **auto**;

B. while it is in or on an aircraft, watercraft or **auto**; or

C. while it is being moved from an aircraft, watercraft or **auto** to the place where it is finally delivered.

However, **loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or **auto**.

## MANAGEMENT CONTROL

**Management control** means:

A. owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or

B. having the right, pursuant to the **Named Insured's** written contract or the by-laws, charter, operating agreement or similar documents, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

## MEDICARE/MEDICAID CLAIM

**Medicare/Medicaid Claim** means a **claim** based on or arising out of any actual or alleged violation of law with respect to Medicare, Medicaid, Tricare or any similar federal, state or local governmental program.

## MICROBE

**Microbe** means any non-fungal microorganism or non-fungal, colony-form organism that causes infection or disease. **Microbe** includes any spores, mycotoxins, odors, or any other substances, products, or byproducts

Form No: CNA71818XX (03-2013)
Glossary Page: 10 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 21 of 42

© Copyright CNA All Rights Reserved.



produced by, released by, or arising out of the current or past presence of microbes. However **microbe** does not mean microbes that were transmitted directly from person to person.

## MOBILE EQUIPMENT

**Mobile equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

A.  bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

B.  vehicles maintained for use solely on or next to premises the **Insured Entity** owns or rents;

C.  vehicles that travel on crawler treads;

D.  vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    1.  power cranes, shovels, loaders, diggers or drills; or

    2.  road construction or resurfacing equipment such as graders, scrapers or rollers;

E.  vehicles not described in **A.**, **B.**, **C.** or **D.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    1.  air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration lighting and well servicing equipment; or

    2.  cherry pickers and similar devices used to raise or lower workers;

F.  vehicles not described in **A.**, **B.**, **C.** or **D.** above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not mobile equipment but will be considered **autos**:

    1.  equipment designed primarily for:

        a.  snow removal;

        b.  road maintenance, but not construction or resurfacing; or

        c.  street cleaning;

    2.  cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    3.  air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, **mobile equipment** does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered **autos**.

## NAMED INSURED

**Named Insured** means the entity listed as such in the Declarations.

## NUCLEAR FACILITY

**Nuclear facility** means:

A.  any **nuclear reactor**;

B.  any equipment or device designed or used for:

    1.  separating the isotopes of uranium or plutonium;

    2.  processing or utilizing **spent fuel**; or

Form No: CNA71818XX (03-2013)
Glossary Page: 11 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 22 of 42

© Copyright CNA All Rights Reserved.



   3.  handling, processing or packaging **nuclear waste;**

C.  any equipment or device used for the processing, fabricating or alloying of special **nuclear material** if at any time the total amount of such material in the custody of any **Insured** at the premises where such equipment is located consists of or contains more than:

   1.  25 grams of plutonium or uranium 233 or any combination thereof; or

   2.  250 grams of uranium 235;

D.  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of **nuclear waste;**

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

## NUCLEAR MATERIAL

**Nuclear material** means source material, special nuclear material, or by-product material as these terms are defined in the Atomic Energy Act of 1954 or in any law amendatory thereof.

## NUCLEAR REACTOR

**Nuclear reactor** means an apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

## NUCLEAR WASTE

**Nuclear Waste** means waste material:

A.  containing **by-product material** other than the tailings or waste produced by the extraction or concentration of uranium or thorium from ore processed primarily for its source material (as defined in the Atomic Energy Act of 1954 or in any law amendatory thereof) content; and

B.  resulting from the operation by any person or organization, of a **nuclear facility** included within paragraphs A. and B. of the definition of **nuclear facility.**

## OCCURRENCE

**Occurrence** means an accident, including continuous or repeated exposure to the same general harmful conditions.

## PERSONAL AND ADVERTISING INJURY

**Personal and advertising injury** means injury, including consequential **bodily injury,** arising out of one or more of the following offenses:

A.  false arrest, detention or imprisonment;

B.  malicious prosecution or abuse of process;

C.  wrongful eviction from, wrongful entry into, or the invasion of the right of private occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

D.  oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

E.  oral or written publication, in any manner, of material that violates a person's right of privacy;

F.  the use of another's advertising idea in the **Insured Entity's advertisement;** or

G.  infringing upon another's copyright, trade dress or slogan in the **Insured Entity's advertisement.**

## POLICY PERIOD

Form No: CNA71818XX (03-2013)
Glossary Page: 12 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 23 of 42

© Copyright CNA All Rights Reserved.

**CNA**

**Policy period** means the time from 12:01 A.M. on the effective date of this policy as set forth in the Declarations to the earlier of 12:01 A.M. of the expiration, termination or cancellation date of this policy.

## POLLUTANTS

**Pollutants** mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes medical waste and materials to be recycled, reconditioned or reclaimed.

## POTENTIAL CLAIM

Potential claim means:

A.  with respect to the **Professional Liability Coverage Part**, an act, error or omission in the rendering of **professional services** that any **authorized insured** has reason to believe would give rise to a **claim**; or

B.  with respect to the **General Liability Coverage Part, bodily injury** or **property damage** arising out of an **occurrence** or an  offense causing **personal and advertising injury** that any **Authorized Insured** has reason to believe would give rise to a **claim**;

C.  with respect to the **Employee Benefits Liability Coverage Part**, an act, error or omission committed in the **administration** of  the **Insured Entity's employee benefit program** that any has reason to believe would give rise to a **claim**.

## PROCTORING SERVICES

**Proctoring services** means supervision, training, assistance, coaching or guidance provided by or on the **Insured Entity's** behalf by:

A.  a physician or any other health care professional licensed, trained and qualified to provide such supervision, training, assistance, coaching or guidance; or

B.  any other person under the supervision, training, or direction and control of such physician or health care professional.

## PROFESSIONAL SERVICES

**Professional services** means the rendering to others of **healthcare services, Good Samaritan services, proctoring services** or **administrative services**.

## PRODUCTS-COMPLETED OPERATIONS HAZARD

**Products-completed operations hazard** means **bodily injury** and **property damage** occurring away from premises the **Insured Entity** owns or rents and arising out of an **insured product** or **insured work** except:

A.  products that are still in the **Insured Entity's** physical possession; or

B.  work that has not yet been completed or abandoned. However, **insured work** will be deemed completed at the earliest of the following times:

1.  when all of the work called for in the **Insured Entity's** contract has been completed;

2.  when all of the work to be done at the job site has been completed if the **Insured Entity's** contract calls for work at more than one job site; or

3.  when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

However, **products-completed operations hazard** does not include **bodily injury** or **property damage** arising out of:

---

Form No: CNA71818XX (03-2013)
Glossary Page: 13 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 24 of 42

© Copyright CNA All Rights Reserved.



1. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by the **Insured Entity**, and that condition was created by the **loading or unloading** of that vehicle by any **Insured**; or

2. the existence of tools, uninstalled equipment or abandoned or unused materials.

## PROPERTY DAMAGE

**Property damage** means physical injury to:

A. tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

B. loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it.

However, **electronic data** is not tangible property.

## RELATED ACTS, ERRORS OR OMISSIONS

**Related acts, errors or omissions** means

A. with respect to the **Professional Liability Coverage Part**, all acts, errors or omissions in the rendering of **professional services** that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision; or

B. with respect to the **Employee Benefits Liability Coverage Part**, all acts, errors or omissions negligently committed in the **administration** of the **Insured Entity's employee benefits program** that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.

## RELATED CLAIM

**Related claim** means:

A. with respect to the **Professional Liability Coverage Part**, all **claims** arising out of a single act, error or omission or arising out of **related acts, errors or omissions** in the rendering of **professional services**;

B. with respect to the General Liability Coverage Part,

   1. **Bodily Injury and Property Damage Liability Coverage**, all **claims** arising out of the same **occurrence** or arising out of **related occurrences**;

   2. **Personal and Advertising Injury Liability Coverage**, all **claims** arising out of the same offense or arising out of **related offenses**;

C. with respect to the **Employee Benefits Liability Coverage Part**, all **claims** arising out of a single act, error or omission or arising out of **related acts, errors or omissions** negligently committed in the **administration** of the **Insured Entity's employee benefits program**.

## RELATED OCCURRENCES

**Related occurrences** means all **occurrences** giving rise to **bodily injury** or **property damage** that are logically causally connected by any common fact, circumstance, situation, transaction or event.

## RELATED OFFENSES

**Related offenses** means all offenses giving rise to **personal and advertising injury** that are logically or causally connected by any common fact, circumstance, situation, transaction or event.

## SPENT FUEL

**Spent fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor**.

Form No: CNA71818XX (03-2013)
Glossary Page: 14 of 15
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 25 of 42

© Copyright CNA All Rights Reserved.

**CNA**

Healthcare Facilities Primary
Glossary

## SUBSIDIARY

Subsidiary means any entity in which the **Named Insured** has management control:

A. on the effective date of this policy; or

B. after the effective date of this policy by reason of being created or acquired by an **Insured Entity** after such date, if and to the extent coverage with respect to the entity is afforded pursuant to the section entitled **NEW AND EXISTING SUBSIDIARIES/CESSATION OF SUBSIDIARY STATUS** of the **COMMON TERMS AND CONDITIONS.**

## TEMPORARY WORKER

Temporary worker means a worker who is furnished to the **Insured Entity** to substitute for a permanent employee on leave or to meet seasonal or short-term workload conditions.

Form No: CNA71818XX (03-2013)
Glossary Page: 15 of 15
Underwriting Company:  Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 26 of 42

© Copyright CNA All Rights Reserved.

 **CNA**

**Healthcare Facilities Primary**
Coverage Part Declarations

## PROFESSIONAL LIABILITY COVERAGE PART DECLARATIONS

### Named Insured and Mailing Address

**Named Insured**
Elite Imaging, LLC

**Mailing Address**
101 Greenwood Ave
Jenkintown, PA 19046

### Policy Period

Effective date from 12/31/2013 to 12/31/2014 at 12:01 A.M. Standard Time at the **First Named Insured's** mailing address shown above.

### Limits of Insurance

**Professional Liability**

| | |
|---|---|
| Each Claim | $1,000,000 |
| Aggregate Limit | $3,000,000 |

### Premium, Surcharges, Taxes and Fees

| | |
|---|---|
| Professional Liability Premium | **Refer to Policy Declarations** |

### Retroactive Date

Professional Liability: 04/29/2002

---

Form No: CNA71871XX (03-2013)
Coverage Part Declarations Page: 1 of 1
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 27 of 42

© Copyright CNA All Rights Reserved.





**Healthcare Facilities Primary**
Coverage Part

## PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE

THIS POLICY PROVIDES COVERAGE FOR THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER DURING THE COVERAGE RELATIONSHIP OR ANY APPLICABLE EXTENDED REPORTING PERIOD AND IN ACCORDANCE WITH THE SECTION ENTITLED NOTICE OF CLAIMS AND POTENTIAL CLAIMS OF THE COMMON CONDITIONS.

### COVERAGE

The Insurer will pay all amounts up to the Insurer's Limit of Insurance which the **Insured** becomes legally obligated to pay as **damages** as a result of a **claim** arising out of an act, error or omission in the rendering of **professional services** provided that:

A.  such **claim** is first made against the **Insured** during the **policy period**, or during the **extended reporting period**, if applicable, and is reported to the Insurer in accordance with the section entitled NOTICE OF CLAIMS AND POTENTIAL CLAIMS of the COMMON TERMS AND CONDITIONS;

B.  such act, error or omission happened on or after the Retroactive Date shown in the Declarations; and

C.  prior to the effective date of the **coverage relationship**:

  1.  no **authorized insured** knew or should have known of a **claim** or a **potential claim**; or

  2.  no **Insured** had given notice to a prior Insurer of any **related claim**.

The Insurer will pay all **defense costs** in connection with a covered **claim**. Such **defense costs** are in addition to the limits of insurance.

### DEFENSE

A.  Duty to Defend

  The Insurer has the right and duty to defend in the **Insured's** name and on the **Insured's** behalf any covered **claim** even if any of the allegations of such **claim** are groundless, false or fraudulent. The Insurer shall have the right to appoint counsel and to make such investigation, defense and settlement of a **claim** as is deemed necessary by the Insurer. If a **claim** is subject to an **arbitration proceeding** or mediation, the Insurer shall be entitled to exercise all of the **Insured's** rights in the choice of arbitrators or mediators and in the conduct of an **arbitration proceeding** or mediation proceeding involving such **claim**.

B.  Exhaustion of Limits

  The Insurer is not obligated to investigate, defend, pay or settle, or continue to investigate, defend, pay or settle a **claim** after the applicable limit of the Insurer's liability has been exhausted by payment of **damages**. In such case, the Insurer shall have the right to withdraw from the further investigation, defense, payment or settlement of such **claim** by tendering control of said investigation, defense or settlement of the **claim** to the **Insured**.

### EXCLUSIONS

The **coverage part** does not apply to:

A.  Contractual Liability

  any **claim** based on or arising out of:

---

Form No: CNA71820XX (03-2013)
Coverage Part Page: 1 of 4
Underwriting Company:  Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 28 of 42

© Copyright CNA All Rights Reserved.

**CNA**

1. the **Insured's** actual or alleged liability under any oral or written contract or agreement, including but not limited to express warranties or guarantees; or

2. the liability of others assumed by an **Insured** under any oral or written contract or agreement;

except that coverage otherwise available to an **Insured** shall apply to such **Insured's** liability that exists in the absence of such contract or agreement.

B. **Criminal Acts or Conduct**

any **claim** based on or arising out of any actual or alleged criminal act or omission committed by or at the direction of any **Insured** except that this exclusion does not apply to the extent liability is imposed upon the **Insured** for acts or omissions of another committed without the knowledge or consent of the **Insured**. The Insurer shall provide the **Insured** with a defense of such **claim** unless or until the criminal act or omission upon which the **claim** is based has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive the Insurer's rights under this policy. In addition, any agreement of the Insurer to provide such defense does not apply to a **Medicare/Medicaid Claim** or to any **claim** under workers compensation or other similar law, whether or not any such **claim** is premised on allegations of criminal acts or conduct.

There is no coverage under this policy for, and the Insurer will not defend any criminal complaint or proceeding regardless of the allegations made against any **Insured**.

C. **Discrimination**

any **claim** based on or arising out of any actual or alleged discrimination, humiliation or harassment, that includes but shall not be limited to **claims** based on an individual's race, creed, color, age, gender, national origin, religion, disability, marital status or sexual orientation. The Insurer shall provide the **Insured** with a defense of such **claim** unless or until such act or omission has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive the Insurer's rights under this policy.

D. **Dishonest Acts/Capacity Claims/Wrongful Employment Practices and Pollution**

Solely with respect to **administrative services**, any **claim** based upon or arising out of:

1. any actual or alleged dishonest, fraudulent, or malicious act or omission, commingling, misappropriation or misuse of funds, or intentional wrongdoing, including the intentional misappropriation of intellectual property, by an **Insured** if a final judgment, ruling or other finding of fact in any proceeding establishes that such act, omission, commingling, misappropriation, misuse or intentional wrongdoing was committed;

2. its capacity as, or solely by reason of its status as, an **executive officer** of an **Insured Entity**; or

3. any wrongful employment practice other than any **claim** based upon or arising out of services as a member of a **formal review board**;

4. **pollutants**.

E. **Employee Claims**

any **claim** based on or arising out of:

1. any actual or alleged **bodily injury to the Insured Entity's employees** during the course of their employment by the **Insured Entity**; or

Form No: CNA71820XX (03-2013)
Coverage Part Page: 2 of 4
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 29 of 42

© Copyright CNA All Rights Reserved.



2. any actual or alleged injury to the spouse, **domestic partner**, child, parent, brother or sister of that **employee** as a consequence of paragraph **1.** above.

This exclusion applies:

a. whether the **Insured Entity** may be liable as an employer or in any other capacity; and

b. to any obligation to share **damages** with or repay someone else who must pay **damages** because of the injury.

F. **Medicare or Medicaid**

any Medicare/Medicaid **Claim**.

G. **Property Damage**

any **claim** based on or arising out of actual or alleged **property damage**.

H. **Workers Compensation and Similar Laws**

any **claim** based on or arising out of any actual or alleged obligation of any **Insured** under workers' compensation, disability benefits or unemployment compensation law or any similar law.

## LIMITS OF INSURANCE

A. Limit of Insurance – Each **Claim**

Subject to paragraph B. below, the Insurer's limit of insurance for **damages** for each covered **claim** shall not exceed the amount stated in the Declarations as "Professional Liability - Each **Claim**".

B. Limit of Insurance - all **claims** in the Aggregate

The Insurer's Limit of Insurance for **damages** for all covered **claims** shall not exceed the amount stated in the Declarations as "Professional Liability – all **claims** in the Aggregate".

C. Related Claims

All **related claims**, whenever made, shall be considered a single **claim** first made during the **policy period** in which the earliest **claim** was first made.

D. Multiple **Insureds**, **claims**, and claimants

The Limits of Insurance shown in the Declarations and subject to the provisions of this policy, is the most the Insurer will pay as **damages** regardless of the number of **Insureds**, **claims** made and reported or persons or entities making **claims**.

The Limits of Insurance of this **coverage part** apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the **policy period** shown in the Declarations, unless the **policy period** is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the limits of insurance.

## SUBPOENA ASSISTANCE

If during the **policy period**, an **Insured** receives a subpoena for documents or testimony arising out of **professional services** (which services were rendered by an **Insured** on or after the Retroactive Date), and the **Insured** would like the Insurer's assistance in responding to the subpoena, the **Insured** may provide the Insurer

Form No: CNA71820XX (03-2013)
Coverage Part Page: 3 of 4
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 30 of 42

© Copyright CNA All Rights Reserved.

**CNA**

Healthcare Facilities Primary
Coverage Part

with a copy of the subpoena. In such case, the Insurer will retain an attorney to provide advice regarding the production of documents, prepare the **Insured** for sworn testimony, and represent the **Insured** at deposition, court hearing or proceeding provided that:

A. the subpoena arises out of a lawsuit to which the **Insured** is not a party; and

B. the **Insured** has not been engaged for compensation to provide advice or testimony in connection with the subject proceeding, nor has the **Insured** provided such advice or testimony in the past.

Any notice the **Insured** gives the Insurer of such subpoena shall be deemed notification of a **potential claim** under the section entitled **NOTICE OF CLAIMS AND POTENTIAL CLAIMS** of the **COMMON TERMS AND CONDITIONS**. Any costs incurred by the Insurer pursuant to the terms of this paragraph shall be in addition to the Limits of Insurance.

Form No: CNA71820XX (03-2013)
Coverage Part Page: 4 of 4
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 31 of 42

© Copyright CNA All Rights Reserved.



**Healthcare Facilities Primary**
Coverage Part Endorsement

## HIPAA PROCEEDINGS SUPPLEMENTARY PAYMENTS ENDORSEMENT

It is understood and agreed as follows:

I.   The Declarations is amended to add the following:

**HIPAA Proceedings** Aggregate Limit of Insurance: $10,000

**HIPAA Proceedings** Deductible per **HIPAA Proceeding:** $0

II.   The **Professional Liability Coverage Part** is amended to add the following:

A.   **HIPAA Proceedings Supplementary Payment**

Subject to the **HIPAA Proceedings** Deductible in the amount set forth in paragraph 1. above, if any scheduled, the Insurer will pay all amounts up to the **HIPAA Proceeding** Aggregate Limit of Insurance set forth in paragraph 1. above for each **HIPAA Proceeding** and for all **HIPAA Proceedings** in the Aggregate regardless of the number of **Insureds** or the number of such **HIPAA Proceedings** for the following:

1.   attorney's fees and other reasonable costs, expenses or fees resulting from the investigation or defense of a **HIPAA Proceeding** ; and

2.   any amounts which the **Insured** becomes legally obligated to pay as a civil penalty or violation for its failure to comply with HIPAA, or any rules or regulations thereunder, but solely to the extent that such civil violation or penalty is related to a **HIPAA Proceeding**. As used herein HIPAA means the Health Insurance Portability and Accountability Act, any rules or regulations promulgated thereunder, or any amendment thereto.

Any payments made by the Insurer pursuant to this endorsement shall be in addition to the limits of insurance.

III.   The **COMMON TERMS AND CONDITIONS** is amended to add the following:

·   A HIPAA Proceeding will be deemed first commenced when any **authorized insured** first receives notice of the **HIPAA Proceeding** whether an investigation, complaint, proceeding, hearing or other, made or brought against an **Insured.**

·   The coverage provided by this endorsement shall be specifically excess of any other insurance policy, available to the **Insured Entity** with respect to a **HIPAA Proceeding.**

IV.   The **GLOSSARY OF DEFINED TERMS** is amended to add the following terms:

**HIPAA Proceeding** means an administrative proceeding, including a complaint, investigation, or hearing instituted against the **Insured** by the Department of Health and Human Services or its designee alleging a violation of responsibilities or duties imposed upon the **Insured** under HIPAA with respect to the management and disclosure of confidential and private health information, but solely to the extent that such proceeding:

A.   is first commenced during the **policy period** and is reported to the Insurer within 30 days of the **Insured's** receipt of such notice, and

B.   is based upon or arises out of **professional services** rendered by or on behalf of the **Insured Entity** on or after the Retroactive Date;

and provided that:

Form No: CNA71884XX (03-2013)
Endorsement Effective Date:
Endorsement No: 1; Page: 1 of 2
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 32 of 42

© Copyright CNA All Rights Reserved.

**CNA**

Healthcare Facilities Primary
Coverage Part Endorsement

C. prior to the effective date of the **coverage relationship**:

1. no **authorized insured** knew or should have known of such **HIPAA Proceeding** or a **potential HIPAA Proceeding**;

2. no **Insured** had given notice to a prior Insurer of any **related HIPAA Proceeding**.

**Potential HIPAA Proceeding** means an act, error or omission in the rendering of **professional services** with respect to the **Insured's** obligations under **HIPAA** that any **authorized insured** has reason to believe would give rise to a **HIPAA Proceeding**.

**Related HIPAA Proceedings** means **HIPAA Proceedings** arising out of a single act, error or omission or arising out of **related acts, errors or omissions** in the rendering of **professional services** with respect to the **Insured's** obligations under **HIPAA**.

All other terms and conditions of the policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the policy issued by the designated Insurers, takes effect on the Policy Effective date of said policy at the hour stated in said policy, unless another effective date (the Endorsement Effective Date) is shown below, and expires concurrently with said policy.

---

Form No: CNA71884XX (03-2013)
Endorsement Effective Date:
Endorsement No: 1; Page: 2 of 2
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 33 of 42

© Copyright CNA All Rights Reserved.



**CNA**

Healthcare Facilities Primary
Coverage Part Endorsement

## MEDIA EXPENSES SUPPLEMENTARY PAYMENTS ENDORSEMENT

It is understood and agreed that:

I. The following Limit of Insurance and deductible are added:

Media Expense Aggregate Limit of Insurance: $25,000

Media Expense deductible per adverse event: $0

II. The **Professional Liability Claims Made Coverage Part**, is amended to add the following:

Media Expenses Supplementary Payment

A. **Media Expenses Supplementary Payment**

Subject to the Media Expense deductible in the amount set forth in paragraph I. above, if any scheduled, the Insurer will pay **media expenses** incurred as a result of an **adverse event**, up to the **Media Expense Aggregate Limit of Insurance** set forth in paragraph I. above for all **Media Expenses** in the Aggregate, regardless of the number of **Insureds** or the number of **adverse events** provided that:

1. such **adverse event** first occurs during the **policy period** and is reported to the Insurer within 30 days of the **Insured's** receipt of notice of such **adverse event**;

2. such act, error or omission that is the subject of the **adverse event** happened on or after the Retroactive Date shown in the Declarations; and

3. prior to the effective date of the **coverage relationship**:

   a. no **authorized insured** knew or should have known of such **adverse event** or a  potential **adverse event**;

   b. no **Insured** had given notice to a prior insurer of any **related adverse events**;

4. all **media expenses** are incurred within six (6) months following the **authorized insured's** discovery of such **adverse event**.

Any **media expenses** incurred by the Insurer pursuant to this endorsement shall be in addition to the Limits of Insurance.

III. The **COMMON TERMS AND CONDITIONS** is amended to add the following:

- An **adverse event** will be deemed to have first occurred at the earliest of the following times when any **authorized insured** first receives notice of negative media attention arising out of a **claim**, criminal investigation, complaint, indictment, administrative proceeding or investigation made or brought against an **Insured**.

- The coverage provided by this endorsement shall be specifically excess of any other insurance policy available to the **Insured Entity** with respect to an **adverse event**.

IV. The **GLOSSARY OF DEFINED TERMS** is amended to add the following terms:

Adverse event means negative media attention arising out of a **claim**, criminal investigation, complaint, indictment, administrative proceeding or investigation made or brought against an **Insured** related to or arising out of the rendering of **professional services**.

---

Form No: CNA71887XX (03-2013)
Endorsement Effective Date:
Endorsement No: 2; Page: 1 of 2
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 34 of 42

© Copyright CNA All Rights Reserved.



<div align="right">

**Healthcare Facilities Primary**
Coverage Part Endorsement

</div>

**Media expenses** means the reasonable and necessary charges and fees incurred by the **Insured Entity** and consented to by the Insurer to address or manage an **adverse event** including fees of third party legal or public relations consultants with regard to addressing adverse publicity or media attention, including preparation of statements, press releases, and interviews but solely to the extent that such consultants are specifically retained or hired by the **Insured Entity** to manage or address the **adverse event**. **Media expenses** shall not include:

A.  any amounts incurred with respect to an **Insured's** defense against a criminal investigation, complaint or indictment, or with respect to your defense of any civil complaint or **claim** or administrative proceeding, investigation or complaint, including any alleged violation of the Health Insurance Portability and Accountability Act, HIPAA, or other patient privacy laws, statutes, or regulations;

B.  any **damages**, fines, violations or penalties an **Insured** is legally obligated to pay as a result of an **adverse event**;

C.  compensation, fees, benefits, overhead, charges or expenses of any **Insured**;

D.  any defense costs, expense or supplementary payments, including attorney's fees which are covered pursuant to any other provision of this policy, including attorney's fees of defense counsel retained to defend you in any **claim**.

**Potential adverse event** means an act, error or omission in the rendering of **professional services** that any authorized insured has reason to believe would give rise to an **adverse event**.

**Related adverse events** means **adverse events** arising out of a single act, error or omission or arising out of **related acts, errors or omissions** in the rendering of **professional services**.

All other terms and conditions of the policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the policy issued by the designated Insurers, takes effect on the Policy Effective date of said policy at the hour stated in said policy, unless another effective date (the Endorsement Effective Date) is shown below, and expires concurrently with said policy.

---

Form No: CNA71887XX (03-2013)
Endorsement Effective Date:
Endorsement No: 2; Page: 2 of 2
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 35 of 42

© Copyright CNA All Rights Reserved.





Healthcare Facilities Primary
Coverage Part Endorsement

## DISCIPLINARY PROCEEDINGS SUPPLEMENTARY PAYMENTS ENDORSEMENT

It is understood and agreed as follows:

I.  The following Limit of Insurance is added:

Disciplinary Proceedings Costs Aggregate Limit of Insurance: $10,000

Disciplinary proceedings costs deductible per disciplinary proceeding: $0

II. The **Professional Liability Claims Made Coverage Part**, the section entitled **COVERAGES** is amended to add the following coverage:

*   Disciplinary Proceedings

Subject to the **Disciplinary proceedings costs** deductible in the amount set forth in paragraph I. above, if any scheduled, the Insurer will pay **disciplinary proceeding costs** incurred as a result of a **disciplinary proceeding** up to the **Disciplinary Proceedings Costs** Aggregate Limit of Insurance set forth in paragraph I. above for all **Disciplinary Proceeding Costs** in the Aggregate, regardless of the number of **Insureds** or the number of such **disciplinary proceedings**, provided that:

1.  such **disciplinary proceeding** is first commenced against the **Insured** during the **policy period** and is reported to the Insurer within 30 days of the **Insured's** receipt of notice of such **disciplinary proceeding**;

2.  any act, error or omission that is the subject of the **disciplinary proceeding** happened on or after the Retroactive Date shown in the **DECLARATIONS**; and

3.  prior to the Effective Date of the **coverage relationship**:

    a.  no **authorized insured** knew or should have known of a **disciplinary proceeding** or a potential **disciplinary proceedings**;

    b.  no **Insured** had given notice to a prior Insurer of any **related disciplinary proceeding**;

4.  the **Named Insured** consents to the coverage provided by this endorsement for the **Insured** who is the subject of such **disciplinary proceeding**.

Any **disciplinary proceedings costs** incurred by the Insurer pursuant to this endorsement shall be in addition to the Limits of Insurance.

III. The **COMMON TERMS AND CONDITIONS** is amended to add the following:

A **disciplinary proceeding** will be deemed first commenced at the earliest of the following times when any **authorized insured** first receives notice of the **disciplinary proceeding**.

IV. The **GLOSSARY OF DEFINED TERMS** is amended to add the following terms:

**Disciplinary proceedings costs** means attorney fees charged by an attorney selected by the Insurer and for other reasonable costs, expenses or fees paid to third parties incurred as a result of **disciplinary proceeding**.

---

Form No: CNA71890XX (03-2013)
Endorsement Effective Date:
Endorsement No: 3; Page: 1 of 2
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 36 of 42

© Copyright CNA All Rights Reserved.

**CNA**

<div align="right">

**Healthcare Facilities Primary**
Coverage Part Endorsement

</div>

**Disciplinary proceeding** means any pending matter, including an initial inquiry, before a state or federal licensing board to investigate charges alleging a violation of any rule of professional conduct in the performance of **professional services. Disciplinary proceeding** does not include any complaint or proceeding instituted against an **Insured** by the Department of Health and Human Services or its designee relative to a failure to comply with the Health Insurance Portability and Accountability Act, **HIPAA**.

**Potential disciplinary proceeding** means an act, error or omission in the rendering of **professional services** that any **authorized insured** has reason to believe would give rise to a **disciplinary proceeding.**

**Related disciplinary proceedings** means disciplinary **proceedings** arising out of a single act, error or omission or arising out of **related acts, errors or omissions** in the rendering of **professional services.**

All other terms and conditions of the policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the policy issued by the designated Insurers, takes effect on the Policy Effective date of said policy at the hour stated in said policy, unless another effective date (the Endorsement Effective Date) is shown below, and expires concurrently with said policy.

---

Form No: CNA71890XX (03-2013)
Endorsement Effective Date:
Endorsement No: 3; Page: 2 of 2
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 37 of 42

© Copyright CNA All Rights Reserved.




Healthcare Facilities Primary
Policy Endorsement

**CANCELLATION AND NONRENEWAL AMENDATORY ENDORSEMENT WITH MINIMUM EARNED PREMIUM PROVISIONS**

It is understood and agreed that the following provisions are added to the **COMMON TERMS AND CONDITIONS:**

**Cancellation**

1. This policy can be canceled by either the **First Named Insured** or the Insurer.

2. Only the **First Named Insured** may cancel this policy at any time. To do so, the **First Named Insured** must:

    a. return the policy to the Insurer or any of its authorized representatives, indicating the effective date of cancellation; or

    b. provide a written notice to the Insurer, stating when the cancellation is to be effective.

    The Insurer must receive the policy or written notice before the cancellation date.

3. The Insurer can cancel this policy by giving written notice to the **First Named Insured**, at its last known address at least:

    a. the indicated number of days for Cancellation for Nonpayment as indicated on the Declarations, if the Insurer cancels for non-payment of premium; or

    b. the indicated number of days for Cancellation for any Other Reason as indicated on the Declarations, if the Insurer cancels for any other reason;

    before the effective date of cancellation.

4. Notice of cancellation will state the effective date of cancellation. The policy will end on that date.

5. If the Insurer cancels, the refund will be pro rata. If the **First Named Insured** cancels, the refund may be less than pro rata. The Insurer shall retain a minimum percentage of earned premium in the percentage set forth in the declarations. The cancellation will be effective even if the Insurer has not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**Non-renewal**

The Insurer can non-renew this policy by giving written notice to the **First Named Insured**, at its last known address, at least the number of days for Nonrenewal as indicated on the Declarations before the expiration date. If notice of nonrenewal is mailed, proof of mailing will be sufficient proof of notice.

All other terms and conditions of the policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the policy issued by the designated Insurers, takes effect on the Policy Effective date of said policy at the hour stated in said policy, unless another effective date (the Endorsement Effective Date) is shown below, and expires concurrently with said policy.

Form No: CNA71876XX (03-2013)
Endorsement Effective Date:
Endorsement No: 4; Page: 1 of 1
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 38 of 42

© Copyright CNA All Rights Reserved.





Healthcare Facilities Primary
Coverage Part Endorsement

**EMERGENCY EVACUATION EXPENSES ENDORSEMENT**

It is understood and agreed as follows:

I.  The following Limit of Insurance and deductible are added:

Emergency Evacuation Expenses Aggregate Limit of Insurance: $25,000

Emergency Evacuation Expenses deductible per **emergency evacuation**: $0

II.  The **Professional Liability Claims Made Coverage Part** is amended to add the following:

A.  **Emergency Evacuation Expenses**

Subject to the **Emergency Evacuation Expenses** deductible set forth in paragraph **I.** above if any scheduled, the Insurer will pay **emergency evacuation expenses** up to the **Emergency Evacuation Expenses** Aggregate Limit of Insurance set forth in paragraph **I.** above for all **Emergency Evacuation Expenses** in the Aggregate, regardless of the number of **Insureds** or the number of such evacuations provided that such **emergency evacuation** is reported to the Insurer no later than 60 days after the **emergency evacuation** takes place.

Any amounts paid by the Insurer for **emergency evacuation expenses** incurred by the **Insured entity** pursuant to this endorsement shall be in addition to the Limits of Insurance

III.  The **GLOSSARY OF DEFINED TERMS** is amended by the addition of the following new definitions:

**Emergency evacuation** means an evacuation, that begins during the **policy period**, of the **Insured Entity's** premises based upon imminent danger from an external event or a condition which could cause loss of life or harm to the **Insured Entity's** patients. **Emergency evacuation** shall not include an evacuation arising out of:

A.  a strike, bomb threat or false fire alarm, unless vacating is ordered by a civil authority;

B.  a planned vacating drill;

C.  the relocation of one or more patients that is due and confined to their individual medical condition;

D.  nuclear hazard;

E.  war and military action.

**Emergency evacuation expenses** means the reasonable and necessary expenses incurred by an **Insured Entity** in the performance of an **emergency evacuation**, including the costs of transportation and relocation of patients.

All other terms and conditions of the policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the policy issued by the designated Insurers, takes effect on the Policy Effective date of said policy at the hour stated in said policy, unless another effective date (the Endorsement Effective Date) is shown below, and expires concurrently with said policy.

Form No: CNA71880XX (03-2013)
Endorsement Effective Date:
Endorsement No: 5; Page: 1 of 1
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 39 of 42

© Copyright CNA All Rights Reserved.



Healthcare Facilities Primary
Policy Endorsement



## SERVICE OF SUIT ENDORSEMENT

It is understood and agreed as follows:

**SERVICE OF SUIT**

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **First Named Insured** or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or true copy thereof.

Service of process in such suit shall be made upon

General Counsel

Columbia Casualty Company

333 S. Wabash Ave.

Chicago, IL 60604

and in any suit instituted against such person upon this Policy, the Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The General Counsel is authorized and directed to accept service of process on behalf of the Insurer in any such suit and, upon the request of the **First Named Insured**, to give a written undertaking to the **First Named Insured** that he will enter a general appearance upon the Insurer's behalf in the event such suit shall be instituted.

All other terms and conditions of the policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the policy issued by the designated Insurers, takes effect on the Policy Effective date of said policy at the hour stated in said policy, unless another effective date (the Endorsement Effective Date) is shown below, and expires concurrently with said policy.

---

Form No: CNA71921XX (03-2013)
Endorsement Effective Date:
Endorsement No: 6; Page: 1 of 1
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 40 of 42

© Copyright CNA All Rights Reserved.





**Healthcare Facilities Primary**
*Coverage Part Endorsement*

**DEDUCTIBLE ENDORSEMENT (APPLICABLE TO DAMAGES ONLY)**

It is understood and agreed as follows:

I.  The following **Deductible** section is added to the Declarations:

    A.  Subject to paragraph B. below, the deductible applies as follows:

        1.  $N/A each **occurrence** causing **bodily injury** or **property damage** under the **General Liability Coverage Part.**

        2.  $N/A each person or organization sustaining **personal and advertising injury** arising out of an offense under the **General Liability Coverage Part.**

        3.  $10,000 each **claim** under the **Professional Liability Coverage Part.**

    B.  Aggregate:

        1.  Combined Aggregate applicable to all **Coverage Parts:**

            Regardless of the number of applicable **coverage parts**, the aggregate deductible, if any, is $N/A and applies to all **occurrences** causing **bodily injury** or **property damage**, or all persons or organizations sustaining **personal and advertising injury** arising out of an offense under the **General Liability Coverage Part** and all **claims** under the **Professional Liability Coverage Part**; or

        2.  Aggregate applicable to each **Coverage Part:**

            a.  The aggregate deductible, if any, of $N/A applies to all **occurrences** causing **bodily injury** or **property damage** and all persons or organizations sustaining **personal and advertising injury** arising out of an offense under the **General Liability Coverage Part.**

            b.  The aggregate deductible, if any, of $N/A applies to all **claims** under the **Professional Liability Coverage Part.**

    C.  The **Professional Liability Coverage Part** and the **General Liability Coverage Part** are amended to add the following new section entitled **DEDUCTIBLE:**

        The Insurer's obligation to pay **damages** as a result of a **claim, occurrence** or offense is subject to the deductible set forth in paragraph I. of this endorsement. The **Insured** agrees to pay all such **damages** up to the amount of such deductible. The deductible amount erodes the applicable Limits of Insurance. Payment of the deductible or portions thereof shall be made by the **Insured** as such **damages** are paid. If there is a Deductible Security Agreement between the **Insured** and the Insurer, such payments shall be made pursuant to it.

        Notwithstanding the forgoing, at the Insurer's discretion, the Insurer may pay any part or all of the deductible amount to effect settlement of any **claim** or to satisfy a judgment against an **Insured** and, upon notification of the action taken, the **Insured** shall promptly, but in no event later than fourteen days after such notification, reimburse the Insurer for such part of the deductible amount as has been paid by the Insurer.

    D.  The **Professional Liability Coverage Part**, the section entitled **COVERAGE** is amended to delete the introductory sentence and replace it with the following:

        Subject to the deductible, the Insurer will pay all amounts up to the Insurer's Limit of Insurance which the **Insured** becomes legally obligated to pay as **damages** as a result of a **claim** arising from an act, error or omission in the rendering of **professional services** provided that:

Form No: CNA71952XX (03-2013)
Endorsement Effective Date:
Endorsement No: 7; Page: 1 of 2
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 41 of 42

© Copyright CNA All Rights Reserved.

**CNA**

Healthcare Facilities Primary
Coverage Part Endorsement

E.   The **General Liability Coverage Part** and the **Professional Liability Coverage Part**, the section entitled **DEFENSE** is amended to add the following:

- Payment of **defense costs** are not included within the deductible.

All other terms and conditions of the policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the policy issued by the designated Insurers, takes effect on the Policy Effective date of said policy at the hour stated in said policy, unless another effective date (the Endorsement Effective Date) is shown below, and expires concurrently with said policy.

---

Form No: CNA71952XX (03-2013)
Endorsement Effective Date:
Endorsement No: 7; Page: 2 of 2
Underwriting Company: Columbia Casualty Company, 333 S. Wabash Ave., Chicago, IL, 60604

Policy No: HMA 4032149809-0
Policy Effective Date: 12/31/2013
Policy Page: 42 of 42

© Copyright CNA All Rights Reserved.